**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ILLINOIS ASSET MANAGEMENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-1912 |
| | ) | |
| SCOTT J. KRONE, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT SCOTT J. KRONE'S MOTION TO OPEN THE
JUDGMENT BY CONFESSION AND STAY ENFORCEMENT**

Defendant, SCOTT J. KRONE, through his undersigned attorneys, and for his Motion to Open the Judgment by Confession and Stay Enforcement of the Judgment pursuant to Fed.R.Civ.P. 59 and Illinois Supreme Court Rule 276, states the following.

## **INTRODUCTION**

On April 5, 2019, Plaintiff obtained a judgment by confession from this Court on a commercial guarantee signed by Krone. Plaintiff did so without informing the Court that this same commercial guarantee is, in part, the subject of hotly contested litigation in the Circuit Court of Cook County. (*See* Affidavit of Krone and Third Amended Verified Complaint in *Krone v. Freedom Builders, LLC, et al*, Circuit Court of Cook County, Illinois, attached as Exhibit A (the "State Court Lawsuit") and Answer to Plaintiff's Complaint, attached as Exhibit B).[1] That lawsuit stems, in part, from the collective efforts of several individuals, including Plaintiff Illinois Asset Management ("IAM") and its President and purported sole owner, Abdul Arif, to unlawfully force Krone out as a manager and member of two Illinois limited liability companies and disenfranchise him of his property rights in each company. Krone alleges that IAM and Arif obtained the

---

[1] Krone also seeks damages.

1

commercial guarantee as part of an unlawful scheme involving Krone's co-managers to use as leverage against Krone in order to force him out of the companies and his property rights in those companies. Accordingly, Krone respectfully requests that this Court open the judgment and stay its enforcement, because Krone not only has a meritorious defense, but also affirmative counterclaims for declaratory judgment and injunctive relief that seek to invalidate IAM's unlawful and improper use of the commercial guarantee against Krone.

Not surprisingly, Plaintiff failed to alert the Court that, as of the date it obtained the judgment by confession, Krone had already been given leave to file his Third Amended Complaint in the State Court Lawsuit, which names Plaintiff and its sole owner, Abdul Arif, as defendants, and seeks declaratory judgment that the same commercial guarantee at issue in this case is invalid and unenforceable.[2] (*See* Order in *Krone v. Freedom Builders, et al*, dated March 26, 2019, attached as Exhibit C). Instead, Plaintiff arranged for a separate attorney to appear on behalf of Krone, unbeknownst to Krone, and report that Krone "has no objection whatsoever" to the entry of judgment. (*See* Transcript of Proceedings, April 2, 2019, 2:16-17, attached as Exhibit D). That claim is demonstrably false. Plaintiff knew it, and the attorney it recruited to speak for Krone likewise knew it, or should have known it. Though the commercial guarantee ostensibly allows any attorney to confess judgment for Krone once a default has been established under the promissory note, it does not give Plaintiff, or the attorney it recruited to confess judgment for Krone, the right to give this Court the false impression that Krone has no objection to confessing judgment or that this case involves nothing more than a garden-variety attempt to collect a debt.[3]

---

[2] Arif was already a defendant and had been served in the State Court Lawsuit prior to the filing of the Third Amended Complaint.

[3] Despite IAM's knowledge of these objections and the pending State Court Lawsuit, IAM has already issued a third party citation, causing Krone's personal bank accounts to be frozen, and set a citation exam of the bank for April 18, 2019. This obviously has caused severe financial hardship on Krone, a married father of multiple children.

Krone's objections are not limited to the claims in his Third Amended Complaint. He is also entitled to contribution from two other individuals who signed identical guarantees, but which IAM and Arif refuse to enforce. Finally, the guarantee is void as a matter of law because the judgment amount cannot be ascertained from the face of the promissory note or commercial guarantee.[4]

## BACKGROUND FACTS

Krone's Third Amended Complaint alleges a dispute and scheme to defraud him and other investors, the gist of which involved forcing two companies Krone manages to default on their respective mortgages, and then purchasing the debt from the lenders to enforce against the company or, in this case, Krone himself. (Ex. A, ¶¶ 2-6). IAM and Arif participated in this scheme by purchasing the mortgage for Platform Bradley LLC so it could use Krone's commercial guarantee as a sword against him, and force him into resigning as manager and giving up his ownership interest. (*Id*., ¶¶ 77-89 and Counts V, VI, VII, IX, and XII).

### The Events Leading to IAM's Purchase of the Bradley Mortgage

Krone is a member and manager of two limited liability companies, Platform I 600 Waukegan ("Waukegan") and Platform Bradley ("Bradley").[5] (Ex. A, ¶ 8). Krone's co-managers in both companies are Freedom Buildings, LLC ("Freedom") and the Subhash H. Shah Family Partnership ("Shah").[6] Freedom is managed and partially owned by Muthukumar Vellachaimy ("Kumar") and Shah is managed and partially owned by Subhash H. Shah ("Subhash"). (Ex. A, ¶¶ 9-14). In other words, for all practical purposes, the individuals making the decisions for Freedom and Shah were Kumar and Subhash.

---

[4] In all likelihood, Krone will move to remand this case to the State Court Lawsuit.
[5] Both companies are manager-managed, as opposed to member-managed.
[6] The fourth and final manager of Bradley is Noel Cain. There are no other managers of Waukegan.

Beginning in 2016, a number of disputes arose between Krone and Kumar and Subhash over the management of Waukegan and Bradley. Shortly thereafter, Kumar and Subhash began taking actions to undermine Krone and remove him from the companies, starting with the appointment Arif, their personal attorney, as their "proxy" with respect to both companies. Arif went beyond the scope of "proxy" and began dictating terms, making demands of Krone and in effect trying to bully Krone. For example:

- On January 8, 2017, Arif wrote to Krone, "As much as you hate to hear from me, you will need to get used to it. Bottom line is I speak for Drs Kumar and Shah. Galkin speaks for the LLC and none else; you speak for yourself… I would suggest you read the operating agreement as to rights and priviliges [*sic*] of members and managers in these matters… I really dont [*sic*] give a damn about what you do or dont [*sic*] understand about the levels of understanding of how I say it."

- On October 3, 2017, Arif wrote in an email to Krone, "Please DO NOT communicate with Drs Kumar or Shah. Period." (Ex. A, ¶ 36).

- In a second email on October 3, 2017, Arif wrote to Krone and others, "I have [Kumar and Subhash's] authority and trust in my judgment to act on their behalf, to do whatever is necessary to enhance their investment. That authority is broad and limited only by them. And them alone." (*Id*., ¶ 37).

- And in a third email to Krone on October 3, 2017, Arif told Krone that Arif's only purpose is to make money for Kumar and Shah and that Krone should "[f]igure out a way to help me or ***get out of the way***." (emphasis added). (*Id*., ¶ 38).

- Later in October 2017, Arif attended a Board meeting and threatened Krone, exclaiming that if Krone did not give Freedom and Shah complete control of Waukegan and Bradley, he would cause problems. Noel Cain, another Manager of Bradley, said to Arif that Arif's demands seemed like blackmail. Arif replied "Damn straight!" (*Id*., ¶ 39).

- On November 7, 2017, Arif wrote in an email to Kumar and others, cc'ing Krone, "Dont [sic] waste time on [Krone]. He is useless and more important, worse in being complicit in concealment and enabler of Noel in diverting funds directly from source to Noel… Its like a thief or thieves, that steal and put back the money before anyone notices. And not all of it, mind you!!, I am sure there is more thievery to be discovered. Soon.

Consistent with Arif's demand for Krone to "get out of the way," Kumar and Subhash had already been taking steps to defame Krone and freeze him out. For example, on September 23, 2017, Kumar hosted an investor call, without advising or including Krone, in which he falsely told investors in both companies that Krone had been wasting corporate assets and opportunities, and that he was preventing the return of equity to members. (*Id*., ¶ 40).

In addition, Arif, Kumar and Subhash were undermining Krone's attempts to manage Waukegan and Bradley. For example, in October 2017, Krone notified them of on opportunity to sell a condo unit owned by Waukegan for $200,000. Kumar and Subhash refused to respond or approve of the sale, and the opportunity was lost.[7] (*Id*., ¶ 41). In November 2017, no one from Freedom or Shah attended Bradley's annual board meeting, voted on the annual budget or even acknowledged the budget. (*Id*., ¶ 42).

On December 2017, Freedom and Shah (through Kumar, Subhash and Arif) refused to consider, respond to, or approve of an extremely beneficial refinancing package Krone had secured for Waukegan, without personal guarantees. As a result, that opportunity was lost too. The refinancing would have immediately returned equity to the other members and saved Waukegan over $8,000 per year. It also would have prevented Waukegan's lender at the time, Alliant Bank, from pursuing a foreclosure action instigated by one of Waukegan's minority members (and one of Kumar, Subhash, Arif and IAM's co-conspirators) Tresi, LLC. (*Id*., ¶ 43-45). Tresi is a minority's member of Waukegan and Bradley, and is owned by James Licata. (*Id*., ¶ 16).

In 2013, Tresi obtained a $100,000 mortgage in its favor from Waukegan; Licata had requested that half of Tresi's $200,000 investment in Waukegan be in the form of a mortgage. (*Id*., ¶ 46). In 2017, Tresi's owner recorded the mortgage, triggering a default under Waukegan's

---

[7] The operating agreement requires the unanimous consent of all managers for this type of decision.

mortgage with Alliant Bank. (*Id*., ¶ 56). Throughout December 2017, Freedom and Shah (through Kumar, Subhash and Arif) refused to communicate with Krone about Tresi's recording of the mortgage. Instead, it appears Kumar and/or Subhash forwarded to Licata confidential emails they and Krone had received from Waukegan's attorney. These emails discussed legal strategy related to the Tresi's note. (*Id*., ¶¶ 58-61).

For example, on December 21, 2017, Tresi's owner, James Licata, wrote Krone an email with exact passages quoted from a confidential email Krone and his co-managers had received from Waukegan's corporate attorney. Licata could only have gotten this information from Freedom/Kumar, Shah/Subhash or Krone, and it was not Krone. (*Id*., ¶ 61). Armed with information regarding Waukegan's legal strategy, Licata refused to remove Tresi's mortgage from the Waukegan property, causing Alliant to file a foreclosure action in February 2018. (*Id*., ¶ 63). Within months, Licata, along with a former manager in Waukegan, Steven Siegel, formed Joint Equity Partners, LLC ("JEP") and bought the mortgage and note from Alliant Bank and are now attempting to obtain the property from Waukegan through foreclosure. (*Id*., ¶¶ 64-65). Since that time, Freedom/Kumar and Shah/Subhash have thwarted Krone's attempts to refinance the property, which would extinguish the debt held by JEP and take the property out of foreclosure. That foreclosure action is still pending and has been consolidated with Krone's lawsuit in the State Court Lawsuit. (*See* Ex. A, in passim).

Meanwhile, since 2017, Bradley, which owns a retail storage facility, has been operating at a deficit. Despite the need for some form of restructuring, Freedom/Kumar, Shah/Subhash and Arif have refused to discuss or approve of any refinance resolution that would bring relief to Bradley's condition so it could operate with a positive cash flow. (*Id*., ¶ 71). On May 15, 2018, (around the same time JEP purchased the Waukegan mortgage from Alliant), Kumar advised Noel

Cain he was engaged in discussions with an "outside investor" who wanted to know more about the financial liabilities of Bradley. Cain, sensing the obvious, responded: "is this at all related to the note purchase that [Licata] just completed on the 600 Waukegan property? If the strategy is to purchase the note from our lender I can't assist you with this in any fashion." (*Id.*, ¶¶ 71-72). Kumar never responded and has since refused to confirm or deny whether Licata was the outside investor. (*Id.*, ¶ 73).

In January 2019, Krone announced he had found a bank interested in refinancing the Alliant/JEP loan for Waukegan and sought to obtain a term sheet. He also sought to have Freedom and Shah sign a resolution approving of the loan. Freedom and Shah have never responded to the resolution or indicated whether they will consent, holding up the possibility of refinancing.

### Facts Regarding IAM's Purchase Of The Bradley Mortgage From International Bank Of Chicago

On February 28, 2019, IAM purchased Bradley's note and mortgage from International Bank of Chicago ("IBC"). (*Id.*, ¶ 79). That same day, IAM's attorney advised Krone's attorney that this could be handled the "easy way or the hard way," and that Krone would need to drop his interests in both Waukegan and Bradley, drop his lawsuit and walk away.

On March 7, 2019, IAM sent a demand letter to Krone, threatening to obtain a confession of judgment against Krone for over $6 million if Krone did not, in just five days' time, pay IAM more than $360,000.00, plus attorneys' fees and turn over his past five years of tax returns and other financial documents. (*Id.*, ¶ 81). IAM made no demand on Kumar and Subhash, even though they too signed commercial guarantees identical to Krone's. (*Id.*, ¶ 82). (*See* Commercial Guaranties signed by Kumar and Subhash, attached as Exhibits E and F). In other words, the demand was not made in good faith to resolve a dispute, but rather for the purpose of forcing Krone into an untenable bargaining position and killing his efforts to refinance Waukegan.

On March 21, 2019, Kumar sent an email to all members and managers of Bradley, except for Krone, in which he made additional false and defamatory statements about Krone, and confirmed the roles he, Subhash, and Arif undertook in the Bradley scheme. (See Ex. G, copy of the March 21, 2019, emails; *see also* Ex. A, ¶¶ 84-85). In the email, Kumar wrote:

- Despite numerous inquiries, Krone as the tax matters partner has refused to send any K1 or give property report for 2018;

- Krone changed the bank accounts sometime last year 2018 and effectively stopped paying excess revenues from Cubesmart to pay the bank note;

- We have broken pipes, no heat and assorted issues there, despite that, our rent roll is steady at $44k a month, unfortunately, only until now, all of the excess revenue was like being siphoned off by Krone. (I dont [sic] have proof, but he never gave any accounting); and

- I and Dr Shah have borne the brunt of Krone's misdeeds all by ourselves.

Kumar knew these statements were false. Indeed, his statements were so egregiously false that the fourth manager, Noel Cain, was compelled to set the record straight. He responded that Krone did not refuse to send K1 statements, change bank accounts, or stop paying revenues. Nor did Krone siphon off revenue. (*See* Ex. G).

With regard to IAM and its purchase of the Bradley note held by IBC, Kumar wrote:

- In February, Mr Arif's company Illinois Asset Management LLC bought out the bank note for 5.6M and now is our banker. He is pursuing personal guarantees against Mr Krone and the company at the defaulted rate of 15% on the 5.6M note;

- [Arif] is patiently waiting till we come to terms about repairing the property and selling it to pay off everyone and their investment. Obviously, his patience is not finite and will run out eventually and he will foreclose and force sell the property at some point;

- We need about 150K in less than 30 days or so and another 60K in 60 days or so;

8

- Please understand, your contribution will be treated as a loan to the company. we [sic] will pay the vendor directly and avoid touching any company bank account controlled by Krone; and

- Conversely, if you dont [sic] want to contribute any money or cannot, this will effectively work to shrink your investment and in the end, (within a next 12-24 months) result in substantial reduction of your investment.

(Ex. G). Kumar's email confirms that he and Subhash have worked, and are working, with their attorney/"proxy" Arif to impose the entirety of the Bradley financial obligation onto Krone (despite their own commercial guarantees to shoulder the debt as well). Moreover, Kumar made a not-so-subtle attempt to extort the other Bradley members into giving them a "loan" or risk losing their respective investments in Bradley.

The email is also significant for what Kumar failed to disclose: that he and Subhash signed the same commercial guarantees as Krone, but that Arif has no intention of trying to collect on those guarantees. Instead, he falsely led them to believe that Arif's only other remedy would be to foreclose and force the sale of the Bradley property unless the loans were made. (*Id*.). Thus, not only are they trying to foist the entirety of the Bradley financial obligation onto Krone, in breach of their fiduciary duties, but they are fraudulently concealing their own exposure and misrepresenting the situation to the other members, in breach of their fiduciary duties. The other members are entitled to question why IAM would foreclose and force a sale without seeking to enforce the commercial guarantees signed by Kumar and Subhash. That answer points directly to a coordinated plan between Kumar, Subhash and Arif to purchase the note, hammer Krone with it and acquire the property at a discount.

## **STANDARD**

Illinois Supreme Court Rule 276 provides that a judgment by confession may be opened by a judgment-debtor if the defendant "has a defense on the merits to the whole or a part of the

plaintiff's claim and that he has been diligent in presenting his motion to open the judgment." In determining whether or not the motion and affidavit disclose a *prima facie* defense, the court must accept as true those facts asserted by defendant in his affidavit. *Fed. Deposit Ins. Corp. v. Bruno*, 777 F.Supp. 1432, 1434 (N.D. Ill. 1991), *citing Colonial Bank & Trust Co. v. Kozlowski,* 106 Ill.App.3d 639, 642, 62 Ill.Dec. 279, 281, 435 N.E.2d 1251, 1253 (1st Dist.1982). The court is foreclosed from inquiring "into the facts of the cause." *Id.*, citing *National Boulevard Bank of Chicago v. Corydon Travel Bureau, Inc.,* 95 Ill. App. 2d 281, 285, 238 N.E.2d 81, 83–84 (1st Dist. 1968). Moreover, any counter-affidavit by the plaintiff is considered "only to the extent that [it is] consistent with the allegations" made by the defendant. *Id.*, citing *Herget Nat'l Bank of Pekin v. Theede,* 181 Ill.App.3d 1053, 1056, 537 N.E.2d 1109, 1111 (3d Dist.1989); *see also Kim v. Kim*, 247 Ill. App. 3d 910, 913 (2d Dist. 1993). Indeed, it is improper for the trial court to consider a judgment-creditor's affidavits or answer to a motion to open judgment, as the trial court "may not try the merits of the case on the affidavits or counter-affidavits as such a procedure would encroach upon the right to trial by jury." *Kuh v. Williams*, 13 Ill. App. 3d 588, 593 (1st Dist. 1973). Although such a motion is committed to the sound discretion of the Court, upon the showing of such a *prima facie* defense, the Court has no discretionary authority and must open the judgment to proceed to trial. *Id.* A "*prima facie* defense" includes counterclaims. *Id*. Once the judgment by judgment is opened, the case proceeds to trial on the merits and the defendant may assert a counterclaim. Ill. S. Ct. R. 276. In addition, all further proceedings are stayed until further order of the Court. *Id*. Moreover, if the defendant discloses a counterclaim even where no defense exists, and the defendant has been diligent in presenting his motion, the court may permit the filing of the counterclaim and stay proceedings on the judgment until the counterclaim is disposed of. *Id*.

**ARGUMENT**

I.     **Krone Has Established A Prima Facie Defense On The Merits To Enforcement Of The Commercial Guarantee And Promissory Note On The Grounds That They Are Being Used For An Unlawful Purpose.**

In Counts V through VII and IX of the Third Amended Complaint, Krone brings claims for breach of fiduciary duties, conspiracy, aiding and abetting the breach of fiduciary duties and defamation against Freedom, Shah, Kumar, Subhash, Arif and IAM arising, in part, out of the attempts to use the commercial guarantee as a weapon against Krone. Krone also brings a claim for declaratory judgment (Count XII) that the commercial guarantee is unenforceable in the context and manner in which IAM obtained it and is attempting to use it. The facts alleged in this motion and in the Third Amended Complaint establish *prima facie* defenses to enforcement of the commercial guarantee and promissory note on the grounds that IAM (Arif's company) purchased the Bradley mortgage from IBC in concert with Freedom/Kumar and Shah/Subhash (Arif's clients), for the unlawful purpose of selectively enforcing only Krone's commercial guarantee in order to force him out of the companies and disenfranchise him of his ownership interest under the threat of financial ruin. They are also attempting to leverage IAM's power as a debt-holder over the other members of Bradley in order to extort them into making additional "loans" to the company or risk losing their own ownership interests while, at the same time, misrepresenting IAM's available remedies and concealing their own commercial guarantees.

To state a claim for breach of fiduciary duty, Krone must allege that (1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) he was injured as a proximate result of the breach. *Neade v. Portes,* 193 Ill.2d 433, 444, 739 N.E.2d 496 (2000). To state a claim for aiding and abetting the breach of fiduciary duties the plaintiff must allege facts showing: (1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he

provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation. *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 27–28, 799 N.E.2d 756, 767 (2003), as modified on denial of reh'g (Nov. 10, 2003).

Here, there is no question that Freedom and Shah (and by extension, their managers, Kumar and Subhash) owed fiduciary duties to Krone, Waukegan and Bradley. The Illinois Limited Liability Company Act establishes the general duties of a manager in a manager-managed LLC as substantively identical to that of the members in a member-managed LLC. *See* 805 ILCS 180/15-3(g)(2). Thus, a manager of a limited liability company owes fiduciary duties of loyalty and care both to the limited liability company and to its other managers, including an obligation to discharge these duties to the other managers "consistent with the obligation of good faith and fair dealing." *Id.* at s. 1, *see also 6030 Sheridan Rd., LLC v. Wright*, 2011 IL App (1st) 093282-U, ¶5 ("Similarly, a manager owes a manager-managed company and its other managers fiduciary duties of loyalty and care"). Once a fiduciary duty is established in a corporate setting, a fiduciary has the duty to "act with the utmost good faith and loyalty in managing the corporation" and is prohibited from enhancing his or her "own personal interests at the expense of corporate interests." *Maercker Point Villas Condo. Ass'n v. Szymski*, 275 Ill. App. 3d 481, 484 (2d Dist. 1995).

There is also no question those duties were known to Freedom/Kumar, Shah/Subhash and Arif, and breached by them. They obtained Krone's commercial guarantee for the unlawful purpose of forcing him out, contrary to the procedures set forth under the operating agreement and under Illinois law, dispossessing him of his ownership interests and acquiring the Bradley real estate at a significant discount. (*See* Ex. A, ¶¶ 77-89). Then IAM went ahead and saddled Krone with a judgment for the entirety of the Bradley debt. Krone has demanded indemnification under the operating agreement and that Freedom/Kumar and Shah/Subhash agree to an immediate sale

of the property to satisfy the debt. They never responded. Given Arif's self-admitted role as "proxy" and "attorney" for Kumar and Subhash, it is highly unlikely his company's purchase of the Bradley mortgage was coincidental. Arif's close relationship with Kumar and Shah as their proxy/attorney only confirms his company was a straw man for the purchase. And, as discovery will almost certainly reveal, his "clients" either financed the purchase of the debt themselves or facilitated the financing for it.[8] That means Kumar and Subhash, with IAM's and Arif's assistance, have committed a massive breach of fiduciary duty as co-managers of Bradley and Waukegan, by obtaining and selectively weaponizing Krone's personal guarantee to force Krone out of the companies and saddle him alone with all of Bradley's debt. They also breached their fiduciary duties by attempting to extort "loans" from the other members and mislead them into believing that IAM's only recourse Krone or a foreclosure. It is no coincidence that the purchase of the Bradley mortgage seems to have been pulled right out of the JEP playbook. The likelihood of the exact same maneuver happening twice, coincidentally, among the same group Krone has accused of collectively conspiring against him is zero.

IAM's demand for $360,000 plus fees, Krone's personal tax returns and his financial records on a five-day deadline likewise confirms a total absence of good faith. The demand is intended to make compliance impossible and to pressure Krone into an untenable bargaining position and force his removal. All of these facts demonstrate a prima facie defense to enforcement of the commercial guarantee on the grounds that Freedom/Kumar, Shah/Subhash and IAM/Arif

---

[8] And they do not want this discovery to take place. Arif and IAM recently filed a motion in the State Court Lawsuit to quash Krone's subpoena to IBC for documents showing the source of the funds for IAM's purchase. The circuit court did not grant the motion, but encouraged Krone to withdraw the subpoena only until IAM is officially served in the State Court Lawsuit. (*See* Subpoena to IBC and Order in the State Court Lawsuit, dated April 9, 2019, attached as Exhibits H and I, respectively).

are using the commercial guarantee in a way that constitutes a breach of fiduciary duties to Krone and the other members of Bradley.

**II.    Krone Has Established A Prima Facie Defense On The Merits To Enforcement Of The Commercial Guaranty And Promissory Note On The Grounds Of Contribution.**

Even if the personal guaranty could be enforced, it cannot be done in the manner envisioned by IAM and Arif. In Illinois, the general rule is that the "release of a co-guarantor releases the remaining guarantors of liability on the guaranty to the extent of the proportionate value of their respective lost rights of contribution against the released guarantor, absent a contrary agreement between the guarantor and the guarantee." *F.D.I.C. v. O'Malley*, 249 Ill. App. 3d 340, 358 (1st Dist. 1994). This principle is rooted in equity, as the court presumes that all co-guarantors should contribute equally to the discharge of any liability occurring by reason of the guaranty, thus a co-guarantor may have an action in contribution against his or her co-guarantors. *Harris v. Handmacher*, 185 Ill. App. 3d 1023, 1027 (1st Dist. 1989).

Here, the facts demonstrate that IAM and Arif acted in concert with, and at the direction of, Kumar and Subhash. They cannot now distance themselves and pretend they are acting independently of Kumar and Subhash. Accordingly, the Court should vacate the confessed judgment.

**III.    Krone Has Established A Prima Facie Defense On The Merits On The Grounds That The Extent Of Liability Is Not Ascertainable From the Guaranty or Promissory Note.**

It is well-settled under Illinois law the extent of liability under personal guaranty must be ascertainable from the face of the instrument in order for judgment to be confessed. *See Grundy County Nat. Bank v. Westfall*, 49 Ill. 2d 498, 500–01, 275 N.E.2d 374, 375–76 (1971). The Illinois Supreme Court in *Westfall* discussed requirements for a valid warrant of authority for judgment by confession:

14

Judgments by confession are circumspectly viewed. … 'The power to confess a judgment must be clearly given and strictly pursued, and a departure from the authority conferred will render the confessed judgment void.' ***The extent of the liability undertaken must be ascertainable from the face of the instrument in which the warrant is granted.*** … 'A judgment by confession must be for a fixed and definite sum, and not in confession of a fact that can only be established by testimony outside of the written documents, required by the statute to be filed in order to enter up a judgment by confession.'

*Id.* (internal citation omitted) (emphasis added); *see also Ninow v. Loughnane*, 103 Ill. App. 3d 833, 836, 431 N.E.2d 1267, 1269 (1st Dist. 1981); *State National Bank v. Epsteen*, 59 Ill. App. 3d 233 (1st Dist. 1978).

Here, the extent of the liability is not in any way ascertainable from the face of the promissory note or commercial guaranty. The guaranty contains no amount whatsoever. The promissory note only reflects the original loan amount without reference to any setoffs for amounts paid to date. Not surprisingly, Plaintiff's Complaint in fact goes outside the note and guaranty to establish its alleged damages by reference to the Non-Recourse Loan Sale and attorneys' fees. Thus, Plaintiffs' own pleadings establishing the alleged damages can only be ascertained by going outside the instrument on which the confession is based, rendering the confession void.

<u>CONCLUSION</u>

For the reasons set forth above, Defendant SCOTT J. KRONE respectfully requests that this Honorable Court enter an order opening the judgment pursuant to Fed. R. Civ. P. 59(e) and Ill. S. Ct. R. 276, and staying any enforcement of the judgment or attempt to collect on it, and for such further and additional relief the Court deems just and appropriate.

Date:   April 12, 2019     Respectfully submitted,
              SCOTT J. KRONE

               */s/ Patrick R. Moran*
              One of his attorneys

John J. Rock, ARDC #6237980
Patrick R. Moran, ARDC #6272747
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, IL 60654
(312) 494-1000 (p)/(312) 494-1001 (f)
jrock@rfclaw.com
pmoran@rfclaw.com
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that a copy of the foregoing document was served on all counsel of record via the Court's ECF/CM system on the date of filing.

               */s/ Patrick R. Moran*

16