# EXHIBIT A
# (Case No. 1:19-cv-1912)

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

SCOTT KRONE,                            )
              Plaintiff,             )
                           )
v.                             )
                           )
FREEDOM BUILDINGS, LLC, et al.,   )   Case No. 2018 CH 6885
                           )   Consol w/ 2018 CH 2032
            Defendants.       )
                           )
                           )

## <u>NOTICE OF FILING</u>

To:   See Attached Certificate of Service

PLEASE TAKE NOTICE that on this 5th day of April, 2019 we filed with the Clerk of the Court for the Circuit Court of Cook County, Illinois the following pleading:

- **Plaintiff's Third Amended Verified Complaint for Declaratory, Injunctive and Other Relief**

copies of which are hereby attached and served upon you.

Dated:      April 5, 2019            Respectfully submitted,


                                    By: */s/ Patrick W. Chinnery*_____
                            Attorney for Plaintiffs, SCOTT KRONE

John J. Rock
Patrick R. Moran
Patrick W. Chinnery
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
312.491.1000/312.494.1001 – fax
Email: jrock@rfclaw.com
       pmoran@rfclaw.com
       pchinnery@rfclaw.com
Firm ID: 48719

FILED
4/5/2019 10:04 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH06885

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies he served the foregoing document upon all parties listed below, via email and U.S. mail, on the date of filing before 5:00 p.m.

Platform I 600 Waukegan, LLC
600 Waukegan Road Condominium Association
c/o Jeffrey M. Galkin
Levin Ginsburg
180 N. LaSalle Street, Suite 3200
Chicago, IL 60601
Email: jgalkin@lgattorneys.com

Jeffrey C. Blumenthal
Jeffrey C. Blumenthal Chartered
2970 Maria Avenue, Suite 223
Northbrook, Illinois 60015
Email: jeffrey@jcblawyer.com
        terrie@jcblawyer.com
*Attorneys for Abdul Arif*

Stephen J. Link
Attorney at Law
1001 W. Lake Street, Suite A
Addison, IL 60101
Email: sjlink502@aol.com
*Attorney for James Licata and Tresi, LLC*

Craig M. Capilla
Allie K. Haling
Franklin Law Group
181 Waukegan Road Suite 205
Northfield, Illinois 60093
Email: ccapilla@charlesfranklinlaw.com
        ahaling@charlesfranklinlaw.com
*Attorneys for Freedom Buildings, Vimame, Inc., Muthukumar Vellaichamy, Shah Management, LLC, Shah Subhash Family, L.P. and Subhash Shah, M.D.*

Glenn M. Kanter
Brown, Udell, Pomerantz & Delrahim, Ltd.
225 W. Illinois Street, 3rd Floor
Chicago, Illinois 60654
Email: gkanter@bupdlaw.com
*Attorneys for SBS Private Equity Funds, LP, Steve Siegel, Joint Equity Partners, LLC and Fountainhead Capital Corp.*

Katherine Grosh
Levin Ginsburg
180 N. LaSalle Street, Suite 3200
Chicago, Illinois 60601
Email: kgrosh@lgattorneys.com
*Attorneys for Platform Bradley, LLC*

*/s/ Patrick W. Chinnery*

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| SCOTT KRONE, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2018 CH 6885 |
| | ) | Consolidated with |
| FREEDOM BUILDINGS, LLC, a Nevada | ) | No. 2018 CH 2032 |
| limited liability company; VIMAME, INC., a | ) | |
| Nevada corporation; MUTHUKUMAR | ) | |
| VELLAICHAMY, an individual; SHAH | ) | |
| SUBHASH FAMILY, L.P., an Alaskan limited | ) | |
| partnership; SHAH MANAGEMENT LLC, an | ) | |
| Alaskan limited liability company, SUBHASH | ) | FILED |
| H. SHAH, MD, an individual, TRESI, LLC, | ) | 4/5/2019 10:04 AM |
| a New York limited liability company; | ) | DOROTHY BROWN |
| JAMES LICATA, an individual; ABDUL ARIF, | ) | CIRCUIT CLERK |
| an individual; SBS PRIVATE EQUITY FUNDS | ) | COOK COUNTY, IL |
| LP, an Illinois limited partnership; STEVE | ) | 2018CH06885 |
| SIEGEL, an individual; JOINT EQUITY | ) | |
| PARTNERS, LLC, an Illinois limited liability | ) | |
| company; FOUNTAINHEAD CAPITAL | ) | |
| CORPORATION, an Illinois corporation; and | ) | |
| ILLINOIS ASSET MANAGEMENT, LLC, | ) | |
| a Wyoming limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |

## THIRD AMENDED VERIFIED COMPLAINT
## FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF

Plaintiff, SCOTT KRONE, through his attorneys, ROCK FUSCO & CONNELLY, LLC,

and for his Third Amended Verified Complaint against Defendants, FREEDOM BUILDINGS,

LLC (a Nevada limited liability company); VIMAME, INC. (a Nevada corporation);

MUTHUKUMAR VELLAICHAMY ("KUMAR"); SHAH SUBHASH FAMILY, L.P.

("SHAH"); SHAH MANAGEMENT, LLC; SUBHASH H. SHAH, M.D. (an individual); TRESI,

LLC (a New York limited liability company); JAMES LICATA (an individual); ABDUL ARIF

(an individual); SBS PRIVATE EQUITY FUNDS LP (an Illinois limited partnership); STEVE

SIEGEL (an individual); JOINT EQUITY PARTNERS, LLC (an Illinois limited liability company); FOUNTAINHEAD CAPITAL CORPORATION (an Illinois corporation); and Illinois Asset Management, LLC (a Wyoming limited liability company), states:

## NATURE OF THE CASE

1.     This is an action for declaratory and injunctive relief and to recover damages for the fraudulent schemes by Defendants to seize title and control of properties they co-owned and managed with Plaintiff.  Plaintiff brings claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, civil conspiracy, fraud, tortious interference with business relations and defamation *per se* in connection with the systemic corporate mismanagement and intentional disenfranchisement of the Members of two companies: PLATFORM I – 600 WAUKEGAN, LLC ("WAUKEGAN") and PLATFORM—BRADLEY LLC ("BRADLEY"), by Defendants. Plaintiff also seeks declaratory and injunctive relief regarding the enforcement of a certain personal guaranty, and the removal of Defendant members of WAUKEGAN and BRADLEY and other remedies pursuant to the Illinois Limited Liability Company Act.

2.     WAUKEGAN owns a parcel of land located at 600 Waukegan Road, Northbrook, Illinois ("the WAUKEGAN Property"), and it is comprised of forty-two (42) condominium units. WAUKEGAN owns and operates thirty-five (35) of the forty-two (42) units. Defendants have conspired together to drive the value of the WAUKEGAN Property down, force the lender to foreclose on it, and then acquire the WAUKEGAN Property at a fraction of its value while attempting to freeze out KRONE in the process.

3.     BRADLEY owns a parcel of land located at 27944 N Bradley Rd, Libertyville, IL 60048 that it converted into approximately 580 self-storage units.

2

Defendant ILLINOIS ASSET MANAGEMENT, LLC holds approximately $5.6 million in debt for the BRADLEY Property.

4.      Defendants have colluded together to interfere with BRADLEY's operations, to prevent management from securing lucrative refinancing opportunities and to drive the company into debt and, ultimately, into foreclosure.

5.      Further, Defendants have colluded to force KRONE out as a manager of BRADLEY, divest him of his membership share in Bradley, and hold him solely responsible on a personal guaranty of Bradley's loan, notwithstanding that Defendants KUMAR and SUBHASH also signed personal guaranties on the same Bradley loan.

6.      Ultimately, as with WAUKEGAN, Defendants' goal is to acquire the BRADLEY Property at a fraction of its value while attempting to freeze out KRONE in the process.

7.      FREEDOM and SHAH (collectively referred to herein as "the Manager Defendants") have also failed to manage both WAUKEGAN and BRADLEY in a way that will maximize value for Members, repeatedly taken actions designed to enrich themselves and harm the Members of both companies, intentionally misled company Members, and violated state corporate governance laws and WAUKEGAN's and BRADLEY's governing corporate documents. In doing so, the Manager Defendants breached various fiduciary duties owed to WAUKEGAN and BRADLEY, its Members and Plaintiff; engaged in civil conspiracy, committed fraud, committed tortious acts to harm WAUKEGAN's and BRADLEY's business relationships and made numerous defamatory statements, thereby damaging Plaintiffs.

## PARTIES

8.      Plaintiff, SCOTT KRONE ("Plaintiff" or "KRONE"), an individual, is a Manager of both WAUKEGAN and BRADLEY.

3

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

9. Defendant FREEDOM BUILDINGS, LLC ("FREEDOM") is a Nevada limited liability company with a principal place of business at 6505 E. Central Avenue, Suite #183, Wichita, Kansas, 67206. FREEDOM is a Member and Manager of WAUKEGAN. FREEDOM is also a Member and Manager of BRADLEY.

10. Defendant VIMAME INC. ("VIMAME") is a Nevada corporation and the Manager of FREEDOM. VIMAME was dissolved on November 25, 2013.

11. Defendant, MUTHUKUMAR VELLAICHAMY ("KUMAR") is the president of VIMAME, and a member of FREEDOM holding a 49% interest.

12. Defendant, SHAH SUBHASH FAMILY, L.P. ("SHAH"), is an Alaskan limited partnership, with a principal place of business at 2803 N. Penstemon Street, Wichita, Kansas 67226. SHAH is a Member and Manager of WAUKEGAN. SHAH is also a Member and Manager of BRADLEY.

13. Defendant, SHAH MANAGEMENT, LLC, ("SHAH MANAGEMENT") is an Alaskan limited liability company, with a principal place of business at 2803 N. Penstemon Street, Wichita, Kansas 67226. SHAH MANAGEMENT is the general partner SHAH.

14. Defendant, SUBHASH H. SHAH, M.D. ("SUBHASH") is an individual and a limited partner of SHAH.

15. Defendant, TRESI LLC ("TRESI"), is a New York limited liability company, with a principal place of business at 62 Pamela Rd., Cortland Manor, New York, 10567. TRESI is a minority member of WAUKEGAN. TRESI also holds a mortgage on the WAUKEGAN property dated January 25, 2013, in the original amount of $100,000.00.

16. Defendant JAMES LICATA is an individual and, on information and belief, the majority owner and manager of TRESI. LICATA is also a minority Member of WAUKEGAN and

a shareholder of FOUNTAINHEAD.  In addition, LICATA is a Member of two other companies that are members of both WAUKEGAN and BRADLEY. Those companies are PROGRESSIVE NETWORKS LLC ("PROGRESSIVE") and TRI-STATE REAL ESTATE SOLUTIONS, INC. ("TRI STATE").

17.     Defendant ABDUL ARIF ("ARIF") is an individual residing in Kansas. Upon information and belief, FREEDOM and SHAH have appointed him their proxy for all matters related to WAUKEGAN and BRADLEY. ARIF has physically and personally appeared in Illinois, on numerous occasions in the last three years, for the purpose of acting on FREEDOM and SHAH's behalf in matters related to WAUKEGAN and BRADLEY.

18.     Defendant SBS PRIVATE EQUITY FUNDS LP ("SBS") is a limited partnership and former business partner of KRONE.

19.     Defendant STEVE SIEGEL ("SIEGEL") is KRONE's former business partner. He is also a limited partner of SBS and, on information and belief, is a shareholder of FOUNTAINHEAD CAPITAL CORPORATION ("FOUNTAINHEAD") with LICATA.

20.     Defendant JOINT EQUITY PARTNERS, LLC ("JEP"), is an Illinois limited liability company with a principal place of business listed at a UPS store located at 4957 Oakton Street, Skokie, IL 60007. On information and belief, the sole member of JEP is FOUNTAINHEAD.

21.     Defendant FOUNTAINHEAD is an Illinois corporation and the member-manager of JEP.  Its principal place of business is the same UPS store as JEP.  On information and belief, FOUNTAINHEAD is owned and controlled by SIEGEL and LICATA.

22.     Defendant ILLINOIS ASSET MANAGEMENT, LLC ("IAM") is a Wyoming limited liability company. Its president and sole member is Defendant ARIF.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

## JURISDICTION AND VENUE

23.     Jurisdiction in Illinois is proper because the Member Defendants co-own and possess the real estate at the center of this action, which is located in Illinois, and are conducting business in the State which is continuous or systematic. 735 ILCS 5/2-209(b)(4). Additionally, the Operating Agreements giving rise to the claims stated herein provide that Illinois shall govern pursuant to Section 20.1.

24.     Venue is proper pursuant to 735 ILCS 5/2-101 because (a) the WAUKEGAN property that is the subject of this action is located in Cook County, Illinois; and (b) a substantial part of the events or omissions giving rise to the claim occurred in Illinois.  BRADLEY  also  has its headquarters in Cook County, Illinois.

## FACTUAL BACKGROUND

25.     Krone and Siegel formed WAUKEGAN and BRADLEY by filing Articles of Organization with the Secretary of State of Illinois on January 4, 2013, and May 13, 2014, respectively. They were both Managers with equal membership units.

26.     The purpose of WAUKEGAN was, *inter alia*, to purchase, finance, acquire, own, maintain, operate, manage, lease, build, develop, construct, hold or sell, property, including but not limited to, the WAUKEGAN Property with the common address 600 Waukegan Road, Northbrook, Illinois, 60062 (the "WAUKEGAN Property").

27.     The purpose of BRADLEY was, *inter alia*, to purchase, finance, acquire, own, maintain, operate, manage, lease, build, develop, construct, hold or sell, property, including but not limited to, the BRADLEY Property with the common address 27944 N. Bradley Rd, Libertyville, IL 60048 (the "BRADLEY Property").

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

28.     The original Operating Agreements are attached hereto as Exhibit A and Exhibit B, respectively, and incorporated by this reference.

29.     On or about June 26, 2014, WAUKEGAN executed a Promissory Note in favor of ALLIANT in the original principal amount of $2,373,000.

30.     KRONE and SIEGEL had numerous business disputes and ultimately entered into a settlement agreement dated June 15, 2015, wherein SIEGEL would divest his complete interests in WAUKEGAN and BRADLEY. Paragraph 21 of the settlement agreement contains a "good faith" provision, which reads that SIEGEL "will avoid causing undue harm or injury to the business ventures of [KRONE]."

31.     On June 29, 2015, FREEDOM and SHAH executed an agreement with KRONE wherein FREEDOM and SHAH increased their interests in WAUKEGAN and in BRADLEY, and SHAH became a manager in WAUKEGAN and BRADLEY.  FREEDOM was a Manager for WAUKEGAN and BRADLEY.

**Corporate Mismanagement**

32.     FREEDOM and SHAH have consistently and systematically refused to fulfill their duties as Managers of both companies and, in fact, have instead worked to harm not only Plaintiff, but also the companies themselves, in part through their "proxy"/attorney, ARIF.

33.     In or around July 2016, Defendants FREEDOM and SHAH named ARIF as their proxy to discuss business matters related to WAUKEGAN and BRADLEY. FREEDOM did not execute its proxy form until January 23, 2017, and SHAH did not execute its proxy form until September 2017.

34.     From the moment ARIF became involved in WAUKEGAN and BRADLEY, he inserted himself as a barrier between KUMAR and SHAH on the one hand and KRONE on the

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

other, made unreasonable demands that the companies follow his direction and interfered with the management of the companies. He also made frequent threats and accusations of misconduct against KRONE, another manager of BRADLEY and the corporate attorney for both companies.

35.     On April 17, 2017, ARIF wrote KRONE in an email, "I am directed by Dr. KUMAR to pursue any avenue to move past [KRONE's] objection" to selling the BRADLEY Property.

36.     On October 3, 2017, ARIF wrote in an email to KRONE, "Please DO NOT communicate with Drs Kumar or Shah. Period."

37.     In a second email on October 3, 2017, ARIF wrote to KRONE and others, "I have [KUMAR and SUBHASH's] authority and trust in my judgment to act on their behalf, to do whatever is necessary to enhance their investment. That authority is broad and limited only by them. And them alone."

38.     And in a third email to Krone on October 3, 2017, ARIF told KRONE that ARIF's only purpose is to make money for KUMAR and SHAH and that KRONE should "[f]igure out a way to help me or get out of the way."

39.     Later in October 2017, ARIF attended a Board meeting and threatened KRONE, exclaiming that if KRONE did not give FREEDOM and SHAH complete control of WAUKEGAN and BRADLEY, ARIF would cause problems. Noel Cain, another Manager of BRADLEY, said to ARIF that ARIF's demands seemed like blackmail. ARIF replied "Damn straight!" The meeting was video-recorded with ARIF's consent and approval.

40.     On or about October 10, 2017, Rama Voddi, another minority Member of WAUKEGAN, informed KRONE that Defendant FREEDOM, through its member KUMAR, hosted an investor call on September 23, 2017, without advising KRONE or obtaining KRONE'S permission. This action was in violation of WAUKEGAN's Operating Agreement. During the call,

FILED DATE: 4/5/2019 10:04 AM 2018CH06885

FREEDOM/KUMAR intentionally misrepresented its role in the company for its/his own benefit and to the detriment of Plaintiff, causing harm to Plaintiff's reputations among the Members of WAUKEGAN. In that call, KUMAR accused KRONE of wasting corporate assets and opportunities, and that he was preventing the return of equity to members. Those statements were all factually, demonstrably false.

41.    On October 11, 2017, Plaintiff KRONE notified Defendant FREEDOM of an opportunity to sell Unit 131 to the Vice President of the Condominium Board of the WAUKEGAN property for approximately $200,000 because the prospective purchaser wished to add 1,500 square feet of rentable space to his current Unit 130, also 1,500 square feet. Unfortunately, FREEDOM would not fulfill its duties as a Manager and never responded to KRONE. Accordingly, the opportunity to bring revenue was lost for WAUKEGAN and its Members.

42.    In November 2017 FREEDOM and SHAH again would not fulfill its duties as a Manager, in that they were absent from BRADLEY's annual Board Meeting and did not even send their "proxy/attorney" ARIF. KRONE and Cain were forced to approve BRADLEY's annual 2018 budget without input from FREEDOM and SHAH because they never responded to requests for comments to that budget. This was also a breach of their fiduciary duties.

43.    On December 18, 2017, in an effort to reduce Company debt and bring equity to its Members, Plaintiff KRONE secured extremely beneficial refinancing options for WAUKEGAN for a minimum of $2.1 million at 4.9% interest with a 20-year amortization without personal guaranties. The refinancing would immediately return equity to the Members and save WAUKEGAN over $8,000 per year. Neither SHAH nor FREEDOM fulfilled their obligations as Managers in considering, responding to, or approving the refinancing package secured by Plaintiff. As a result of FREEDOM and SHAH's inaction, this opportunity was lost.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

44.     As described in detail below, soon thereafter, ALLIANT Bank, then the holder of WAUKEGAN's Note ("WAUKEGAN Note") and Mortgage on its property, filed its foreclosure lawsuit against WAUKEGAN (Case No. 2018 CH 2032). A copy of the WAUKEGAN Note is attached hereto as Exhibit C.

45.     If SHAH and FREEDOM had responded and approved the refinance of WAUKEGAN, ALLIANT would not have filed its foreclosure lawsuit, as its loan to WAUKEGAN would have been extinguished.

### The WAUKEGAN Scheme

46.     In or about January 2013, as consideration for a $100,000 cash infusion from TRESI, WAUKEGAN executed a Promissory Note and Mortgage in TRESI's favor (the "TRESI Note," and "TRESI Mortgage," respectively), identifying a $100,000 Loan maturing on January 25, 2018, and providing for accrual of three percent interest annually. A copy of the TRESI Note is attached hereto as Exhibit D.

47.     TRESI's principal owner, LICATA, agreed with KRONE in 2013 that TRESI would not record the TRESI Mortgage in the absence of a default.

48.     In or about August 2014, as a result of positive developments including a favorable refinancing of the primary loan on the WAUKEGAN Property, WAUKEGAN returned to its equity investors $71,746.99 for each $100,000 invested (thus leaving each equity investor with an equity position of $29,253.01 for each $100,000 invested). This favorable outcome was due almost entirely to the actions taken by Plaintiff in the management of the company.

49.     WAUKEGAN also paid TRESI the same $71,746.99 that it paid to its $100,000 equity investors, at the same time that it paid those equity investors.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

50.     Because TRESI was in fact a lender and not an equity investor, that payment constituted a repayment of principal.

51.     Accordingly, as of August 2014, the amount owing under the TRESI Note was $28,253.01 plus interest on unpaid principal.

52.     At TRESI's instruction, its $71,746.99 was invested as equity in another real estate development – the BRADLEY Property.

53.     TRESI, through LICATA, elected to convert this loan repayment to an ownership interest in BRADLEY.

54.     In August 28, 2014, and notwithstanding the fact that WAUKEGAN had repaid $71,746.99 towards the Note's principal balance, TRESI initially denied receiving any payment at all. When presented with proof of payment, TRESI, through LICATA, claimed the $71,746.99 was simply for "special interest." TRESI demanded an additional $135,000 through a gross and fraudulent miscalculation of interest, to cancel its Note and to release the recorded TRESI Mortgage.  TRESI has since changed his position and now, once again, claims there was no payment at all and the full amount of the loan is due, plus interest.

55.     TRESI's claim that it received no payment on its mortgage is inconsistent with the TRESI's ownership interest in BRADLEY.  That interest did not materialize out of nothing and TRESI provided no other cash for that interest.  Moreover, since the formation of BRADLEY, TRESI has received annual Schedule K-1 tax forms from BRADLEY reflecting its ownership interest and never once disputed the amounts reflected in the forms or otherwise alerted BRADLEY or KRONE that it had received the forms in error.

56.     On or about September 13, 2017, TRESI recorded the TRESI Mortgage with the Cook County Recorder of Deeds as Document No. 1725655136 against the WAUKEGAN

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

property, even though there had been no default, and in direct contravention of the oral agreement between KRONE and LICATA.

57.     TRESI recorded the TRESI Mortgage on the WAUKEGAN Property despite TRESI's knowledge that doing so would jeopardize WAUKEGAN's note and mortgage with ALLIANT

58.     Throughout December 2017, despite numerous requests for input, neither SHAH nor FREEDOM would fulfill their fiduciary duties as Managers and would not respond to KRONE's inquiries regarding TRESI's recording of the TRESI Mortgage and its harm to WAUKEGAN'S interests.

59.     Additionally, on information and belief, FREEDOM, through KUMAR, and/or SHAH, through SUBHASH, forwarded confidential emails from WAUKEGAN's corporate counsel discussing legal strategy relating to the fraudulently recorded note to TRESI and/or LICATA.

60.     For example, in or about December 2017, WAUKEGAN's corporate attorney, Jeff Galkin, wrote the Managers of WAUKEGAN an email marked "confidential" discussing strategy on how to defend against TRESI and/or LICATA's fraudulent actions against WAUKEGAN.

61.     On December 21, 2017, LICATA wrote Plaintiff an email with passages exactly quoted from the confidential email. LICATA could only have gotten the quoted passages from Defendants FREEDOM/KUMAR and/or SHAH/SUBHASH.

62.     The Manager Defendants further breached their fiduciary duties to WAUKEGAN and to Plaintiff, as a Manager, when they forwarded confidential emails containing legal advice as to how the LLC could most appropriately deal with the TRESI mortgage and threatened foreclosure from ALLIANT.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

63. TRESI refused to remove the recorded TRESI Mortgage from the WAUKEGAN Property after demands by WAUKEGAN, through its counsel and through Plaintiff, that TRESI do so.

64. ALLIANT thereafter initiated the aforementioned complaint for foreclosure in the Circuit Court of Cook County, Illinois, Case No. 18 CH 2032. In that complaint, the only grounds cited by ALLIANT for its foreclosure was a technical default solely and proximately caused by TRESI's recordation of the TRESI Mortgage on the Waukegan Property.

65. In February or Mach 2018, ALLIANT sold and assigned its Note to JEP. On information and belief, ALLIANT sold the mortgage and note to JEP for the full amount of the WAUKEGAN Note.

66. LICATA, owning TRESI, half of FOUNTAINHEAD, and as a minority member of WAUKEGAN and BRADLEY is the common thread throughout these entities.

**The BRADLEY Scheme**

67. In 2016, when BRADLEY's initial property loan was coming due, the Manager Defendants delayed the refinancing which caused substantial expenses. When the refinancing package was finally obtained, FREEDOM, SHAH, KUMAR and/or SUBHASH refused to sign the required guaranties pursuant to the refinancing agreement terms and conditions.

68. That refusal to sign was a failure of Manager Defendants to act in good faith and to honor their fiduciary obligations as Managers of BRADLEY.

69. A condition for the refinancing was reimbursing KRONE approximately $80,000 in funds he had loaned the company for documented and necessary expenses. The Manager Defendants agreed to the reimbursement if KRONE provided itemized receipts of all expenses. By 10:00 a.m. the next morning, the Manager Defendants had every receipt. Noel Cain, Attorney

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

Galkin and International Bank all verified the legitimacy and accuracy of the receipts. Despite that fact, for the next six weeks, the Manager Defendants and ARIF refused to acknowledge the receipts and payments. Instead they demanded countless, unrelated documents, creating unnecessary expenses and further harming Plaintiff.

70.     FREEDOM and SHAH forced KRONE and Noel Cain into altering the BRADLEY operating agreement terms to meet with their demanded changes to the operating agreement and manager's authority or the bank would have put the BRADLEY loan into foreclosure.

71.     Since October 2017, BRADLEY has been operating at a deficit. However, Manager Defendants have consistently refused to discuss or approve any refinance resolution that would bring relief to BRADLEY's financial condition so that it could operate with a positive cash flow.

72.     On May 15, 2018, Defendant KUMAR requested appraisals of the BRADLEY Property from Noel Cain, another manager of BRADLEY, via email. KUMAR wrote Cain that he was engaged in discussions with an unnamed "outside investor" who wanted to know more about the financial liabilities of BRADLEY. KUMAR further wrote that the anonymous investor "wants to help us."

73.     In response, Cain wrote, "Please don't take this the wrong way but is this at all related to the note purchase that [LICATA] just completed on the 600 Waukegan property?  If the strategy is to purchase the note from our lender I can't assist you with this in any fashion.  We have a proposal to refinance the existing property with additional cash to give us more runway and also continue interest only.  That seed [sic] like a better way to go than outside equity capital."

74.     KUMAR did not respond to that email, nor would he disclose to Cain or to KRONE who his proposed "outside investor" was. He also refused to confirm or deny whether LICATA was the "outside investor."

FILED DATE: 4/5/2019 10:04 AM 2018CH06885

75. On information and belief, FREEDOM's "outside investor" was LICATA and/or Licata's company TRESI.

76. KUMAR's refusal to confirm or deny whether the "outside investor," was LICATA is further evidence of the Defendants' conspiracy to take over both WAUKEGAN and BRADLEY to the detriment of KRONE and the other members of both LLCs.

77. On information and belief, sometime immediately prior to February 28, 2019, FREEDOM and SHAH, through their human alter-egos KUMAR and SUBHASH, funded the creation of IAM with a capital infusion of approximately $5.6 million, or otherwise arranged for financing in that amount on behalf of IAM.

78. FREEDOM and SHAH, through their human alter-egos KUMAR and SUBHASH, appointed ARIF the President of IAM.

79. On February 28, 2019, IAM purchased BRADLEY's Note and Mortgage from BRADLEY's lender, International Bank. ARIF signed the contracts relating to that purchase on behalf of IAM.

80. KUMAR AND SUBHASH signed personal guaranties for the BRADLEY Note when International Bank refinanced the BRADLEY Property. On information and belief, KUMAR and SUBHASH personal guaranties remain in full force and effect.

81. On March 7, 2019, IAM sent a demand letter to KRONE. In that letter, IAM threatened to file a lawsuit to enforce KRONE's personal guaranty on BRADLEY's defaulted Note and obtain a confession of judgment against KRONE if KRONE did not, in just five days' time, pay IAM more than $360,000.00, plus attorneys' fees and turn over KRONE's past five years of tax returns and other financial documents.

FILED DATE: 4/5/2019 10:04 AM 2018CH06885

82.     IAM made no demand on KUMAR and SUBHASH for any amount, let alone the more $360,000.00, plus attorneys' fees, it demanded from Krone. It also did not demand that KUMAR and SHAH turn over their respective past five years of tax returns and other financial documents.

83.     FREEDOM and SHAH's funding of a shell corporation, IAM, to purchase the debt of BRADLEY, and their use ARIF as the purported "sole owner" of IAM to selectively enforce only KRONE's personal guaranty, was done for the purpose for weaponizing KRONE's personal guarantee of the BRADLEY Note against him, forcing him out as manager of both BRADLEY and WAUKEGAN and disassociating his membership interests in both companies under the threat of financial ruin. Such actions are breaches of the fiduciary duties FREEDOM and SUBHASH owe to KRONE as co-Managers of BRADLEY.

84.     On March 21, 2019, KUMAR sent an email to all members and managers of BRADLEY, except for KRONE (the "March 2019 Email").

85.     In the March 2019 Email, KUMAR made additional false and defamatory statements about KRONE, and confirmed the roles he, SUBHASH, and ARIF undertook in the BRADLEY scheme, including the formation of IAM and IAM's purchase of the BRADLEY Note from International Bank.

86.     KUMAR's false and defamatory statements about KRONE in the March 2019 Email included:

a.  "Despite numerous inquiries, Krone as the tax matters partner has refused to send any K1 or give property report for 2018";

b.  "Krone changed the bank accounts sometime last year 2018 and effectively stopped paying excess revenues from Cubesmart to pay the bank note."

16

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

c. We have broken pipes, no heat and assorted issues there, despite that, our rent roll is steady at $44k a month, unfortunately, only until now, all of the excess revenue was like being siphoned off by Krone. (I dont have proof, but he never gave any accounting)"; and

d. "I and Dr Shah have borne the brunt of Krone's misdeeds all by ourselves."

87.     KUMAR knew the foregoing statements were false. As another manager immediately notified KUMAR after KUMAR sent the March 2019 Email, KRONE did not refuse to send K1 statements, change bank accounts, or stop paying revenues. Nor did KRONE siphon off revenue.

88.     With regard to IAM and its purchase of the Bradley Note held by International Bank, KUMAR wrote in the March 2019 Email:

a. "In February, Mr Arif's company Illinois Asset Management LLC bought out the bank note for 5.6M and now is our banker. He is pursuing personal guarantees against Mr Krone and the company at the defaulted rate of 15% on the 5.6M note";

b. "[ARIF] is patiently waiting till we come to terms about repairing the property and selling it to pay off everyone and their investment. Obviously, his patience is not finite and will run out eventually and he will foreclose and force sell the property at some point";

c. "We need about 150K in less than 30 days or so and another 60K in 60 days or so";

d. "Please understand, your contribution will be treated as a loan to the company. we (*sic*) will pay the vendor directly and avoid touching any company bank account controlled by Krone:" and

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

e. "Conversely, if you dont want to contribute any money or cannot, this will effectively work to shrink your investment and in the end, (within a next 12-24 months) result in substantial reduction of your investment."

89.  By the text of the March 2019 Email, not only did KUMAR confirm that he and SUBHASH worked with their attorney and/or "proxy" ARIF to acquire the BRADLEY Note, but KUMAR also attempted to extort the other BRADLEY members into giving BRADLEY a "loan" or risk losing all of their respective investments.

## The Cost to WAUKEGAN and BRADLEY of Defendants' Civil Conspiracy

90.   Part of Defendants' motivation for attempting to force KRONE out and case a default is greed. By triggering defaults on the mortgages, purchasing the companies' respective mortgages and notes and then foreclosing on the properties, Defendants are able to obtain the properties at a much lower cost basis in order to enrich themselves at the expense of KRONE and each company's members.

91.  For example, with WAUKEGAN, the property was originally purchased in 2014 for $3 million with an additional $300,000 of improvements.  In 2015, the property was refinanced by ALLIANT after nearly $1 million of the original equity was returned to the investors.  The balance of the WAUKEGAN Members' initial equity contributions is $324,909.

92.  With $1 million of equity returned, the remainder of the original loan was refinanced through ALLIANT in 2015 for a principal amount of $2,373,000.  By February 2018, the principal amount due had been reduced to $2,016,834.  Assuming JEP paid Alliant bank the full, original principal value of the Note to obtain it, Defendants' share of equity they contributed to the WAUKEGAN Property was only $141,265.  That means JEP may now be able to obtain the

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

WAUKEGAN property for $2,158,099, significantly discounted from the original purchase price, not including fees, which JEP will almost certainly demand from KRONE as a personal guarantor.

93.    Additionally, in the time since WAUKEGAN originally purchased the Property, the company has made improvements to the property and its value has otherwise increased, estimated at $3,755,555.

94.    Not surprisingly, both JEP and TRESI are resisting KRONE's efforts to secure refinancing for the WAUKEGAN property by inflating the payoff amounts for each respective mortgage.

95.    Similarly, Defendants stand to enrich themselves on the BRADLEY Property at the expense of KRONE, the company and its members. That note had an original principal amount of $5,600,000. Members of BRADLEY made initial equity contributions of $1,753,343, for a total cost to BRADLEY of $7,353,343.

96.    IAM paid the full, original principal value of the Note to obtain it, and FREEDOM and SHAH's share of equity investors' equity contribution for the BRADLEY Property was only $365,240.. That means the cost to the Manager Defendants and IAM is $5,965,240.

97.    Additionally, in the time since BRADLEY originally purchased the Property, the company has made improvements to the property and its value has otherwise increased, estimated at $7,650,000..

98.    If Defendants are successfully able to force KRONE out as a manger of both companies, which the Manager Defendants and ARIF have repeatedly tried to do and are still trying to do, there would be no management voice resisting efforts to foreclose on the properties.

99.    By taking the properties into foreclosure, which JEP has already done with WAUKEGAN and which IAM is now poised to do with BRADLEY, each stands ready to take

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

ownership of the properties away WAUKEGAN and BRADLEY, depriving each company (and its several other members) of its most significant asset. In other words, Defendants' scheme is a way to obtain the properties at a discount.

<div align="center">

**COUNT I - BREACH OF FIDUCIARY DUTY (WAUKEGAN)**
**(Against Defendants SHAH and FREEDOM)**

</div>

100.   Plaintiff incorporates by reference the allegations of Paragraphs 1 through 99, as though fully set forth herein.

101.   As Managers of WAUKEGAN, Defendants FREEDOM and SHAH owe fiduciary duties of care, loyalty and good faith to WAUKEGAN's Members and Managers, including Plaintiff.

102.   In addition to the duties established by common law, the Illinois Limited Liability Company Act sets forth specific duties owed by managers in manager-managed LLCs. *See* 805 ILCS 180/15-3(g).

103.   FREEDOM and SHAH have breached their common law fiduciary duties of care, loyalty, and good faith, as well as the statutory duties imposed on them by 805 ILCS 180/15-3(b) and (c).

104.   FREEDOM and SHAH breached their fiduciary duties of loyalty and care to KRONE by making false representations to other minority members as to KRONE's alleged mishandling of funds, as described above.

105.   FREEDOM and SHAH abused their positions as Managers in violation of WAUKEGAN's Operating Agreement and refused to approve or even consider a refinancing package that would have saved WAUKEGAN more than $8,000 per year; they refused to approve or even consider leases to increase the occupancy of the WAUKEGAN property; and they provided confidential Company information to LICATA and TRESI in an effort to harm WAUKEGAN.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

106.    FREEDOM and SHAH have also breached their fiduciary duties to KRONE, and to the other members of WAUKEGAN, by failing to act in WAUKEGAN's best legal and financial interests. For example, they colluded with LICATA and SIEGEL to record TRESI's Mortgage against the WAUKEGAN Property, to drive the value of the WAUKEGAN Property, WAUKEGAN's sole asset, down, and the WAUKEGAN Property itself into foreclosure. Further, they conspired to acquire the WAUKEGAN property at a fraction of its value in detriment to KRONE, the other members of the LLC and to WAUKEGAN itself.

107.    After the TRESI mortgage was recorded, they disclosed confidential and privileged communications from WAUKEGAN's attorney to LICATA, which identifies strategies for dealing with TRESI's recording of the mortgage.  LICATA is a member of and manages TRESI.

108.    FREEDOM also breached its fiduciary duty to WAUKEGAN and its Members through its failure to follow up with potential buyers of Unit 131, thus losing an approximately $200,000 sale and thereby failing to reducing WAUKEGAN's debt and/or provide equity for its Members.

109.    FREEDOM again breached its fiduciary duty to the company and its Members by failing to generate or approve or even comment on, a budget for WAUKEGAN in the past two fiscal years.

110.    KRONE detrimentally relied upon the belief that FREEDOM and SHAH were acting in the best interests of WAUKEGAN and complying with their fiduciary duties.

111.    FREEDOM and SHAH have also damaged KRONE personally (including, but not limited to, his reputation), economically, and legally, by their numerous bad acts.

112.    FREEDOM and SHAH's breaches of their fiduciary duties were the direct and proximate cause of damages to KRONE and the other WAUKEGAN Members.

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

WHEREFORE, KRONE respectfully requests that the Court enter judgment in his favor and against FREEDOM and SHAH, and award him compensatory and punitive damages in an amount in excess of $1,000,000 plus attorneys' fees and costs, and for any further relief this Court deems just and appropriate.

## COUNT II – CONSTRUCTIVE FRAUD (WAUKEGAN)
### (Against Defendants SHAH and FREEDOM)

113.    Plaintiff incorporates by reference the allegations of Paragraphs 1 through 112, as though fully set forth herein.

114.    As alleged in detail in Count I, FREEDOM and SUBHASH owe KRONE fiduciary duties as they are managers of WAUKEGAN.

115.    FREEDOM and SHAH have breached their fiduciary duties owed to KRONE, as detailed in Count I and below.

116.    FREEDOM, KUMAR, SHAH, and/or SUBHASH passed confidential information regarding WAUKEGAN's legal strategies, meant to protect WAUKEGAN from TRESI and LICATA, directly to LICATA and TRESI, undermining those strategies.

117.    In turn, LICATA and TRESI used that information to interfere with WAUKEGAN's operations and worked to drive the WAUKEGAN Property into foreclosure by recording the TRESI Mortgage so ALLIANT would foreclose on the WAUKEGAN Property.

118.    Defendants FREEDOM and SHAH knowingly withheld the facts surrounding their breaches of fiduciary duties from KRONE. For example, in May 2018, KUMAR tried to solicit confidential information about the BRADLEY property and its financial condition from BRADLEY manager Noel Cain in order to provide that information to a secret investor.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

119.    When Cain asked KUMAR if the information was intended to go to LICATA, for a strategy of "purchas[ing] the note from our lender," KUMAR stopped corresponding with Cain, and refused to confirm or deny if LICATA was involved.

120.    KRONE is the only current Member or Manager of WAUKEGAN who is a personal guarantor on the WAUKEGAN Note (now assigned to JEP). As a result, JEP is attempting to enforce KRONE's personal guaranty on the WAUKEGAN Note in Case No. 2018 CH 2032.

121.    That action is by design, to harm Krone and prevent him from salvaging the property.  As a result, JEP (and those with an indirect ownership interest in it, SIEGEL and LICATA) are attempting to gain ownership of the property through the very same foreclosure action they instigated.

122.    KRONE and WAUKEGAN have suffered damages as a result of Defendants' fraudulent scheme, including, but not limited to, wrongfully depriving KRONE of his interest as a member (equity owner) and manager of WAUKEGAN; by triggering KRONE's guaranty of Alliant's loan; by causing KRONE reputational and professional injury; and by exposing him to potential claims of liability by other equity investors in WAUKEGAN.

123.    FREEDOM and SHAH's breaches of their fiduciary duties, and resulting constructive fraud, were the direct and proximate cause of damages to KRONE and the other WAUKEGAN Members.

WHEREFORE, KRONE respectfully requests that the Court enter judgment in his favor and against FREEDOM and SHAH, and award him compensatory and punitive damages in an amount in excess of $1,000,000 plus attorneys' fees and costs, and for any further relief this Court deems just and appropriate.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

## COUNT III – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (WAUKEGAN)
### (Against Defendants KUMAR and SHAH)

124.  Plaintiff incorporates by reference Paragraphs 1 through 123 as though fully stated herein.

125.  As described in detail in Count I, FREEDOM and SHAH breached their fiduciary duties owed to KRONE as managers of BRADLEY.

126.  At all times relevant hereto, FREEDOM acted through its human alter ego KUMAR and SHAH acted through its human alter ego SUBHASH.

127.  As FREEDOM and SHAH are corporate entities, all actions they took, each of their breaches of fiduciary duties, can be ascribed to their human alter egos, KUMAR and SHAH.

128.  KUMAR and SHAH knowingly and substantially participated in FREEDOM and SHAH's breach of fiduciary duties.

129.  As direct and proximate result of KUMAR and SHAH's misconduct, KRONE has been injured and continues to be injured.

WHEREFORE, KRONE respectfully requests that the Court enter judgment in his favor and against FREEDOM and SHAH, and award him compensatory and punitive damages in an amount in excess of $1,000,000 plus attorneys' fees and costs, and for any further relief this Court deems just and appropriate.

## COUNT IV – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS
### (Against Defendants SHAH, SUBHASH, FREEDOM, KUMAR, SBS, SIEGEL, LICATA, TRESI, JEP, FOUNTAINHEAD and ARIF)

130.  Plaintiff incorporates by reference the allegations of Paragraphs 1 through 99, as though fully set forth herein.

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

131.    As noted above, on or about June 26, 2014, WAUKEGAN executed a Promissory Note in favor of ALLIANT in the original principal amount of $2,373,000.00.

132.    As Managers of WAUKEGAN, SHAH and FREEDOM knew of the existence of the mortgage and WAUKEGAN's business relationship with ALLIANT.

133.    As a minority Member of WAUKEGAN, TRESI knew of the existence of the mortgage and WAUKEGAN's business relationship with ALLIANT.

134.    Upon information and belief, TRESI and LICATA also knew of WAUKEGAN's business relationship with ALLIANT because FREEDOM, KUMAR, SHAH and/or SUBHASH passed confidential Company information to TRESI and/or LICATA.

135.    As a former manager of WAUKEGAN when WAUKEGAN applied for its mortgage with ALLIANT, and as a personal guarantor of the initial ALLIANT mortgage, SIEGEL knew of the existence of the ALLIANT mortgage of the Waukegan Property.

136.    In fact, there is an ongoing lawsuit (Cook County Case No. 16 CH 1118) between KRONE and SIEGEL, the basis of which is that SIEGEL refused to provide a notarized signature for the removal of his personal guaranty from the ALLIANT mortgage and then, acting in bad faith, filed a UCC claim for breach of contract for not getting his name removed.

137.    FREEDOM, SHAH, ARIF, SIEGEL, LICATA, JEP, FOUNTAINHEAD and TRESI worked together to pass on confidential information that would harm WAUKEGAN; to record TRESI's note, in order to create a dispute between ALLIANT and WAUKEGAN and eventually foreclosure on the WAUKEGAN Property; to drive down the value of the WAUKEGAN property; and to force ALLIANT to foreclose on the WAUKEGAN Property.

138.    FREEDOM and SHAH intentionally appointed ARIF as their proxy for WAUKEGAN and instructed him to contact ALLIANT directly.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

139.    Without authority from WAUKEGAN, ARIF directly contacted ALLIANT (in violation of WAUKEGAN's Operating Agreement) and demanded copies of the loan application completed by KRONE on behalf of WAUKEGAN.

140.    ALLIANT felt uneasy by ARIF's interference and the fact that TRESI refused to remove or otherwise release the recorded TRESI Mortgage from the WAUKEGAN Property's title. As a direct consequence of the other Defendants' actions, ALLIANT foreclosed on the WAUKEGAN Property.

141.    Approximately four months after ALLIANT filed its foreclosure action, ALLIANT sold its mortgage to JEP and assigned the Note to JEP after receiving consideration from TRESI and/or JEP.  On information and belief, JEP paid ALLIANT the full price of the outstanding debt.

142.    The conduct of FREEDOM, SHAH, ARIF, SIEGEL, LICATA, TRESI, JEP and FOUNTAINHEAD prevented performance of WAUKEGAN's obligations to ALLIANT and/or made performance more expensive or difficult.

143.    FREEDOM, SHAH, ARIF, SIEGEL, LICATA, TRESI, ARIF, JEP and FOUNTAINHEAD intended to disrupt the performance of WAUKEGAN's contract with ALLIANT and/or knew that disruption of performance (and ALLIANT foreclosing on the WAUKEGAN Property) was certain or substantially certain to occur.

144.    At the same time, TRESI refused to accept what was actually owed to pay off its mortgage, and instead demanded an amount inflated by almost $100,000.

145.    But for the actions of the Defendants named in this Count, WAUKEGAN would have been capable of performing its obligations under the ALLIANT mortgage, and would have performed all such obligations.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

146.    KRONE and WAUKEGAN were directly and indirectly harmed by the named Defendants' actions. The conduct of FREEDOM, SHAH, ARIF, SIEGEL, LICATA, TRESI, JEP and FOUNTAINHEAD was a substantial factor in causing Plaintiff and WAUKEGAN harm.

WHEREFORE, KRONE respectfully requests that the Court enter judgment in his favor and against FREEDOM, SHAH, ARIF, SIEGEL, LICATA, TRESI, JEP and FOUNTAINHEAD, and award him compensatory and punitive damages in an amount in excess of $1,000,000 plus attorneys' fees and costs, and for any further relief this Court deems just and appropriate.

### COUNT V – BREACH OF FIDUCIARY DUTY (BRADLEY)
### (Against Defendants FREEDOM and SHAH)

147.    Plaintiff incorporates by reference the allegations of Paragraphs 1 through 99 as though fully set forth herein.

148.    As Managers of BRADLEY, FREEDOM and SHAH owe fiduciary duties of care, loyalty and good faith to BRADLEY's Members and Managers, including Plaintiff.

149.    In addition to the duties established by common law, the Illinois Limited Liability Company Act sets forth specific duties owed by managers in manager-managed LLCs. *See* 805 ILCS 180/15-3(g).

150.    FREEDOM and SHAH have breached their common law fiduciary duties of care, loyalty, and good faith, as well as the statutory duties imposed on them by 805 ILCS 180/15-3(b) and (c).

151.    FREEDOM and SHAH breached the duties they owed as Managers by refusing to consider, or even acknowledge, refinancing offers for BRADLEY's Mortgage that would eliminate BRADLEY's financial deficiencies, reduce BRADLEY's overall debt, and would result in returns of equity for BRADLEY's members, including KRONE.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

152.    FREEDOM also breached its fiduciary duty to KRONE and WAUKEGAN by failing to inform KRONE of scheduled investor calls so that KRONE could attend or participate.

153.    On at least one such "secret" call, detained above in Paragraph 40, KUMAR made defamatory statements about KRONE in his capacity as manager of BRADLEY.

154.    The defamatory statements about KRONE in the March 2019 Email, by FREEDOM through KUMAR, as detailed above, also were a breach of fiduciary duty owed from one manager to another.

155.    FREEDOM and SHAH's involvement in the funding, creation, and activities of IAM, including the purchase of BRADLEY's Note held by International Bank, and their subsequent demand for additional capital from members without unanimous consent of all BRADLEY's managers, were additional breaches of fiduciary duties FREEDOM and SHAH owed to BRADLEY and KRONE.

156.    As direct and proximate result of the misconduct of FREEDOM and SHAH, acting through their respective human alter egos KUMAR and SUBHASH, KRONE has been injured and continues to be injured.

WHEREFORE, KRONE respectfully requests that the Court enter judgment in his favor and against FREEDOM and SHAH, and award him compensatory and punitive damages in an amount in excess of $1,000,000 plus attorneys' fees and costs, and for any further relief this Court deems just and appropriate.

## COUNT VI – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (BRADLEY)
### (Against Defendants KUMAR, SUBHASH, ARIF and IAM)

157.    Plaintiff incorporates by reference Paragraphs 1 through 99 and 148 through 156 as though fully stated herein.

FILED DATE: 4/5/2019 10:04 AM 2018CH06885

158. As described in detail in Count V, FREEDOM and SHAH breached their fiduciary duties owed to KRONE as managers of BRADLEY.

159. At all times relevant hereto, FREEDOM acted through its human alter ego KUMAR and SHAH acted through its human alter ego SUBHASH.

160. As FREEDOM and SHAH are corporate entities, all actions they took, each of their breaches of fiduciary duties, can be ascribed to their human alter egos, KUMAR and SHAH.

161. Accordingly, KUMAR and SHAH knowingly and substantially participated in FREEDOM and SHAH's breach of fiduciary duties.

162. At all times relevant hereto, ARIF and IAM either acted at the direction of FREEDOM and SHAH, and their human alter egos KUMAR and SUBHASH, or conspired with them in order for unlawfully injure KRONE. ARIF and IAM were aware of their role in FREEDOM and SHAH's breaches of their fiduciary duties owed to KRONE. In fact, ARIF and IAM embraced their role.

163. ARIF told KRONE in an April 2017 email, "I am directed by Dr. KUMAR to pursue any avenue" to circumvent KRONE's managerial rights regarding a potential sale of the BRADLEY property.

164. As ARIF wrote to KRONE on October 3, 2017, he was "authorized" by them "to do whatever is necessary to enhance their investment."

165. In a different October 3, 2017 email, ARIF further told KRONE, "At this time, I speak and continue to speak exclusively with the collective voice of TWO managers. And other investors as well, whose proxies I will present to the LLC counsel. If and when I start speaking as their attorney, it will be when I get admitted to Illinois bar (in the works). Rest assured, you will

be the first to know." ARIF concluded by suggesting that KRONE should "hire an attorney" and that "You are of course free to infer whatever your mind allows you to do so."

166.    Following through on his threats to KRONE, ARIF, at the instruction and/or with the backing of KUMAR and SUBHASH, formed IAM, purchased the BRADLEY Note held by International Bank, and then send a letter to KRONE, via counsel, threatening legal action to enforce KRONE's personal guarantee of the Bradley Note.

167.    As the "proxy" and attorney appointed by FREEDOM and SHAH to conduct their business related to WAUKEGAN and BRADLEY, ARIF's conduct was required to conform to the same fiduciary duties owed to KRONE by FREEDOM and SHAH. ARIF continually insisted to KRONE that ARIF stood in the shoes of FREEDOM and SHAH, that he spoke and acted for them, and that all of BRADLEY and WAUKEGAN's communications be run through him, rather than communicated to FREEDOM and SHAH directly.

168.    For example, in a January 6, 2017 email, ARIF wrote, "If I (on behalf of Drs Shah and Kumar) ask Scott or Noel any questions about their actions, they are answerable to me. Period."

169.    On October 3, 2017, ARIF wrote to KRONE, "When I say DO NOT communicate with Drs. K and S, I say so as someone who is paid to be their proxy and any communications directed to them will be wasted and defeat the purpose of having hired me to be their proxy."

170.    The Illinois Limited Liability Company Act establishes the general duties of a manager in a manager-managed LLC as substantively identical to that of the members in a member-managed LLC.  Thus, a manager of a limited liability company owes fiduciary duties of loyalty and care both to the limited liability company and to its other managers, including an obligation to discharge these duties to the other managers "consistent with the obligation of good faith and fair dealing.

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

171.     Similarly, a manager owes a manager-managed company and its other managers fiduciary duties of loyalty and care.  A fiduciary has the duty to "act with the utmost good faith and loyalty in managing the corporation and is prohibited from enhancing his or her own personal interests at the expense of corporate interests.

172.     As an attorney, ARIF purports to be knowledgeable as the operations of a limited liability company, including the fiduciary obligations of a company's managers.  Moreover, as the sole owner and President of IAM, ARIF is likewise aware of these fiduciary obligations.

173.     KUMAR and SUBHASH are likewise aware of the fiduciary obligations a manager owes to a limited liability company. Each manages his own entity.  KUMAR managers FREEDOM and SUBHASH manages SHAH.

174.     Although ARIF has held himself out as the "proxy" and/or attorney for KUMAR and SHAH, and purports to take actions in their shoes as managers of BRADLEY, he has already indicated his only purpose is to benefit his "clients," not to help the company, regardless of who gets in the way.  Indeed, ARIF made this point clear, having once told KRONE that his only purpose is to make as much money as possible for his clients.  ARIF also told KRONE, "Figure out a way to help me or get out of the way."

175.     Consistent with ARIF's own words, ARIF, IAM, KUMAR and SUBESH knowingly and substantially assisted FREEDOM and SHAH in breaching their fiduciary duties as set forth in Count V, in an effort to force KRONE out and take over the company.  They did so in the following ways:

   a.  They used IAM, a company purportedly owned solely by ARIF, for the purpose of purchasing the BRADLEY mortgage and promissory notes from IBC, in order to use only KRONE's personal guarantee as weapon against KRONE, and they did so without disclosing these actions to BRADLEY or KRONE;

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

b. KUMAR, SUBHASH, FREEDOM and/or SHAH, directly or indirectly provided the funds, or facilitated the financing for funds, which IAM used to purchase BRADLEY's mortgage from IBC, and they did so without disclosing these actions to BRADLEY or KRONE;

c. IAM, purportedly controlled by ARIF, used these funds to purchase BRADLEY's mortgage from IBC and is now using KRONE's personal guarantee as weapon against KRONE to force him out of the company;

d. IAM, purportedly controlled by ARIF, demanded that KRONE alone pay more than $360,000 to cover purported deficiencies in the IBC mortgage, plus attorneys' fees and interest, within a five-day deadline or risk having the personal guarantee enforced through a confession of judgment;

e. IAM, as an alter ego for ARIF, whose only goal is to make money for KUMAR, SUBHASH, FREEDOM and SHAH, are attempting to force KRONE out so they can take over the property through foreclosure, without any significant opposition, to the detriment of KRONE and the other members of BRADLEY.

176. In addition, FREEDOM, acting through KUMAR, using IAM's and ARIF's new status as the so-called "bank," attempted to extort the other members of BRADLEY into making "loans" to BRADLEY or risk losing their respective investments.

177. As direct and proximate result of KUMAR, SUBHASH, ARIF and IAM's misconduct, KRONE has been injured and continues to be injured through their attempts to enforce KRONE's personal guarantee and force him out as a manager of both WAUKEGAN and BRADLEY.

WHEREFORE, KRONE respectfully requests that the Court enter judgment in his favor and against KUMAR, SHAH, ARIF and IAM, and award him compensatory and punitive damages in an amount in excess of $1,000,000 plus attorneys' fees and costs, and for any further relief this Court deems just and appropriate.

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

## COUNT VII – CONSTRUCTIVE FRAUD (BRADLEY)
### (Against Defendants FREEDOM, SHAH, and ARIF)

178.    Plaintiff incorporates the allegations of Paragraph 1 through 99, 148-156 and 158-177 as though fully set forth herein.

179.    As alleged in Count V, Manager Defendants owed fiduciary duties to KRONE, as those parties were all Managers of BRADLEY. ARIF aided and abetted those breaches of fiduciary duty, as alleged in Count VI, and he was required to adhere to FREEDOM and SHAH's fiduciary duties owed to KRONE to the extent he was acting on behalf of, at the direction of, and/or in place of FREEDOM and SHAH.

180.    Manager Defendants and ARIF have breached their respective fiduciary duties owed to KRONE as a manger of BRADLEY by funding and creating IAM, purchasing the Bradley Note, and threatened to impose the entirety of the BRADLEY Note on KRONE. The purpose of this tactic is to force KRONE out as a Manager.

181.    Manager Defendants have further breached their fiduciary duties owed to KRONE as managers of Bradley by refusing to consider, or even acknowledge, refinancing offers for BRADLEY's Mortgage that would have eliminated BRADLEY's financial deficiencies, reduced BRADLEY's overall debt, and still provide returns of equity for BRADLEY's members, including KRONE, from July 2016 to the present.

182.    KRONE and BRADLEY have suffered damages as a result of the breaches of these fiduciary duties in the form of loss of income to BRADLEY, KRONE's loss of income from BRADLEY, KRONE's loss of reputational and professional standing amongst BRADLEY's other members, by triggering KRONE's personal guaranty of BRADLEY's loan; by causing KRONE reputational and professional injury; and by exposing him to potential claims of liability by other equity investors in BRADLEY.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

183.     As direct and proximate result of KUMAR, SUBHASH, and ARIF's misconduct, KRONE has been injured and continues to be injured through their attempts to enforce the KRONE's personal guarantee.

WHEREFORE, KRONE respectfully requests that the Court enter judgment in his favor and against KUMAR, SHAH, ARIF and IAM, and award him compensatory and punitive damages in an amount in excess of $50,000 plus attorneys' fees and costs, and for any further relief this Court deems just and appropriate.

<div align="center">

**COUNT VIII – DEFAMATION *PER SE***
**(Against Defendants FREEDOM and KUMAR)**

</div>

184.     Plaintiff incorporates by reference the allegations of Paragraphs 1 through 89, as though fully set forth herein.

185.     On or about December 20, 2017, in an email to some of the members of BRADLEY, Defendants FREEDOM and KUMAR accused KRONE of fraud against the Members of BRADLEY alleging KRONE "took the distributions and hiding them from every one [sic]."

186.     On or about May 18, 2018, in an email to some of the members of WAUKEGAN, Defendants FREEDOM and KUMAR accused KRONE of not making any distributions since 2014 in an effort to turn the Members of WAUKEGAN against KRONE.

187.     In the same May 2018 email, Defendants FREEDOM and KUMAR accused KRONE of keeping banking information from the other managers of WAUKEGAN, managing the financial affairs unilaterally, and other violations of the WAUKEGAN Operating Agreement.

188.     In the same May 2018 email, Defendants FREEDOM and KUMAR accused KRONE of putting the WAUKEGAN property "into lots of litigation" and driving the WAUKEGAN property into foreclosure in an effort to turn the Members of WAUKEGAN against KRONE.

<div align="center">34</div>

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

189.     In the March 2019 Email to the other managers and members of BRADLEY, FREEDOM and KUMAR made multiple false and defamatory about Krone, as detailed above in Paragraph 86.

190.     These statements were all false and were sent to numerous third parties via email.

191.     Additionally, Defendants FREEDOM and KUMAR defamed KRONE in their phone calls to WAUKEGAN members, as discussed above.

192.     The comments by FREEDOM and KUMAR were defamatory *per se* in two ways. First, they imputed that KRONE had committed a crime (embezzling funds and otherwise keeping money for himself that should have gone to Members of BRADLEY and WAUKEGAN). Second, the comments imputed that KRONE lacked the integrity to perform his duties as a Manager of BRADLEY and WAUKEGAN.

193.     As a direct and proximate result of FREEDOM and KUMAR's false publications to third parties, via both email and teleconference, KRONE's reputation as a Manager of both BRADLEY and WAUKEGAN was injured.

WHEREFORE, KRONE respectfully requests that the Court enter judgment in his favor and against FREEDOM and KUMAR, and award him compensatory and punitive damages in an amount in excess of $1,000,000 plus attorneys' fees and costs, and for any further relief this Court deems just and appropriate.

### COUNT IX – CIVIL CONSPIRACY
**(Against Defendants SHAH, SHAH MANAGEMENT, SUBHASH, FREEDOM, VIMAME, KUMAR, SBS, SIEGEL, LICATA, TRESI, ARIF, JEP, FOUNTAINHEAD, and IAM)**

194.     Plaintiff incorporates by reference the allegations of Paragraphs 1 through 193, as though fully set forth herein.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

195.     The Manager Defendants' various breaches of their fiduciary duties, described in detail in the Factual Background and Counts I and III of this Complaint, were unlawful acts conducted in furtherance of the civil conspiracy.

196.     FREEDOM and KUMAR's defamation of KRONE, described in detail in Count VII, were overt tortious acts in furtherance of the civil conspiracy.

197.     Defendants SHAH, SHAH MANAGEMENT, SUBHASH, FREEDOM, VIMAME, KUMAR, SBS, SIEGEL, LICATA, TRESI, ARIF, JEP, FOUNTAINHEAD, , and IAM assisted each other in the unlawful acts and lawful acts done for unlawful purposes in furtherance of the conspiracy,  including, but not limited to: Manager Defendants' failure to consider, let alone approve refinancing options for both WAUKEGAN and BRADLEY that Krone has presented to cure those companies' respective defaults; TRESI's refusal to remove the TRESI Mortgage on the WAUKEGAN Property, thereby forcing it into foreclosure; TRESI's inflation of the payoff amount for the loan by more than $100,000; the revealing, to TRESI and LICATA, of WAUKEGAN's confidential legal strategies for dealing with the recorded TRESI Mortgage; ARIF's attempt to blackmail KRONE into resigning as manager at the October 2017 meeting; the surreptitious plan to allow LICATA, TRESI, SIEGEL, JEP, and FOUNTAINHEAD to gain control of the WAUKEGAN Property while enforcing KRONE's personal guaranty but not SIEGEL's personal guaranty on the ALLIANT Note; and IAM's nearly identical attempt to take the BRADLEY Property while enforcing KRONE's personal guaranty but not the personal guaranties of KUMAR and SUBHASH on that Note.

198.     That TRESI waited more than four years after it received the TRESI Mortgage to record the document is evidence that it only recorded the Mortgage when it did to maximize the damage to be inflicted on WAUKEGAN and, by extension, KRONE.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

199.    SIEGEL and LICATA, via their JEP and FOUNTAINHEAD corporate entities, then purchased the ALLIANT Mortgage and Note in March 2018 in an effort to acquire the WAUKEGAN Property at a fraction of its real value.

200.    By using his JEP corporate alter ego to purchase the Waukegan Property and step into the shoes of ALLIANT in the foreclosure action (Case No. 18 CH 2032) and prosecute KRONE to enforce KRONE's personal guaranty, SIEGEL and SBS breached their prior settlement agreement with KRONE. Specifically, they breached Paragraph 21, the "Good Faith Provision," wherein they had warranted "going forward they will avoid causing undue harm or injury to the business ventures of the other. They further agree not to disparage one another or to encourage others to file legal actions."

201.    Prior to the breaching actions of SBS and SIEGEL of the settlement agreement, Krone had fulfilled all obligations imposed on him pursuant to the terms of the settlement agreement.

202.    KRONE has suffered damages as a result of SIEGEL and SBS's breach of their settlement agreement, notably that KRONE is now defending himself in the foreclosure action brought by SIEGEL's company JEP, as well as further economic and reputational harm on account of that lawsuit.

203.    SIEGEL and SBS's breach of their settlement agreement with KRONE was an additional unlawful act in furtherance of the civil conspiracy alleged herein.

204.    Additionally, in May 2018, JEP unlawfully attempted to collect rents from WAUKEGAN's tenants without first obtaining a court order, by posting signs throughout the property directing tenants to send the rent payments directly to JEP and/or its property manager.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

This was an attempt to deprive KRONE and the other WAUKEGAN members of income from the property without court sanction, another unlawful act in furtherance of the civil conspiracy.

205.    Defendants SHAH, SHAH MANAGEMENT, SUBHASH, FREEDOM, VIMAME, KUMAR, SBS, SIEGEL, LICATA, TRESI, ARIF, JEP, FOUNTAINHEAD,, and IAM did the things herein alleged maliciously and to oppress KRONE, WAUKEGAN and BRADLEY, causing each of them irreparable damage and damages.

206.    As described in Paragraphs 77 through 86, Defendants' scheme is to obtain the properties at a reduced cost and enrich themselves.

207.    KRONE, WAUKEGAN, and BRADLEY were damaged as a direct and proximate cause of Defendants' civil conspiracy.

WHEREFORE, KRONE respectfully requests that the Court enter judgment in his favor and against SHAH, SHAH MANAGEMENT, SUBHASH, FREEDOM, VIMAME, KUMAR, SBS, SIEGEL, LICATA, TRESI, ARIF, JEP, FOUNTAINHEAD, and IAM, and award him compensatory and punitive damages in an amount in excess of $1,000,000 plus attorneys' fees and costs, and for any further relief this Court deems just and appropriate

### COUNT X – APPLICATION FOR MEMBER EXPULSION
### FROM WAUKEGAN AND BRADLEY PURSUANT TO 805 ILCS 180/35-45(6)
#### (Against Defendants FREEDOM, SHAH, and TRESI)

208.    Plaintiff incorporates by reference the allegations of Paragraphs 1 through 207, as though fully set forth herein.

209.    At all times relevant to this complaint, and as now in effect, the Illinois Limited Liability Act, Section 35-45(6), provides:

A member is dissociated from a limited liability company upon the occurrence of any of the following events: …
(6) On application by the company or another member, the member's expulsion by judicial determination because the member:

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

a)  engaged in wrongful conduct that adversely and materially affected the company's business;

b)  willfully or persistently committed a material breach of the operating agreement or of a duty owed to the company or the other members under Section 15-3; or

c)  engaged in conduct relating to the company's business that makes it not reasonably practicable to carry on the business with the member.

210.    Section 10 of the Operating Agreements of both WAUKEGAN and BRADLEY incorporate Section 35-45 by explicit reference. *See* Ex. A and B.

211.    As alleged in the foregoing paragraphs, Defendants FREEDOM, SHAH, and TRESI engaged in wrongful conduct that adversely and materially affected WAUKEGAN's and BRADLEY's respective businesses; and willfully or persistently committed material breaches of WAUKEGAN's and BRADLEY's Operating Agreements and their duties, fiduciary and otherwise, owed to WAUKEGAN and BRADLEY and the other members of each company.

212.    Because of the actions of Defendants FREEDOM, SHAH, and TRESI, as alleged herein, it is not reasonably practicable to carry on the business of WAUKEGAN and BRADLEY with those members, as those Defendants have demonstrated a pattern of willful and malicious conduct against the interests of BRADLEY and WAUKEGAN.

213.    Pursuant to 805 ILCS 180/35-45(6), this Court is vested with the power to expel Defendants FREEDOM, SHAH, and TRESI as members of BRADLEY and WAUKEGAN upon this application by Plaintiff.

WHEREFORE, KRONE respectfully requests that this Court enter judgment in his favor and against FREEDOM, SHAH, and TRESI, and enter an order, pursuant to Section 35-45(6) of the Illinois Limited Liability Act, of expulsion of FREEDOM, SHAH, and TRESI as members of WAUKEGAN and BRADLEY, and to further order their respective interests be converted to

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

economic interests with no vote, control or management authority; further awarding Plaintiff his costs and attorneys' fees; and such other relief as the Court deems just and equitable.

## COUNT XI – BREACH OF CONTRACT
### (Against Defendants SHAH and FREEDOM)

214.     Plaintiff incorporates by reference the allegations of Paragraphs 1 through 207 as though fully set forth herein.

215.     Pursuant to a written agreement, SHAH became a manager of WAUKEGAN on or about June 29, 2015. *See* Exhibit D. At all times relevant to this Complaint, that agreement and the WAUKEGAN Operating Agreement were in full force and effect.

216.     At all relevant times KRONE, SHAH and FREEDOM were Managers of WAUKEGAN and BRADLEY.

217.     KRONE performed all duties required of a member and manager under the WAUKEGAN and BRADLEY Operating Agreements, including, but not limited to, finding tenants for the Properties' units, serving as WAUKEGAN's Tax Matters Partner, working with banks to secure refinancing options, and composing and creating financial reports for the members.

218.     As alleged in the preceding paragraphs, SHAH and FREEDOM constantly failed to fulfill their obligations and duties as Managers of WAUKEGAN and BRADLEY, breaching the companies' respective Operating Agreements (the material terms of which are identical).

219.     KRONE and the members of WAUKEGAN and BRADLEY have suffered significant damages as a direct and proximate cause of the breaches of the WAUKEGAN and BRADLEY Operating Agreements by FREEDOM and SHAH.

220.     KRONE and the other members of BRADLEY have further suffered significant damages as a direct and proximate cause of FREEDOM, KUMAR, SHAH, and SUBHASH's role

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

in the creation, funding, and activities of IAM, all of which also constitute violations of the BRADLEY Operating Agreements.

WHEREFORE, KRONE respectfully requests that the Court enter judgment in his favor and against FREEDOM and KUMAR, and award him compensatory and punitive damages in an amount in excess of $1,000,000 plus attorneys' fees and costs, and for any further relief this Court deems just and appropriate.

## COUNT XII – DECLARATORY AND INJUNCTIVE RELIEF
### (Against Defendants Freedom, Kumar, Shah, Subhash, Arif, and IAM)

221.     Plaintiff incorporates by reference Paragraphs 1 through 207 and 215 through 220 as though fully stated herein.

222.     As the sometimes-proxy, sometimes-attorney for FREEDOM, SHAH, KUMAR, and SUBHASH, ARIF has tried for several years to force KRONE out as a manger from both WAUKEGAN and BRADLEY, interfered with the business of each company, falsely accused KRONE of mismanagement and theft and threatened to financially ruin KRONE, as detailed in the incorporated Paragraphs.

223.     The Manager Defendants, KUMAR, SHAH, and ARIF are using IAM for the sole purpose of forcing KRONE out of WAUKEGAN and BRADLEY through the purchase of BRADLEY's debt from International Bank.

224.     IAM purchased BRADLEY's debt for the full price of the loan, $5.6 million, with full knowledge of any alleged existing defaults.

225.     The Manager Defendants, KUMAR, SHAH, ARIF, and IAM are trying to use KRONE's personal guaranty as a weapon against him, as part of the civil conspiracy described in throughout this Complaint and specifically within Count IX.

FILED DATE: 4/5/2019 10:04 AM 2018CH06885

226. By weaponizing the personal guarantee against KRONE and only KRONE, to the exclusion of the other personal guarantors, KUMAR and SUBHASH, the Manager Defendants, ARIF and IAM are attempting to inflict as much harm as possible against KRONE in order to force him out of the companies.

227. The selective enforcement of the personal guarantors by ARIF and IAM further demonstrates this malicious motive. ARIF, as the sole owner of IAM and as the current or former "proxy" and attorney for KUMAR, SHAH, FREEDOM and SUBHASH, purchased the IBC note shortly after KRONE had announced he was attempting to refinance the WAUKEGAN property, and now seeks only to enforce the note as to KRONE.

228. ARIF's contentious communications with KRONE between 2016 and 2018, in which he repeatedly accused KRONE of mismanagement and misappropriation, tried to generate support among investors for KRONE's removal and openly advocated for KRONE's removal, only serve to confirm that ARIF, through IAM, purchased the IBC loan in order to threaten KRONE with the prospect of a judgment so significant KRONE would have no choice but to withdraw from each company.

229. ARIF did all this as a conspirator with the Manager Defendants or as the "proxy" or attorney of the Manager Defendants. In other words, ARIF either conspired with the Manager Defendants or aided and abetted the Manager Defendants in a committing a massive breach of their fiduciary duties to KRONE as a co-manager and the members of each company

230. Consistent with the attempt to unlawfully force KRONE through the selective enforcement of KRONE's personal guarantee of the IBC note, KUMAR then sent an email to the members of BRADLEY, without including KRONE as a recipient, purporting to update the members as to the status of the business. In the email, KUMAR tried to mislead the members and

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

generate support for his position by defaming KRONE and accusing him of criminal misconduct and mismanagement, while admitting that he was working closely with ARIF.

231.     KUMAR also made it clear to the other members that if they did not "loan" the business money within 60 days, they would lose their investments, without advising the other members that he had in fact either provided the funds for IAM to purchase the debt or provided the financing for the purchase.  In other words, KUMAR fraudulently concealed this material fact – his involvement in the purchase - in an attempt to force the members into making a "loan" or risk losing their investments.

232.     Because AIRF and IAM are using KRONE's personal guarantee of the IBC loan unlawfully to facilitate the breach of FREEDOM and SHAH's fiduciary duties, the personal guarantee should be declared unenforceable.

233.     Pursuant to 735 ILCS 5/2-701, this Court has jurisdiction in cases of actual controversy to make binding declarations of rights.

234.     An actual controversy exists between KRONE and Manager Defendants, KUMAR, SHAH, ARIF, and IAM, as KRONE has alleged those Defendants are engaged in a civil conspiracy, in relevant part to this Count XII, to force KRONE's resignation as a Manager of BRADLEY and to relinquish his membership interest in BRADLEY, under the threat of IAM enforcing KRONE's personal guaranty, while refusing to enforce the guaranties of KUMAR and SHAH to cover the same alleged deficiency on the Note held by IAM, and seek to confess judgment against KRONE.

235.     A declaration of KRONE's right to not be coerced and that IAM has no right to use the personal guaranty in furtherance of the alleged civil conspiracy will terminate a portion of the controversy between the parties to this litigation.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

236.     KRONE has protectable rights as a manager and investor in WAUKEGAN and BRADLEY that are at serious risk if the Manager Defendants, KUMAR, SHAH, ARIF, and IAM, are allowed to selectively and arbitrarily enforce KRONE's personal guarantee of the BRADLEY debt.

237.     Aside from that ascertainable monetary injury, KRONE will suffer irreparable injuries, for which there are no adequate remedies at law, including property rights as a manager and member of BRADLEY, damage to his credit rating, and inability to personally guaranty refinance loans for BRADLEY and WAUKEGAN (a requirement from all lender given this on-going litigation and the financial histories of the companies).

238.     Krone also has established a likelihood of success on the merits of his claims, because the record thus far clearly raises a "fair question" that (1) FREEDOM and SHAH have breached their fiduciary duties as co-managers of BRADLEY and WAUKEGAN by using ARIF and IAM as the straw man to purchase the BRADLEY mortgage and arbitrarily enforce Krone's personal guarantee; (2) ARIF has conspired with KUMAR and SUBHASH to do the same; and (3) the Manager Defendants, KUMAR, SHAH, ARIF, IAM, JEP, SIEGEL, LICATA, and TRESI have conspired among one another to employ the same tactic – causing a default of a mortgage, purchasing it and then enforcing it as to Krone – in order to pressure Krone from different angles.

WHEREFORE, KRONE respectfully requests that this Court enter a declaratory judgment in his favor and against Defendants FREEDOM, KUMAR, SHAH, SUBHASH, ARIF and IAM, that those Defendants have no right to use or enforce KRONE's personal guaranty of the Note currently held by IAM in furtherance of the alleged civil conspiracy and while this litigation is pending; and further enter orders granting a preliminary injunction and, after the requisite hearing, permanent injunctions enjoining those Defendants from (i) foreclosing on the Bradley Note, and

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

(ii) taking any legal action to enforce KRONE's personal guaranty or confess judgment on the same; further order an award to Plaintiff of his costs and reasonable attorneys' fees; and such other relief as the Court deems just and equitable.

## COUNT XIII – DECLARATORY JUDGMENT
### (Derivative Action on behalf of Waukegan, Against Defendant JEP)

239.    Plaintiff incorporates by reference Paragraphs 1 through 24, 64, 65, and Exhibit C as if fully stated herein.

240.    On several occasions throughout January 2019 through the present, KRONE and WAUKEGAN, through their respective counsel, have attempted to seek the required unanimity with the Manager Defendants to refinance the WAUKEGAN property, which would render as moot JEP's foreclosure action, Case No. 2018 CH 2032, as WAUKEGAN would pay the existing WAUKEGAN Note in full.

241.    Previously, in February 2019, the Manager Defendants did consent to WAUKEGAN sending a request to JEP, pursuant to 735 ILCS 5/15-1505.5, for a payoff letter.

242.    However, the Manager Defendants have not responded to follow-up requests for authority to further challenge the inaccurate 1505.5 Letter that JEP sent to WAUKEGAN's counsel on February 18, 2019.

243.    Most recently, on March 5, 2019, and again on March 7, 2019, WAUKEGAN's counsel sought the Manager Defendants' approval emailed counsel for the Manager Defendants, seeking their approval for a term sheet, secured by KRONE, for refinancing.

244.    Manager Defendants never responded to these requests but rather have remained silent. The silence of Manager Defendants can only be construed as a tacit denial or outright refusal to cooperate or offer alternative suggestions.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

245.    The Waukegan Operating Agreement requires unanimous consent from all Managers for any decisions relating to the Company's real property interests. *See* Ex. A.

246.    The Manager Defendants' silence is designed to obstruct KRONE's ability to secure refinancing and block his attempts to take WAUKEGAN out of foreclosure, saving the company's asset.

247.    Accordingly, KRONE brings this Count XII as a derivative action on behalf of WAUKEGAN for a declaratory judgment from the Court as to the correct payoff amount for the WAUKEGAN Note.

248.    Pursuant to 735 ILCS 5/2-701, this Court has jurisdiction in cases of actual controversy to make binding declarations of rights, "including the determination, at the instance of anyone interested in the controversy," of the construction of any written instrument.

249.    A genuine and existing controversy exists between the parties as to the amount owed on the WAUKEGAN Note held by JEP.

250.    The controversy is evident by the correspondence exchanged between JEP's counsel and WAUKEGAN's counsel between February 2019 and March 2019 regarding the correct payoff amount on the WAUKEGAN Note. In short, WAUKEGAN asserts that the current balance on the Note as of February 18, 2019, inclusive of all principal, interest, penalties, and allowable fees is $2,149,827.07. JEP asserts that the balance is (as of March 7, 2019), $2,465,830.24, plus nearly $70,000 in attorneys' fees.

251.    A determination by the Court of the correct Note payoff amount will extinguish the controversy, as it will allow WAUKEGAN to formalize and execute its refinancing of the property, paying JEP off in full, and mooting Case No. 2018 CH 2032.

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

WHEREFORE, KRONE, on behalf of WAUKEGAN, requests that this Court enter a declaratory judgement as to correct amount currently due and owing on the WAUKEGAN Note, and for any other relief the Court deems just and equitable.

## COUNT XIV – DECLARATORY JUDGMENT
### (Derivative Action on behalf of Waukegan, Against Defendant Tresi)

252.    Plaintiff incorporates by reference Paragraphs 1 through 24, 46 through 57, 63 and Exhibit D as through fully stated herein.

253.    On several occasions throughout January 2019 through the present, KRONE and WAUKEGAN, through their respective counsel, have attempted to seek the required unanimity with the Manager Defendants to refinance the WAUKEGAN property, which would render as moot JEP's foreclosure action, Case No. 2018 CH 2032, as WAUKEGAN would pay the existing notes held by JEP and Tresi in full.

254.    Previously, in February 2019, the Manager Defendants did consent to WAUKEGAN sending a request to TRESI, pursuant to 735 ILCS 5/15-1505.5, for a payoff letter.

255.    However, the Manager Defendants have not responded to follow-up requests for authority to further challenge the inaccurate 1505.5 Letter that TRESI sent to WAUKEGAN's counsel on February 18, 2019.

256.    Most recently, on March 5, 2019, and again on March 7, 2019, WAUKEGAN's counsel emailed counsel for the Manager Defendants, seeking their approval for a term sheet, secured by KRONE, for refinancing.

257.    Manager Defendants never responded to these requests but rather have remained silent. The silence of Manager Defendants can only be construed as a tacit denial or outright refusal to cooperate or offer alternative suggestions.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

258.    The Waukegan Operating Agreement requires unanimous consent from all Managers for any decisions relating to the Company's real property interests. *See* Ex. A.

259.    The Manager Defendants' silence is designed to obstruct KRONE's ability to secure refinancing and block his attempts to take WAUKEGAN out of foreclosure, saving the company's only asset.

260.    Accordingly, KRONE brings this Count XIII as a derivative action on behalf of WAUKEGAN for a declaratory judgment from the Court as to the correct payoff amount for the WAUKEGAN Note held by TRESI.

261.    Pursuant to 735 ILCS 5/2-701, this Court has jurisdiction in cases of actual controversy to make binding declarations of rights, ""including the determination, at the instance of anyone interested in the controversy," of the construction of any written instrument.

262.    A genuine and existing controversy exists between the parties as to the amount owed on the WAUKEGAN Note held by TRESI.

263.    The controversy is evident by the correspondence exchanged between TRESI's counsel and WAUKEGAN's counsel between February 2019 and March 2019. In short, TRESI alleges a balance due on its Note, as of February 18, 2019, of $142,872.26, inclusive of principal, interest, and expenses. WAUKEGAN asserts the total balance due as of February 18, 2019, is $37,975.15.

264.    A determination by the Court as to the payoff amount will extinguish some part of the controversy between TRESI and WAUKEGAN, as it will allow WAUKEGAN to secure refinancing of its Property and pay off the TRESI Note in full.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

WHEREFORE, KRONE, on behalf of WAUKEGAN, requests that this Court enter a declaratory judgement as to correct amount currently due and owing on the TRESI Note, and for any other relief the Court deems just and equitable.

## COUNT XV – CONTRIBUTION
### (Against Defendants KUMAR and SUBHASH, and pled in the alternative)

265.   Plaintiff incorporates by reference Paragraphs 1 through 99, 148 through 156, 158 through 177, and Exhibit B, as though fully stated herein.

266.   Pursuant to 735 ILCS 5/2-701, this Court has jurisdiction in cases of actual controversy to make binding declarations of rights, ""including the determination, at the instance of anyone interested in the controversy," of the construction of any written instrument.

267.   As alleged above, IAM has purchased the BRADLEY Note, and issued a demand letter to KRONE seeking to enforce KRONE's personal guaranty of the BRADLEY Note as its elected remedy, to the exclusion of enforcement against KUMAR and SUBHASH for their personal guaranties of the same NOTE.

268.   Accordingly, to the extent that IAM is able to recover any amount from KRONE on his personal guaranty, KRONE is entitled to proportionate contribution from his co-guarantors KUMAR and SUBHASH.

269.   "If any one or more of a number of co-guarantors of a debt is required to pay the whole or any portion of the debt, the co-guarantors become liable to contribute their proportionate share of the amount paid." *Harris v. Handmacher*, 185 Ill. App. 3d 1023, 1026–27, 542 N.E.2d 77, 80 (1st Dist. 1989).

270.   In the alternative, and in the event that IAM has released KUMAR and SHAH from their respective personal guaranties, IAM may only recover from KRONE is proportionate share of any judgment. *In re Estate of Tiemann*, 141 Ill. App. 3d 512, 515 (4th Dist. 1986).

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

WHEREFORE, KRONE requests that this Court enter judgment in his favor, and against Defendants KUMAR and SUBHASH, and order KUMAR and SUBHASH to contribute their respective proportionate share of any judgment entered against KRONE.

## COUNT XVI – FALSE LIGHT
### (against Defendants FREEDOM and KUMAR)

271.    Plaintiff incorporates by reference Paragraphs 1 through 89 and 185 through 193 as though fully stated herein.

272.    The defamatory statements by FREEDOM, through its human alter ego KUMAR, against KRONE, in the emails to BRADLEY members and managers placed KRONE in a false light before those members and managers.

273.    The false statements in December 2017, the May 2018 email, and the March 2019 Emails, would be highly offensive to a reasonable person, as they accused Krone of several crimes and breaches of his fiduciary duties, impugned his reputation and attacked his integrity as a manager of both WAUKEGAN and BRADLEY.

274.    FREEDOM, through its human alter ego KUMAR, acted with actual malice in making the false statements about KRONE. FREEDOM and KUMAR knew the all the statements made were false at the time that they were made.

275.    Further, within the March 2019 Email, KUMAR admitted, "I dont (*sic*) have proof," that "all the excess revenue was like being siphoned off by KRONE."

276.    Lacking such proof, such statement was, in the light most favorable to FREEDOM and KUMAR, made with reckless disregard for whether the statement was true or false.

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

WHEREFORE, KRONE respectfully requests that the Court enter judgment in his favor and against FREEDOM and KUMAR, and award him compensatory and punitive damages in an amount in excess of $1,000,000 plus attorneys' fees and costs, and for any further relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues presented in this complaint.

DATED: April 5, 2019                    Respectfully submitted,

                                        SCOTT KRONE


                                        By: */s/ Patrick W. Chinnery*
                                             *Attorneys for Plaintiffs*

John J. Rock
Patrick R. Moran
Patrick Chinnery
**ROCK FUSCO & CONNELLY, LLC**
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
T: (312) 494-1000
F: (312) 494-1001
Atty. No. 48719


**CERTIFICATE OF SERVICE**

The undersigned, an attorney, certifies that a copy of this document was served on all counsel of record via electronic mail on the date it was returned stamped as filed by the Court Clerk.

                                        */s/ Patrick W. Chinnery*

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

## **VERIFICATION**

I, Scott Krone, state that under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in the Third Amended Verified Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that I verily believes the same to be true.

Dated: April 4, 2019                                    By:_____

                                                                    Scott Krone

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

# EXHIBIT A

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

# OPERATING AGREEMENT

## OF

## PLATFORM I - 600 WAUKEGAN, LLC

### An Illinois Limited Liability Company

THIS OPERATING AGREEMENT ("Agreement") is made and entered into as of February 3, 2012, by and among SSSK Capital Fund, LTD ("SSSK") and those other parties who from time to time execute this Agreement or counterparts hereof; and

WHEREAS, the parties hereto desire to form a limited liability company on the terms and for the purposes set forth herein;

NOW, THEREFORE, in consideration of the respective mutual covenants and agreements herein contained and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.   <u>DEFINITIONS</u>

"Act" shall mean the Illinois Limited Liability Company Act, as amended from time to time.

"Affiliate" with regard to a Person, means a Person that is directly or indirectly controlled by, controlling or controlled with such Person. For purposes of this Agreement, "control" when used with respect to any Person means the power to direct the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The term "Affiliates" and "affiliated" shall have correlative meanings.

"Assignee" means a Person to whom an Interest has been assigned or transferred in accordance with this Agreement, but which has not become a Substitute Member (and accordingly has no voting or management rights).

"Capital Account" shall mean the capital account of a Member maintained pursuant to Section 9 hereof.

"Capital Contribution" shall mean, with respect to any Member, the cash and fair market value (which value shall be determined by the Managers) of other property (net of any liabilities secured by any contributed property that the Company is considered to take subject to or assume under Section 752 of the Code) contributed to the capital of the Company pursuant to Section 8.1 hereof upon formation of the Company, or at any time thereafter in accordance with the terms of this Agreement.

"Company" shall mean Platform I - 600 Waukegan LLC, the limited liability company created pursuant to this Agreement.

F:\SSSK\Platform I\Platform I - 600 Waukegan\1C Legal Insur\1-0 Attorney\1-1 Proj Struct\PLATFORM OP AGMT Alliant.doc

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Interest" shall mean the respective interests of the Members in and to the Company and its assets as determined in accordance with the provisions of <u>Section 7</u> hereof.

"Managers" shall mean officers of SSSK or any other Person who is selected as a Manager of the Company from time to time in accordance with the terms of this Agreement.

"Members" shall mean the Members identified in the introductory paragraph of this Agreement and any Substitute Members or additional Members admitted in accordance with the terms hereof. The term does not include an Assignee except for the purposes of <u>Sections 12.1</u> and <u>13.1</u>.

"Person" shall mean any individual, partnership, corporation, limited liability company, trust or other entity, or any government or political subdivision, or any agency, department or instrumentality thereof.

"Regulations" shall mean the federal income tax regulations promulgated under the Code.

"Substitute Member" shall mean a transferee of an Interest that succeeds to all of the rights, including the voting and management rights, of the transferor of such Interest pursuant to <u>Section 15.1(e)</u> hereof. Substitute Members shall be Members for all purposes hereunder.

2.   <u>FORMATION</u>

The parties do hereby form a limited liability company under the Act for the scope and purposes set forth herein and upon all of the terms and conditions hereof.

3.   <u>NAME AND PLACE OF BUSINESS; AGENT FOR SERVICE OF PROCESS;</u>

The name of the Company shall be "PLATFORM I - 600 WAUKEGAN LLC". The principal place of business of the Company shall be 1249 Waukegan Road in Glenview, Illinois 60025, or at such other place or places as may be approved by the Managers from time to time. The registered agent and registered office of the Company shall be Michael O'Brien, Esq., 1249 Waukegan Road in Glenview, Illinois 60025, or such other agent or office as may be approved by the Managers from time to time. The Managers shall arrange for the prompt filing of Articles of Organization ("Articles"), and any amendments thereto as required by the Act.

4.   <u>PURPOSE</u>

The purpose of the Company shall be to directly or indirectly provide financing to, acquire, own, maintain, operate, manage, lease, build, develop, construct, hold for capital appreciation and current income, and sell real estate developments in various locations in the United States (it being understood that the Company may provide financing to, operate, manage, lease, build, develop, construct, and provide consulting services for real estate developments owned by Persons other than the Company, as well as those owned by the Company), and to engage in any and all general business activities related or incidental thereto.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

5.      TITLE TO ASSETS

        Any assets of the Company may be held in the name of the Company, or in such other name as shall be determined by the Managers.

6.      DURATION OF THE COMPANY

        The term of the Company shall commence on the filing of the Articles and shall expire only on the first to occur of the following events:

                (a)      written consent of the Managers to terminate the Company; or

                (b)      the sale or disposition of all of the Company's assets in accordance with the terms of this Agreement.

        Notwithstanding anything contained herein to the contrary, the death or legal incompetency of an individual Member, or the bankruptcy, liquidation, dissolution, cessation to exist as a legal entity of a Member which is not an individual, shall not cause the termination or dissolution of the Company and the business of the Company shall continue.

7.      LIMITED LIABILITY COMPANY INTERESTS

        The respective initial percentage Interests of the Members in and to the Company are as shown on Exhibit A hereto and made a part hereof. If, pursuant to the terms of the agreement, a Member contributes additional funds or property to the capital of the Company in excess of such Member's initial contribution, or if new Members are admitted in accordance with this Agreement, the respective percentage Interests of the Members shall be adjusted proportionately to be in the ratio of their then existing adjusted Capital Accounts.

8.      CAPITAL CONTRIBUTIONS; LOANS

        8.1      Capital Contributions; Additional Members. As of the date hereof, each Member has contributed to the Company's aggregate capital the amount set forth opposite such Member's name on Exhibit A hereto. With the consent of the Managers, a Member may make additional Capital Contributions in excess of such Member's initial Capital Contribution. If the Company admits a Person (other than an original Member or a Substitute Member) as a Member, the Person shall contribute to the Company such Capital Contribution as shall be determined by the Managers. The Company may require such Person to make other payments prior to the admission of such Person as a Member, including payments to reimburse the Company for the costs and expenses incurred by the Company in connection with the admission of such Person.

        8.2      No Other Additional Obligations. No Member shall have any obligation to make any additional contribution to the Company or to guarantee any indebtedness of the Company except upon the agreement of all the Members.

        8.3      Intent of Section 8. This Section 8 is not intended to create any third party beneficiary rights or to be for the benefit of (i) any creditor (other than a Member) of the Company or any Member, or (ii) any other Person (other than a Member) to whom any debts,

F:\SSSK\Platform I\Platform I - 600 Waukegan\1C Legal Insur\1-0 Attorney\1-1 Proj Struct\PLATFORM OP AGMT Alliant.doc

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

liabilities or obligations are owed by, or who otherwise has a claim against, the Company or any Members, and no such creditor or other Person shall obtain any rights under the provisions of this <u>Section 8</u> or shall by reason of the provisions of this <u>Section 8</u> make any claim in respect of any of the aforesaid debts, liabilities or obligations (or otherwise) against the Company or any Member.

8.4    <u>Withdrawal of Capital</u>.  No Member shall have any right to withdraw or make any demand for withdrawal of such Member's Capital Contribution or the capital interest reflected in such Member's Capital Account.

8.5    <u>Loans by Members</u>.  If, at any time or from time to time, the Managers determine that it is necessary or advisable for the Members to make loans to the Company (all such loans being collectively referred to herein as "Member Loans"), they shall notify the Members, of the amount which they have determined the Company should borrow from the Members.  Each Member shall have the right, but not the obligation, to lend such Member's pro rata share of any such desired borrowing based upon such Member's percentage Interest, provided, that if some Members do not make Member Loans, then other Members may make Member Loans in proportion to the percentage Interests of the Members who agree to make Member Loans.  All Member Loans shall bear interest at a floating rate per annum equal to the rate from time to time announced by The Northern Trust Company, or any successor thereto, as its prime lending rate (however designated) plus 3% per annum, or at such other rate as may be approved by the Managers, and shall otherwise be made upon terms and conditions satisfactory to the Managers and the Members making the Member Loans.  Member Loans shall not constitute an increase in the Member's Capital Account or percentage Interest.  All Member Loans shall be repaid according to the priority established for cash distributions in <u>Sections 12.1 and 13.1</u>.

9.    <u>CAPITAL ACCOUNTS</u>

Individual Capital Accounts shall be maintained separately for each Member in accordance with Regulations Section 1.704-1(b)(2)(iv).  No interest shall be paid or shall accrue on the Capital Accounts.

10.    <u>MANAGEMENT OF BUSINESS</u>

10.1    <u>Management</u>.

(a)    <u>Manager Authority</u>.  Except as otherwise provided herein, the business and affairs of the Company shall be directed and managed by the Managers, and, subject to the terms of Section 10.1(b) hereof, the Managers shall have the full, complete and exclusive authority, power and discretion to take any and all actions and make any and all decisions regarding the Company's business without the consent or vote of the Members.  Without limiting the foregoing (but subject to Section 10.1(b) hereof), the Managers shall have full, complete and exclusive authority, power and discretion to take any and all actions and make any and all decisions regarding the matters described in Section 15-1(c) of the Act without the consent or vote of the Members.  At such times as there shall be more than one Manager, any action or decision by the Managers on behalf of the Company shall require the approval of all of the Managers.  No Member, in his or her

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

capacity as a Member, shall have the right, power or authority to act for or bind the Company, all such right, power and authority being vested in the Managers. Each Manager only shall be required to devote such time to the management of the business of the Company as he deems necessary to promote the interests of the Company.

(b)  Major Decisions.  Notwithstanding anything to the contrary contained herein, the following actions shall require the unanimous approval of all of the Managers:

(i)  the incurrence by the Company of any indebtedness in excess of One Hundred Thousand Dollars ($100,000);

(ii)  the mortgage, pledge or grant of a security interest in any Company property;

(iii)  the merger of the Company with another Person;

(iv)  any lease of all or any portion of the Property; and

(v)  the sale of the Property or any part thereof.

(c)  Professional Engagements.  Subject to the provisions of Section 10.1 (a) and (d), the Managers may engage on behalf of, and at the expense of, the Company, such persons, firms or corporations as the Managers shall deem advisable for the conduct and operation of the business of the Company, including without limitation lawyers, accountants, investment bankers, engineers, consultants, and purveyors of other services or materials, on such terms and for such compensation or costs as he, in his discretion, shall determine.

(d)  Services by Managers and Members.  The Managers may, on behalf and at the expense of the Company, engage or otherwise permit any Manager, another Member or an employee or affiliate of any of them to render or provide, and pay them or any of them, compensation for rendering or providing, products, services and/or financial accommodations to or for the benefit the Company only upon terms as to which the Managers agree.

(e)  Fees Payable to the Managers; Reimbursement of Expenses.  No salaries or compensation other than as set forth in this Agreement shall be paid to any Manager for services provided to the Company by such Manager in his capacity as Manager hereunder; provided, however, that the Company shall pay or reimburse each Manager and his Affiliates for expenses of every kind incurred on behalf of the Company to the extent permissible by law and consistent with Section 10.1(a).

(f)  Tax Matters Member.  Scott J. Krone is hereby appointed the "Tax Matters Member" of the Company which shall be the equivalent of the "Tax Matters Partner" referred to in Sections 6221-6231 of the Code, and Krone shall serve in such capacity for all purposes pursuant to such Code Sections.  The Company shall not be obligated to pay

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

any fees or other compensation to the Tax Matters Member in his capacity as such, provided that the Company shall reimburse the Tax Matters Member for any and all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) sustained by him in his capacity as Tax Matters Member.

(g) <u>Removal, Resignation and Replacement of Managers.</u>

(i) Any Manager may resign at any time by providing written notice thereof to the other Manager.

(ii) Except as provided in Section 35-45(6) of the Act, no Manager otherwise may be removed, with or without cause.

(iii) In the event any Manager shall die, become legally incapacitated, resign or be removed in accordance with this Agreement (or as provided in Section 35-45(6) of the Act, then the remaining Manager or Managers shall be the sole Manager or Managers of the Company and shall have the exclusive right and obligation to manage the Company as described in Section 10.1(a) hereof. In the event all Managers shall be removed in accordance with the terms of this Agreement, resign, die or become legally incapacitated, the Members shall have the right to appoint a new Manager or Managers.

(h) <u>Officers.</u> The Managers shall have the right to appoint one or more officers of the Company (which may be any Manager or Affiliates thereof) to perform such duties upon such terms as the Managers may specify in their discretion from time to time.

(i) <u>Other Activities.</u> Notwithstanding anything to the contrary contained herein, any Manager, Member and officer (and any Affiliate thereof) may engage and possess an interest in any other business venture or property of any nature, kind or description whether or not similar to or competitive with any business venture or property of the Company and shall have no obligation to offer the Company or any other Member an opportunity to participate in or share the profits, distributions or fees therefrom, and the engagement in or possession of an ownership interest in any such business venture or property shall not be deemed to constitute a breach of fiduciary duty to the Company or to the other Members.

10.2 <u>Indemnification; Etc.</u>

(a) The Company shall, to the extent permitted by law, indemnify and hold harmless the Managers and any officers of the Company against any losses, judgments, liabilities or expenses incurred in settling any claim or incurred in any finally adjudicated legal proceeding, including reasonable attorneys' fees and/or amounts paid in settlement of any claims sustained by him, in each case arising from or relating to management of the Company, provided that the same did not result from actions or inactions of such Managers (or officer) which were outside the scope of authority conferred on such Managers (or officer) or constituted grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

(b)      Expenses incurred in defending a civil or criminal action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by the Managers (or officer) to repay such amount if it shall ultimately be determined that the Managers (or officer) are not entitled to be indemnified by the Company.

(c)      The indemnification provided by this Section shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any statute, agreement, vote of Members or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office.

(d)      Company shall have the power to purchase and maintain insurance on behalf of the Managers and Company officers against any liability asserted against them or incurred by them in such capacity or arising out of their status as such, whether or not the Company would have the power to indemnify them against such liability under the provisions of this Section 10.2.

(e)      The provisions of this Section 10.2 shall continue as to a person who has ceased to be a Manager (or officer) as to claims arising out of activities related to his prior position and shall inure to the benefit of his heirs and personal or legal representatives.  The provisions of this Section 10.2 also shall survive the liquidation, dissolution and termination of the Company and the termination of this Agreement and shall be binding on the Company's successors and assigns.

(f)      Other Persons Covered.  The provisions of this Section 10.2 shall apply in all respects to the Tax Matters Member designated pursuant to Section 10.1(f) and to former managers of the Company.

(g)      Liability of Managers and Officers.  No Manager (or officer) shall have any liability to the Company or the Members as the result of any action or omission arising from or relating to the management of the Company,  including any error of judgment or failure to use due care, provided that the same did not result from actions or inactions of such Manager (or officer) which were outside the scope of authority conferred on such Manager (or officer) or constituted grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.

(h)      Ratification or Authorization of Actions.  Any conduct which otherwise would constitute a breach of a Manager's fiduciary duties to the Company or the Members shall not constitute such a breach if ratified or authorized by Members holding a majority of the Units held by all disinterested Members after full disclosure of all material facts.

11.      BOOKS AND RECORDS; REPORTS

11.1    Maintenance.  The Managers will keep complete and accurate books of account and other records of the Company at the office of the Company, showing the assets, liabilities, costs, expenditures, receipts, profits and losses of the Company.  The books and records will include provisions for separate Capital Accounts for each Member, and the computation of

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

depreciation, if any, on an accelerated basis (unless otherwise agreed to by the Members or required by law). Such books and records will be kept and maintained on the accrual basis in accordance with generally accepted accounting principles consistently applied and shall also contain such information as required by the Regulations issued under Section 704(b) of the Code. Such books and records will be made available for examination at any time by any Member or its representatives. Any Member or such Member's representatives will have the right to make copies of such books and records and to extract therefrom such information as it may desire.

   11.2   <u>Reports</u>. The Managers shall cause to be prepared, at the expense of the Company, the reports described in this <u>Section 11.2</u>.

      (a)   <u>Annual Report</u>. Within 120 days after the end of each fiscal year, there will be distributed to the Members an annual report which shall include a balance sheet as of the end of such fiscal year, together with a profit and loss statement, a statement of the source and application of funds and a statement of changes in partners' capital for such year. Such financial statement shall be prepared in accordance with generally accepted accounting principles and, if requested by the Managers, shall be accompanied by an auditor's report containing an opinion of the independent certified public accountants which is not qualified due to Company imposed scope limitations.

      (b)   <u>Tax Information</u>. Within 75 days after the end of each fiscal year, there will be distributed to the Members all information necessary for the preparation of each Member's Federal, state and other tax returns.

      (c)   <u>Regulatory Reports</u>. As may be prescribed by statute, rule or regulation, all required reports shall be filed with the United States Securities and Exchange Commission or other Federal or state regulatory authorities.

   11.3   <u>Fiscal Year of Company</u>. The fiscal year of the Company shall end on December 31 of each year, unless the Members elect otherwise.

12.   <u>DISTRIBUTIONS; FEES</u>

   12.1   <u>Distributions</u>   Except as provided in <u>Section 13</u>, all Company Revenues, as hereinafter defined, shall be used: <u>first</u> to pay the costs and expenses of the Company, including but not limited to debt service, taxes assessed on the Company or its property, and operating expenses and charges <u>other than</u> Member Fees (as defined in <u>Section 12.2</u> below) and principal of and interest on Member Loans (as defined in <u>Section 8.5</u> above); <u>second</u> to the Members with accrued unpaid Member Fees, pro rata in proportion to the outstanding amounts of such Member Fees, until such Member Fees are paid in full; <u>third</u> to the Members with outstanding Member Loans, pro rata in proportion to the outstanding principal balance of such loans, until such Member Loans are repaid in full (with such payments being first applied to accrued interest and then to principal); <u>fourth</u>, to create reserves for costs and liabilities which in the judgment of the Managers are reasonable; and <u>fifth</u>, the then remaining Company Revenues shall be distributed to the Members pro rata in proportion to their respective Interests. For purposes hereof, "Company Revenues" shall mean cash funds of any kind received by the Company, including,

without limitation, any principal, interest and fees associated with any loan made by the Company to a third party, the net proceeds upon the refinance of a sale of any property owned by the Company, termination of the Company, but shall not include capital contributions or loans by the Members. The Company shall make distributions of Company Revenues to the Members in amounts determined in accordance with the provisions of this Section at such intervals as the Managers may determine.

12.2    Fees.  If any Member shall guarantee any obligation of the Company, such Member shall receive an annual fee (a "Guarantee Fee") equal to three percent (3%) of the amount of the liability guaranteed by such Member during such year.  If a letter of credit is provided by any Member to obtain financing or as a Capital Contribution, then the Member who provides such letter of credit will be entitled to an annual fee (a "LC Fee") equal to the cost of obtaining said letter of credit plus three percent (3%) of the amount of the liability to which the LC Fee relates.  Guarantee Fees and LC Fees are referred to collectively herein as "Member Fees".

13.    DISSOLUTION/LIQUIDATION

13.1    Dissolution, Winding Up, Liquidation and Distribution of Assets.

(a)    The Company shall dissolve and terminate its existence upon the occurrence of any of the following events:

(i)    The occurrence of the events described in Section 6 hereof; or

(ii)    The entry of a decree of judicial dissolution under the Act by a court of competent jurisdiction.

Notwithstanding the foregoing or anything else in this Agreement, upon dissolution the Company may remain in existence for a reasonable period of time to permit an orderly winding-up of the Company's business and affairs.

(b)    Upon dissolution of the Company, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting, if any, until the date of dissolution. The Managers shall proceed to wind up the affairs of the Company in accordance with this Section 13.1.

(c)    If the Company is dissolved and its affairs are to be wound up, the Managers shall:

(i)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managers may determine to distribute any assets to the Members in kind),

(ii)    Allocate any profit or loss resulting from such sales to the Members' Capital Accounts in accordance with Sections 9 and 14 hereof,

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

     (iii)    Discharge all liabilities of the Company, other than liabilities to Members for Member Fees, Member Loans or distributions, and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amounts of such reserves shall be deemed to be an expense of the Company),

     (iv)    Distribute liquidation proceeds to the Members with accrued and unpaid Member Fees (pro rata in proportion to the unpaid balance of such Member Fees) until such Member Fees are paid in full;

     (v)    Distribute liquidation proceeds to the Members with outstanding Member Loans (pro rata in proportion to the outstanding principal balance of such loans) until such Member Loans are repaid in full (with such payments being first applied to accrued interest and then to principal), and

     (vi)    Distribute the remaining assets in the following order:

          (1)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted to reflect such deemed sale.

          (2)    The positive balance (if any) of each Member's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Managers, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to the preceding Section 13.1(c)(vi)(1). Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

     (d)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person or entity for any purpose whatsoever.

     (e)    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

(f)     The Managers shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

13.2    Articles of Dissolution.    When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, articles of dissolution as required by the Act, shall be executed in duplicate and filed with the Illinois Secretary of State.

13.3    Effect of Filing of Articles of Dissolution.    Upon the filing of articles of dissolution with the Illinois Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Managers shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

13.4    Return of Contribution Nonrecourse to Other Members.    Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his or her Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

## 14.    ALLOCATION OF TAXABLE INCOME AND LOSSES

14.1    Profits and Losses Defined.    "Profits" and "Losses" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(a)     all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

(b)     any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

(c)     any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(d)     gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

(e)     in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(f)     notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 14.3 hereof shall not be taken into account in computing Profit or Loss.

14.2     Allocations.  Except as provided in Section 14.3, Profits and Losses shall be allocated to the Members in proportion to their respective Interests; provided that if any Member Fees are payable to any Member under Section 12.1, such Member shall be allocated for tax and book purposes items of gross income equal to the amount of Member Fees distributed to such Member.

14.3     Special Allocation Rules.

(a)     Regulatory Allocations.  Notwithstanding Section 14.1, allocations of Profits and Losses shall be made consistent with the qualified income offset and minimum gain chargeback provisions of the Regulations promulgated under Section 704(b) of the Code.

(b)     Loss Limitation.  No Member shall be allocated Losses or deductions if the allocation causes the Member to have an Adjusted Capital Account Deficit (as defined below).  Any allocation of Loss or deduction that cannot be made to a Member by reason of this Section 14.3(b) shall be made to such Members that have positive Capital Account balances in accordance with their relative balances.  If any Members are allocated an amount of Loss or deduction by reason of the previous sentence, subsequent Profits of an equal amount shall be allocated to such Members as soon as possible.  "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)     the deficit shall be decreased by the amounts which the Member is obligated to restore or is deemed obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii)     the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

(c)     Target Capital Account Balances.  The tax allocation provisions of this Agreement are intended to produce final Capital Account balances that are at levels ("Target Final Balances") which would permit liquidating distributions that are made in accordance with such final Capital Account balances to be equal to the distributions that would occur under Section 12.1 hereof.  To the extent that the tax allocation provisions of this Agreement would not produce the Target Final Balances, the Members agree to take such actions as are necessary to amend such tax allocation provisions to produce such Target Final Balances.  Notwithstanding the other provisions of this Agreement, allocations of income, gain, loss and deduction shall be made prospectively as necessary

to produce such Target Final Balances and, to the extent such prospective allocations would not affect such result, the prior tax returns of the Company shall be amended to reallocate income, gain, loss, and deduction to produce such Target Final Balances.

15.    TRANSFERS OF INTERESTS; WITHDRAWAL

15.1    Member Transfers.

(a)    Limitations on Transfer.  Except as set forth in Section 15.1(b) hereof, no Member shall sell, exchange, transfer, give, encumber, assign, pledge, mortgage, hypothecate or otherwise dispose of, voluntarily or involuntarily, directly or indirectly (each, a "Transfer"), all or any part of his Interest to any Person, without the approval of the Members by Majority Vote.  Any Transfer shall be evidenced by a Transfer and Assignment of Membership substantially in the form of Exhibit B attached hereto.

(b)    Permitted Transfers.  Notwithstanding anything to the contrary set forth in Section 15.1, a Member may, upon notice to but without the prior consent of the other Members, transfer all or part of his Interest to a trust for the benefit of such Member or any member of such Member's family, so long as the original Member is the trustee of such trust with full voting power with respect to all matters relating to the Company.

(c)    Transfers on Death.  Upon the death of a Member, or a former Member who is a trustee of a trust Member pursuant to Section 15.1(b) hereof, (i) his entire Interest shall thereafter be held, by his estate or otherwise, as an Assignee rather than a Substitute Member (unless the Managers agree otherwise), and (ii) the Company may purchase the Interest of the deceased Member or a portion thereof from the estate of such deceased Member if there is agreement as to the purchase price to be paid for such Interest (or portion thereof) between the estate of the deceased Member and the Company.  The Company may, but shall not be obligated to, carry key man insurance on each of its Members in amounts deemed to be sufficient by the Managers to help fund such purchases.

(d)    Right of First Offer.  If at any time a Member desires to Transfer its Interest to any Person (other than any party to which a Transfer is permitted pursuant to Section 15.1(b) or (c) above), the transferring Member shall first send to each of the other Members a notice (a "First Offer Notice") of the transferring Member's desire to Transfer, which First Offer Notice shall set forth the terms on which the transferring Member is willing to Transfer its Interest.  The other Members shall then have the right, exercisable by written notice sent to the transferring Member within ten (10) business days after such First Offer Notice, to elect to purchase the Interest to be transferred on the terms and conditions set forth in the First Offer Notice (with closing of such sale to occur thirty days after the purchasing Member's notice of its agreement to purchase, or, if later, on a date specified in the First Offer Notice).  If more than one Member timely exercises such right of first offer, the Members that have so exercised such right shall be entitled to purchase the Interest to be transferred in proportion to their respective percentage Interests in the Company as of the date of the proposed Transfer.  If no Member timely exercises such right of first offer, then the Member which wishes to Transfer may sell its

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

Interest to any Person for no less than 98% of the purchase price set forth in the First Offer Notice. If (i) the transferring Member proposes to sell its Interest for less than 98% of the proposed price set forth in the First Offer Notice, or (ii) the transferring Member does not execute a binding contract to sell its Interest within 180 days after delivery of the First Offer Notice, then in either such case the transferring Member shall again be obligated to first offer its Interest to the other Members in accordance with the terms of this Section prior to selling or offering to sell its Interest.

(e)    Terms of Transfer.  An Assignee admitted in accordance with this Section 15.1 will be a Substitute Member if, but only if, the Managers approve the admission of such Assignee as a Substitute Member, in which case such Substitute Member shall succeed, to the extent attributable to the Interest transferred, to the status as Member, Capital Accounts, Capital Contributions, rights, powers, restrictions, liabilities and obligations of the transferor Member.  In all other cases (including a transfer following the death of a Member), the Assignee shall not be a Substitute Member, but shall be entitled only to the allocations of income, gains, losses, deductions and credits and distributions of Company assets attributable to the Interest or portion thereof but shall not have any other rights, including any voting or management rights, hereunder.   The effective date of a Transfer shall be the closing date with respect to any Transfer. Notwithstanding the foregoing, neither the Company nor any Member other than the transferor Member shall incur any liability for Company allocations and distributions made in good faith to the transferor Member until the written instrument of Transfer satisfactory to all of the Members has been received by the Company and recorded on its books and the effective date of the Transfer has passed.

(f)     Notwithstanding anything herein to the contrary, a Member shall not sell, assign, exchange or otherwise transfer his or her Interest unless such proposed sale or exchange is, in the opinion of counsel to the Company, an exempt transaction under any applicable federal and state securities laws.

15.2    Withdrawal of Members.    Except as otherwise specifically permitted by this Agreement, no Member shall be entitled to withdraw from the Company.

15.2    Additional Members.    The Company may admit any Person (in addition to the original Members and any Substitute Members) as a Member upon the approval of the Managers.   The initial Capital Contribution required of an additional Member shall be in an amount determined by the Managers pursuant to Section 8.1.

16.    NOTICES

All notices to the Members under this Agreement shall be in writing and shall be (i) delivered by personal service, (ii) delivered by courier service, (iii) telecopied or (iv) sent by certified or registered mail, postage prepaid, return receipt requested, to the Members at the addresses and fax numbers set forth on Exhibit A (or, with respect to any Member which is not an original Member signing this Agreement, at the address and fax number provided to the Company at the time such Member becomes a Member). Except as otherwise expressly set forth herein, each notice shall be effectively given when delivered at such address or fax number. Any

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

notice given by telecopier, facsimile or similar means shall be confirmed by hard copy delivered as soon as possible.  Rejection or other refusal to accept a notice or the inability to deliver a notice because of a changed address or fax number of which no notice was given as provided herein shall be deemed to be receipt of the notice sent.  By giving to the other parties notice thereof, the parties hereto and their respective permitted successors and assigns shall have the right from time to time and at any time during the term of this Agreement to change their respective addressee or address for notices, and each shall have the right to specify as its address for notices any other address within the United States of America.

17.   NO PARTITION

No Member shall have the right to partition any property of the Company during the term of this Agreement nor shall any Member make application to any court or authority having jurisdiction in such matter or commence or prosecute any action or proceeding for partition of any property of the Company and the sale thereof.  Upon any breach of the provisions of this Section by any Member, the other Member(s), in addition to all rights and remedies at law and in equity the Member(s) may have or claim, shall be entitled to a decree or other restraining order enjoining such application, action or proceeding.

18.   CONFIDENTIALITY

The Members agree that Company's business, operating, marketing, leasing and development plans or projections, trade secrets, books and records are confidential and shall not be disclosed to any third party without the Managers' prior written consent; provided, however, that any Member may disclose any such materials if so required by law or to such party's attorneys, accountants and other professionals subject to such professionals' duties not to further disclose such materials.

19.   REPRESENTATIONS AND WARRANTIES REGARDING INVESTMENT

19.1   Investment Intention; No Resales.  Each Member hereby represents and warrants that such Member is acquiring his Interest pursuant to this Agreement for investment solely for such Member's own account and not with a view to, or for resale in connection with, the distribution or other disposition thereof in violation of the Securities Act of 1933, as amended (the "Securities Act").  Each Member agrees and acknowledges that such Member will not, directly or indirectly, offer, transfer, sell, assign, pledge, hypothecate or otherwise dispose of his Interest, or solicit any offers to purchase or otherwise acquire or take a pledge of his Interest, unless (a) such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to an effective registration statement under the Securities Act and has been registered under all applicable state securities or "blue sky" laws, or (b) such Member shall have furnished the Company and the Managers with an opinion of counsel, which opinion of counsel shall be reasonably satisfactory to the Managers, to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act and all applicable state securities or "blue sky" laws.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

19.2  <u>Accredited Investor</u>.  Each Member hereby represents and warrants to the Company and the other Members that such Member is an "accredited investor" as that term is defined in Rule 501 of Regulation D under the Securities Act.

19.3  <u>Legend</u>.  It is not contemplated that the Interests will be separately certificated. However, if separate certificates are issued, each certificate shall bear substantially the following legend:

> "THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE TRANSFERRED OR SOLD UNLESS (i) A REGISTRATION STATEMENT UNDER SUCH ACT IS THEN IN EFFECT WITH RESPECT THERETO, (ii) A WRITTEN OPINION FROM COUNSEL FOR THE ISSUER OR COUNSEL FOR THE HOLDER REASONABLY ACCEPTABLE TO THE ISSUER HAS BEEN OBTAINED TO THE EFFECT THAT NO SUCH REGISTRATION IS REQUIRED, OR (iii) A 'NO ACTION' LETTER OR ITS THEN EQUIVALENT WITH RESPECT TO SUCH TRANSFER OR SALE HAS BEEN ISSUED BY THE STAFF OF THE SECURITIES AND EXCHANGE COMMISSION."

19.4  <u>Units Unregistered</u>.  Each Member acknowledges and represents that such Member has been advised that (a) the offer and sale of the Interests have not been registered under the Securities Act in reliance upon the exemption from registration afforded by Sections 3(b) and/or 4(2) thereof and Regulation D thereunder; (b) the Interests must be held indefinitely and such Member must continue to bear the economic risk of the investment in the Interests unless the offer and sale of such Interests is subsequently registered under the Securities Act and all applicable state securities laws or an exemption from such registration is available; (c) there is no established market for the Interests and it is not anticipated that there will be any public market for the Interests in the foreseeable future; (d) Rule 144 promulgated under the Securities Act is not presently available, nor expected to become available, with respect to the sale of any securities of the Company, and the Company has made no covenant to make such Rule available; (e) when and if Interests may be disposed of without registration under the Securities Act in reliance on Rule 144, such disposition can be made only in limited amounts in accordance with the terms and conditions of such Rule; (f) if the Rule 144 exemption is not available, public offer or sale without registration will require the availability of an exemption under the Securities Act; (g) a restrictive legend in the form heretofore set forth shall be placed on the certificates, if any, representing the Interests; and (h) a notation shall be made in the appropriate records of the Company indicating that the Interests are subject to restrictions on transfer.

19.5  <u>Additional Investment Representations</u>.  Each Member further represents and warrants that (a) in making such Member's decision to purchase the Interests hereby subscribed for, such Member has relied upon independent investigations made by such Member and, to the extent believed by such Member to be appropriate, such Member's own financial, tax and other advisors; (b) such Member has been given the opportunity to examine all documents and to ask

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

questions of, and to receive answers from, the Managers concerning the terms and conditions of the purchase of the Interests and to obtain any additional information which such Member has provided to the Company and the Managers concerning such Member and such Member's financial position is true, complete and correct as of the date of this Agreement.

19.6    No Broker or Finder.  Each Member represents and warrants that such Member has not engaged any broker or finder in connection with this Agreement or the transactions contemplated hereby.

20.    MISCELLANEOUS

20.1    Governing Law.  This Agreement shall be construed and interpreted in accordance with the laws of the State of Illinois.

20.2    Section 754 Election.  The Managers shall have the power, but not the obligation, to cause the Company to make such income tax elections, including elections pursuant to Section 754 of the Code, in order to adjust the basis of Company property as described in Sections 734 and 743 of the Code, as the Managers may deem appropriate.

20.3    Headings.  Section headings and subheadings thereunder are for convenience of reference only and shall be given no legal effect in the interpretation of this Agreement.

20.4    Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

20.5    Severability.  In the event any part or provision of this Agreement is invalid for any reason, the remainder of this Agreement shall continue and be deemed to be in full force and effect.

20.6    Number and Gender.  Whenever required by the context, the singular number shall include the plural, and any gender shall include all genders.

20.7    Transactions with Affiliates.  Each Member acknowledges that the Members and their Affiliates have interests in various entities which may from time to time provide goods or services to the Company.  Accordingly no transaction between the Company and an entity in which one or more of the Members has an interest shall be void or voidable as a result of such interest of the Members and no Member shall incur liability to the Company or other Members for failing to disclose any such interest to the Company or other Members.

20.8    Power of Attorney.  Each Member hereby makes, constitutes and appoints the Managers with full power of substitution and resubstitution, its true and lawful attorney for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, file and record all instruments amending or cancelling the Articles, as and to the extent required under the Act and applicable law, and to sign, execute, certify, acknowledge, file and record such other agreements, instruments or documents as may be necessary or advisable (a) to reflect the exercise by the Managers of any of the powers granted to it under this Agreement, or (b) which may be required of the Company or of the Members by the laws of the State of Illinois or any other jurisdiction, to the extent consistent with the Agreement.  Each Member authorizes such

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in and about the foregoing as fully as such Member might or could do if personally present, and hereby ratifying and confirming all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. The power of attorney granted pursuant to this Section: (a) is a special power of attorney coupled with an interest, is irrevocable, and shall survive the bankruptcy, death, adjudication of incompetency or insanity, or dissolution of any Person granting such power; (b) may be executed by such attorney-in-fact by listing all of the Members executing any agreement, certificate, instrument or document with the single signature of any such attorney-in-fact acting as attorney-in-fact for all of them; and (c) shall survive the delivery of an assignment by a Member of its Interest in the Company (except that where the purchaser, transferee or assignee thereof has the right to be, or is admitted as, a Substitute Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling such attorney-in-fact to execute, acknowledge and file any such agreement, certificate, instrument or document necessary to effect such substitution).

20.9   <u>Amendments</u>.  Except as otherwise required by law, this Agreement may be amended only by the unanimous vote of the Members.

20.10   <u>Binding Effect</u>.  Except as otherwise expressly provided herein, each and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

21.   <u>DESIGNATION OF SERIES</u>

21.1   <u>Membership Series.</u>   The Company may from time to time, with the Managers' prior approval, establish Series (as hereinafter defined) and admit to such Series as Series Members (as hereinafter defined) such Persons as the Manager approves. No other Member shall have any right to vote on the establishment of any new Series or the admission of any Person as a Series Member of any new Series. The Company may establish various Series with differing Members, differing assets, and separate liabilities. If the Company establishes Series, then the provisions of this Article 21 shall govern with respect to each such Series.

(a)   The Managers shall establish new Series by completing and executing a Supplement in the form attached hereto as <u>Exhibit C</u>, causing each Series Member of such Series to execute such Supplement and filing the appropriate documents with the Illinois Secretary of State. Upon completion and execution of each such Supplement and filing of such documents, a new Series shall be established with the Series Members therein designated.

(b)   Once a Series has been established and the initial Series Members therefor admitted to such Series (such admission to be effective upon their execution of the Supplement), no additional Members shall be admitted to such Series without the Managers' prior approval.

F:\SSSK\Platform I\Platform I - 600 Waukegan\1C Legal Insur\1-0 Attorney\1-1 Proj Struct\PLATFORM OP AGMT Alliant.doc

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

      (c)     "Series" means each separate series of limited liability company interests in the Company established as provided in Section 15.1 and in accordance with Section 37-40 of the Act.

      (d)     "Series Member" means a Member with respect to a particular Series.

21.2    <u>Dissolution, Liquidation, and Termination Generally</u>.  Any Series shall be dissolved upon the first to occur of any of the following:

      (a)     the sale or disposition of all of the assets of the Series and the receipt of all consideration therefor, and the determination of the Company Manager not to continue the business of the Series;

      (b)     the determination of the Manager to dissolve the Series; and

      (c)     the occurrence of any event which as a matter of law requires that the Series be dissolved.

21.3    <u>Operating Agreement</u>.  The Operating Agreement shall govern each Series, provided that all references to the "Company" shall mean such "Series" and all references to a "Member" shall mean a "Series Member".

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

Platform I – 600 Waukegan, LLC
By Its Managers:

SCOTT J. KRONE

STEVE SIEGEL

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

## EXHIBIT A

| Members | Address | Interest |
|---------|---------|----------|
| **Mangers:** | | |
| Scott Krone | 600 Waukegan Road<br>Northbrook, IL 60062 | 35.00% |
| Steve Siegel | 600 Waukegan Road<br>Northbrook, IL 60062 | 35.00% |
| **Members** | | |
| Limited Members Combined | | 30.00% |

F:\SSSK\Platform I\Platform I - 600 Waukegan\1C Legal Insur\1-0 Attorney\1-1 Proj Struct\PLATFORM OP AGMT Alliant.doc

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

## EXHIBIT B

### TRANSFER AND ASSIGNMENT
### OF MEMBERSHIP INTEREST

### PLATFORM I - 600 WAUKEGAN LLC

_____ transfers and assigns to _____ all of _____ right, title and interest in and to a __% Interest in the _____, an Illinois limited liability company.

Dated _____, _____

_____

### ACCEPTANCE

The undersigned accepts the foregoing assignment and agrees to become a substituted Member with respect to such Interest and accepts, adopts and approves all of the terms and provisions of the Operating Agreement of the Platform I - 600 Waukegan LLC, and agrees to execute such documents and take such action as the Members deem necessary or appropriate to comply with the Illinois Limited Liability Company Act.

Dated_____, _____

_____

### RECEIPT

The undersigned, as Members of the Platform I - 600 Waukegan LLC acknowledge receipt of an executed counterpart of the foregoing assignment of Membership Interest, and consent to and recognize ownership of a _____% Interest by _____.

Dated _____, _____

_____          _____

_____          _____

F:\SSSK\Platform I\Platform I - 600 Waukegan\1C Legal Insur\1-0 Attorney\1-1 Proj Struct\PLATFORM OP AGMT Alliant.doc

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

**EXHIBIT "C"**
**FORM OF SUPPLEMENT FOR ESTABLISHING SERIES**
**Supplement for Platform I - 600 Waukegan  LLC_____**

This Supplement (this "Supplement") is entered into by the undersigned to create a Series under the Limited Liability Company Agreement of Platform I - 600 Waukegan LLC, dated as of October 30, 2009 as amended and supplemented from time to time (the "LLC Agreement"). Unless otherwise specified herein, all capitalized terms used herein shall have the meanings assigned to them in the LLC Agreement. The Series created hereby and the rights and obligations of the Series Members shall be governed by the LLC Agreement as supplemented hereby.

1. <u>Name of Series</u>:    Platform I - 600 Waukegan LLC _____

2. <u>Purpose</u>.    The purpose of this Series is to _____

_____

_____.

3. <u>Series Members and Percentage Interests</u>:

| Name | Address | Percentage Interest |
|------|---------|---------------------|
| _____ | _____ | ____% |
| _____ | _____ | ____% |
| _____ | _____ | ____% |

4. <u>Other Provisions Pertaining to Series</u>:

_____

_____


**SERIES MEMBERS:**        _____

_____

_____

_____

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

# EXHIBIT B

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

# OPERATING AGREEMENT

## OF

## PLATFORM BRADLEY LLC

### An Illinois Limited Liability Company

THIS OPERATING AGREEMENT ("Agreement") is made and entered into as of May 1, 2014, by and among SBS PRIVATE EQUITY FUND, LP ("SBS"), ANDREW RUBIN ("Rubin"), SCOTT KRONE ("Krone") and those other parties who from time to time execute this Agreement or counterparts hereof; and

WHEREAS, the parties hereto desire to form a limited liability company on the terms and for the purposes set forth herein;

NOW, THEREFORE, in consideration of the respective mutual covenants and agreements herein contained and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  DEFINITIONS

    "Act" shall mean the Illinois Limited Liability Company Act, as amended from time to time.

    "Affiliate" with regard to a Person, means a Person that is directly or indirectly controlled by, controlling or controlled with such Person. For purposes of this Agreement, "control" when used with respect to any Person means the power to direct the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The term "Affiliates" and "affiliated" shall have correlative meanings.

    "Assignee" means a Person to whom an Interest has been assigned or transferred in accordance with this Agreement, but which has not become a Substitute Member (and accordingly has no voting or management rights).

    "Capital Account" shall mean the capital account of a Member maintained pursuant to Section 9 hereof.

    "Capital Contribution" shall mean, with respect to any Member, the cash and fair market value (which value shall be determined by the Managers) of other property (net of any liabilities secured by any contributed property that the Company is considered to take subject to or assume under Section 752 of the Code) contributed to the capital of the Company pursuant to Section 8.1 hereof upon formation of the Company, or at any time thereafter in accordance with the terms of this Agreement.

    "Company" shall mean Platform Bradley LLC, the limited liability company created pursuant to this Agreement.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Interest" shall mean the respective interests of the Members in and to the Company and its assets as determined in accordance with the provisions of <u>Section 7</u> hereof.

"Managers" shall mean SBS and Krone or any other Person who is selected as a Manager of the Company from time to time in accordance with the terms of this Agreement.

"Members" shall mean the Members identified in the introductory paragraph of this Agreement and any Substitute Members or additional Members admitted in accordance with the terms hereof. The term does not include an Assignee except for the purposes of <u>Sections 12.1</u> and <u>13.1</u>.

"Person" shall mean any individual, partnership, corporation, limited liability company, trust or other entity, or any government or political subdivision, or any agency, department or instrumentality thereof.

"Regulations" shall mean the federal income tax regulations promulgated under the Code.

"Substitute Member" shall mean a transferee of an Interest that succeeds to all of the rights, including the voting and management rights, of the transferor of such Interest pursuant to <u>Section 15.1(e)</u> hereof. Substitute Members shall be Members for all purposes hereunder.

2.    <u>FORMATION</u>

The parties do hereby form a limited liability company under the Act for the scope and purposes set forth herein and upon all of the terms and conditions hereof.

3.    <u>NAME AND PLACE OF BUSINESS; AGENT FOR SERVICE OF PROCESS;</u>

The name of the Company shall be "PLATFORM BRADLEY LLC". The principal place of business of the Company shall be 600 Waukegan Road, Suite 129, Northbrook, Illinois 60062, or at such other place or places as may be approved by the Managers from time to time. The registered agent and registered office of the Company shall be Jeffrey M. Galkin, Esq., 180 N. LaSalle Street, Suite 3200, Chicago, Illinois 60601, or such other agent or office as may be approved by the Managers from time to time. The Managers shall arrange for the prompt filing of Articles of Organization ("Articles"), and any amendments thereto as required by the Act.

4.    <u>PURPOSE</u>

The purpose of the Company shall be to directly or indirectly provide financing to, acquire, own, maintain, operate, manage, lease, build, develop, construct, hold for capital appreciation and current income, and sell real estate developments in various locations in the United States (it being understood that the Company may provide financing to, operate, manage, lease, build, develop, construct, and provide consulting services for real estate developments owned by Persons other than the Company, as well as those owned by the Company), and to engage in any and all general business activities related or incidental thereto.

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

5.      TITLE TO ASSETS

Any assets of the Company may be held in the name of the Company, or in such other name as shall be determined by the Managers.

6.      DURATION OF THE COMPANY

The term of the Company shall commence on the filing of the Articles and shall expire only on the first to occur of the following events:

(a)      written consent of the Managers to terminate the Company; or

(b)      the sale or disposition of all of the Company's assets in accordance with the terms of this Agreement.

Notwithstanding anything contained herein to the contrary, the death or legal incompetency of an individual Member, or the bankruptcy, liquidation, dissolution, cessation to exist as a legal entity of a Member which is not an individual, shall not cause the termination or dissolution of the Company and the business of the Company shall continue.

7.      LIMITED LIABILITY COMPANY INTERESTS

The respective initial percentage Interests of the Members in and to the Company are as shown on Exhibit A hereto and made a part hereof. If, pursuant to the terms of the agreement, a Member contributes additional funds or property to the capital of the Company in excess of such Member's initial contribution, or if new Members are admitted in accordance with this Agreement, the respective percentage Interests of the Members shall be adjusted proportionately to be in the ratio of their then existing adjusted Capital Accounts.

8.      CAPITAL CONTRIBUTIONS; LOANS

8.1      Capital Contributions; Additional Members.  As of the date hereof, each Member has contributed to the Company's aggregate capital the amount set forth opposite such Member's name on Exhibit A hereto.  With the consent of the Managers, a Member may make additional Capital Contributions in excess of such Member's initial Capital Contribution.  If the Company admits a Person (other than an original Member or a Substitute Member) as a Member, the Person shall contribute to the Company such Capital Contribution as shall be determined by the Managers.   The Company may require such Person to make other payments prior to the admission of such Person as a Member, including payments to reimburse the Company for the costs and expenses incurred by the Company in connection with the admission of such Person.

8.2      No Other Additional Obligations.  No Member shall have any obligation to make any additional contribution to the Company or to guarantee any indebtedness of the Company except upon the agreement of all the Members.

8.3      Intent of Section 8.  This Section 8 is not intended to create any third party beneficiary rights or to be for the benefit of (i) any creditor (other than a Member) of the Company or any Member, or (ii) any other Person (other than a Member) to whom any debts,

Page 3

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

liabilities or obligations are owed by, or who otherwise has a claim against, the Company or any Members, and no such creditor or other Person shall obtain any rights under the provisions of this Section 8 or shall by reason of the provisions of this Section 8 make any claim in respect of any of the aforesaid debts, liabilities or obligations (or otherwise) against the Company or any Member.

8.4     Withdrawal of Capital.  No Member shall have any right to withdraw or make any demand for withdrawal of such Member's Capital Contribution or the capital interest reflected in such Member's Capital Account.

8.5     Loans by Members.  If, at any time or from time to time, the Managers determine that it is necessary or advisable for the Members to make loans to the Company (all such loans being collectively referred to herein as "Member Loans"), they shall notify the Members, of the amount which they have determined the Company should borrow from the Members.  Each Member shall have the right, but not the obligation, to lend such Member's pro rata share of any such desired borrowing based upon such Member's percentage Interest, provided, that if some Members do not make Member Loans, then other Members may make Member Loans in proportion to the percentage Interests of the Members who agree to make Member Loans.  All Member Loans shall bear interest at a floating rate per annum equal to the rate from time to time announced by The Northern Trust Company, or any successor thereto, as its prime lending rate (however designated) plus 3% per annum, or at such other rate as may be approved by the Managers, and shall otherwise be made upon terms and conditions satisfactory to the Managers and the Members making the Member Loans.  Member Loans shall not constitute an increase in the Member's Capital Account or percentage Interest.  All Member Loans shall be repaid according to the priority established for cash distributions in Sections 12.1 and 13.1.

9.     CAPITAL ACCOUNTS

Individual Capital Accounts shall be maintained separately for each Member in accordance with Regulations Section 1.704-1(b)(2)(iv).  No interest shall be paid or shall accrue on the Capital Accounts.

10.     MANAGEMENT OF BUSINESS

10.1     Management.

(a)     Manager Authority.  Except as otherwise provided herein, the business and affairs of the Company shall be directed and managed by the Managers, and, subject to the terms of Section 10.1(b) hereof, the Managers shall have the full, complete and exclusive authority, power and discretion to take any and all actions and make any and all decisions regarding the Company's business without the consent or vote of the Members. Without limiting the foregoing (but subject to Section 10.1(b) hereof), the Managers shall have full, complete and exclusive authority, power and discretion to take any and all actions and make any and all decisions regarding the matters described in Section 15-1(c) of the Act without the consent or vote of the Members.  At such times as there shall be more than one Manager, any action or decision by the Managers on behalf of the Company shall require the approval of all of the Managers.  No Member, in his or her

Page 4

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

capacity as a Member, shall have the right, power or authority to act for or bind the Company, all such right, power and authority being vested in the Managers. Each Manager only shall be required to devote such time to the management of the business of the Company as he deems necessary to promote the interests of the Company.

(b) <u>Major Decisions</u>. Notwithstanding anything to the contrary contained herein, the following actions shall require the unanimous approval of all of the Managers:

(i) the incurrence by the Company of any indebtedness in excess of One Hundred Thousand Dollars ($100,000);

(ii) the mortgage, pledge or grant of a security interest in any Company property;

(iii) the merger of the Company with another Person;

(iv) any lease of all or any portion of the Property; and

(v) the sale of the Property or any part thereof.

(c) <u>Professional Engagements</u>. Subject to the provisions of Section 10.1 (a) and (d), the Managers may engage on behalf of, and at the expense of, the Company, such persons, firms or corporations as the Managers shall deem advisable for the conduct and operation of the business of the Company, including without limitation lawyers, accountants, investment bankers, engineers, consultants, and purveyors of other services or materials, on such terms and for such compensation or costs as he, in his discretion, shall determine.

(d) <u>Services by Managers and Members</u>. The Managers may, on behalf and at the expense of the Company, engage or otherwise permit any Manager, another Member or an employee or affiliate of any of them to render or provide, and pay them or any of them, compensation for rendering or providing, products, services and/or financial accommodations to or for the benefit the Company only upon terms as to which the Managers agree.

(e) <u>Fees Payable to the Managers; Reimbursement of Expenses</u>. No salaries or compensation other than as set forth in this Agreement shall be paid to any Manager for services provided to the Company by such Manager in his capacity as Manager hereunder; provided, however, that the Company shall pay or reimburse each Manager and his Affiliates for expenses of every kind incurred on behalf of the Company to the extent permissible by law and consistent with Section 10.1(a).

(f) <u>Tax Matters Member</u>. Scott J. Krone is hereby appointed the "Tax Matters Member" of the Company which shall be the equivalent of the "Tax Matters Partner" referred to in Sections 6221-6231 of the Code, and Krone shall serve in such capacity for all purposes pursuant to such Code Sections. The Company shall not be obligated to pay

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

any fees or other compensation to the Tax Matters Member in his capacity as such, provided that the Company shall reimburse the Tax Matters Member for any and all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) sustained by him in his capacity as Tax Matters Member.

      (g)    <u>Removal, Resignation and Replacement of Managers</u>.

      (i)    Any Manager may resign at any time by providing written notice thereof to the other Manager.

      (ii)    Except as provided in Section 35-45(6) of the Act, no Manager otherwise may be removed, with or without cause.

      (iii)    In the event any Manager shall die, become legally incapacitated, resign or be removed in accordance with this Agreement (or as provided in Section 35-45(6) of the Act, then the remaining Manager or Managers shall be the sole Manager or Managers of the Company and shall have the exclusive right and obligation to manage the Company as described in Section 10.1(a) hereof. In the event all Managers shall be removed in accordance with the terms of this Agreement, resign, die or become legally incapacitated, the Members shall have the right to appoint a new Manager or Managers.

      (h)    <u>Officers</u>. The Managers shall have the right to appoint one or more officers of the Company (which may be any Manager or Affiliates thereof) to perform such duties upon such terms as the Managers may specify in their discretion from time to time.

      (i)    <u>Other Activities</u>. Notwithstanding anything to the contrary contained herein, any Manager, Member and officer (and any Affiliate thereof) may engage and possess an interest in any other business venture or property of any nature, kind or description whether or not similar to or competitive with any business venture or property of the Company and shall have no obligation to offer the Company or any other Member an opportunity to participate in or share the profits, distributions or fees therefrom, and the engagement in or possession of an ownership interest in any such business venture or property shall not be deemed to constitute a breach of fiduciary duty to the Company or to the other Members.

10.2    <u>Indemnification; Etc.</u>

      (a)    The Company shall, to the extent permitted by law, indemnify and hold harmless the Managers and any officers of the Company against any losses, judgments, liabilities or expenses incurred in settling any claim or incurred in any finally adjudicated legal proceeding, including reasonable attorneys' fees and/or amounts paid in settlement of any claims sustained by him, in each case arising from or relating to management of the Company, provided that the same did not result from actions or inactions of such Managers (or officer) which were outside the scope of authority conferred on such Managers (or officer) or constituted grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

(b)     Expenses incurred in defending a civil or criminal action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by the Managers (or officer) to repay such amount if it shall ultimately be determined that the Managers (or officer) are not entitled to be indemnified by the Company.

(c)     The indemnification provided by this Section shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any statute, agreement, vote of Members or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office.

(d)     Company shall have the power to purchase and maintain insurance on behalf of the Managers and Company officers against any liability asserted against them or incurred by them in such capacity or arising out of their status as such, whether or not the Company would have the power to indemnify them against such liability under the provisions of this Section 10.2.

(e)     The provisions of this Section 10.2 shall continue as to a person who has ceased to be a Manager (or officer) as to claims arising out of activities related to his prior position and shall inure to the benefit of his heirs and personal or legal representatives. The provisions of this Section 10.2 also shall survive the liquidation, dissolution and termination of the Company and the termination of this Agreement and shall be binding on the Company's successors and assigns.

(f)     <u>Other Persons Covered</u>. The provisions of this Section 10.2 shall apply in all respects to the Tax Matters Member designated pursuant to Section 10.1(f) and to former managers of the Company.

(g)     <u>Liability of Managers and Officers</u>. No Manager (or officer) shall have any liability to the Company or the Members as the result of any action or omission arising from or relating to the management of the Company, including any error of judgment or failure to use due care, provided that the same did not result from actions or inactions of such Manager (or officer) which were outside the scope of authority conferred on such Manager (or officer) or constituted grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.

(h)     <u>Ratification or Authorization of Actions</u>. Any conduct which otherwise would constitute a breach of a Manager's fiduciary duties to the Company or the Members shall not constitute such a breach if ratified or authorized by Members holding a majority of the Units held by all disinterested Members after full disclosure of all material facts.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

## 11.   BOOKS AND RECORDS; REPORTS

11.1   Maintenance.  The Managers will keep complete and accurate books of account and other records of the Company at the office of the Company, showing the assets, liabilities, costs, expenditures, receipts, profits and losses of the Company.  The books and records will include provisions for separate Capital Accounts for each Member, and the computation of depreciation, if any, on an accelerated basis (unless otherwise agreed to by the Members or required by law).  Such books and records will be kept and maintained on the accrual basis in accordance with generally accepted accounting principles consistently applied and shall also contain such information as required by the Regulations issued under Section 704(b) of the Code.  Such books and records will be made available for examination at any time by any Member or its representatives.  Any Member or such Member's representatives will have the right to make copies of such books and records and to extract therefrom such information as it may desire.

11.2   Reports.  The Managers shall cause to be prepared, at the expense of the Company, the reports described in this Section 11.2.

(a)   Annual Report.  Within 120 days after the end of each fiscal year, there will be distributed to the Members an annual report which shall include a balance sheet as of the end of such fiscal year, together with a profit and loss statement, a statement of the source and application of funds and a statement of changes in partners' capital for such year.  Such financial statement shall be prepared in accordance with generally accepted accounting principles and, if requested by the Managers, shall be accompanied by an auditor's report containing an opinion of the independent certified public accountants which is not qualified due to Company imposed scope limitations.

(b)   Tax Information.  Within 75 days after the end of each fiscal year, there will be distributed to the Members all information necessary for the preparation of each Member's Federal, state and other tax returns.

(c)   Regulatory Reports.  As may be prescribed by statute, rule or regulation, all required reports shall be filed with the United States Securities and Exchange Commission or other Federal or state regulatory authorities.

11.3   Fiscal Year of Company.  The fiscal year of the Company shall end on December 31 of each year, unless the Members elect otherwise.

## 12.   DISTRIBUTIONS; FEES

12.1   Distributions   Except as provided in Section 13, all Company Revenues, as hereinafter defined, shall be used:  first to pay the costs and expenses of the Company, including but not limited to debt service, taxes assessed on the Company or its property, and operating expenses and charges other than Member Fees (as defined in Section 12.2 below) and principal of and interest on Member Loans (as defined in Section 8.5 above); second to the Members with accrued unpaid Member Fees, pro rata in proportion to the outstanding amounts of such Member Fees, until such Member Fees are paid in full; third to the Members with outstanding Member Loans, pro rata in proportion to the outstanding principal balance of such loans, until such

Page 8

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

Member Loans are repaid in full (with such payments being first applied to accrued interest and then to principal); fourth, to create reserves for costs and liabilities which in the judgment of the Managers are reasonable; and fifth, the then remaining Company Revenues shall be distributed to the Members pro rata in proportion to their respective Interests. For purposes hereof, "Company Revenues" shall mean cash funds of any kind received by the Company, including, without limitation, any principal, interest and fees associated with any loan made by the Company to a third party, the net proceeds upon the refinance of a sale of any property owned by the Company, termination of the Company, but shall not include capital contributions or loans by the Members. The Company shall make distributions of Company Revenues to the Members in amounts determined in accordance with the provisions of this Section at such intervals as the Managers may determine.

12.2   Fees. If any Member shall guarantee any obligation of the Company, such Member shall receive an annual fee (a "Guarantee Fee") equal to three percent (3%) of the amount of the liability guaranteed by such Member during such year. If a letter of credit is provided by any Member to obtain financing or as a Capital Contribution, then the Member who provides such letter of credit will be entitled to an annual fee (a "LC Fee") equal to the cost of obtaining said letter of credit plus three percent (3%) of the amount of the liability to which the LC Fee relates. Guarantee Fees and LC Fees are referred to collectively herein as "Member Fees".

13.   DISSOLUTION/LIQUIDATION

13.1   Dissolution, Winding Up, Liquidation and Distribution of Assets.

(a)   The Company shall dissolve and terminate its existence upon the occurrence of any of the following events:

(i)   The occurrence of the events described in Section 6 hereof; or

(ii)   The entry of a decree of judicial dissolution under the Act by a court of competent jurisdiction.

Notwithstanding the foregoing or anything else in this Agreement, upon dissolution the Company may remain in existence for a reasonable period of time to permit an orderly winding-up of the Company's business and affairs.

(b)   Upon dissolution of the Company, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting, if any, until the date of dissolution. The Managers shall proceed to wind up the affairs of the Company in accordance with this Section 13.1.

(c)   If the Company is dissolved and its affairs are to be wound up, the Managers shall:

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

(i)      Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managers may determine to distribute any assets to the Members in kind),

(ii)     Allocate any profit or loss resulting from such sales to the Members' Capital Accounts in accordance with Sections 9 and 14 hereof,

(iii)    Discharge all liabilities of the Company, other than liabilities to Members for Member Fees, Member Loans or distributions, and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amounts of such reserves shall be deemed to be an expense of the Company),

(iv)    Distribute liquidation proceeds to the Members with accrued and unpaid Member Fees (pro rata in proportion to the unpaid balance of such Member Fees) until such Member Fees are paid in full;

(v)     Distribute liquidation proceeds to the Members with outstanding Member Loans (pro rata in proportion to the outstanding principal balance of such loans) until such Member Loans are repaid in full (with such payments being first applied to accrued interest and then to principal), and

(vi)    Distribute the remaining assets in the following order:

(1)     If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted to reflect such deemed sale.

(2)     The positive balance (if any) of each Member's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Managers, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to the preceding Section 13.1(c)(vi)(1). Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(d)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of

Page 10

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person or entity for any purpose whatsoever.

       (e)     Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

       (f)     The Managers shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

13.2    <u>Articles of Dissolution</u>.  When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, articles of dissolution as required by the Act, shall be executed in duplicate and filed with the Illinois Secretary of State.

13.3    <u>Effect of Filing of Articles of Dissolution</u>.  Upon the filing of articles of dissolution with the Illinois Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act.  The Managers shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

13.4    <u>Return of Contribution Nonrecourse to Other Members</u>.  Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his or her Capital Contribution.  If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

## 14.    <u>ALLOCATION OF TAXABLE INCOME AND LOSSES</u>

14.1    <u>Profits and Losses Defined</u>.  "Profits" and "Losses" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

       (a)     all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

       (b)     any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

       (c)     any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

(d)      gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

(e)      in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(f)      notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 14.3 hereof shall not be taken into account in computing Profit or Loss.

14.2    Allocations.   Except as provided in Section 14.3, Profits and Losses shall be allocated to the Members in proportion to their respective Interests; provided that if any Member Fees are payable to any Member under Section 12.1, such Member shall be allocated for tax and book purposes items of gross income equal to the amount of Member Fees distributed to such Member.

14.3    Special Allocation Rules.

(a)      Regulatory Allocations.   Notwithstanding Section 14.1, allocations of Profits and Losses shall be made consistent with the qualified income offset and minimum gain chargeback provisions of the Regulations promulgated under Section 704(b) of the Code.

(b)      Loss Limitation.   No Member shall be allocated Losses or deductions if the allocation causes the Member to have an Adjusted Capital Account Deficit (as defined below). Any allocation of Loss or deduction that cannot be made to a Member by reason of this Section 14.3(b) shall be made to such Members that have positive Capital Account balances in accordance with their relative balances. If any Members are allocated an amount of Loss or deduction by reason of the previous sentence, subsequent Profits of an equal amount shall be allocated to such Members as soon as possible. "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)      the deficit shall be decreased by the amounts which the Member is obligated to restore or is deemed obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii)      the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

(c)      Target Capital Account Balances.   The tax allocation provisions of this Agreement are intended to produce final Capital Account balances that are at levels ("Target Final Balances") which would permit liquidating distributions that are made in accordance with such final Capital Account balances to be equal to the distributions that

Page 12

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

would occur under Section 12.1 hereof.  To the extent that the tax allocation provisions of this Agreement would not produce the Target Final Balances, the Members agree to take such actions as are necessary to amend such tax allocation provisions to produce such Target Final Balances.   Notwithstanding the other provisions of this Agreement, allocations of income, gain, loss and deduction shall be made prospectively as necessary to produce such Target Final Balances and, to the extent such prospective allocations would not affect such result, the prior tax returns of the Company shall be amended to reallocate income, gain, loss, and deduction to produce such Target Final Balances.

15.    TRANSFERS OF INTERESTS; WITHDRAWAL

   15.1    Member Transfers.

      (a)    Limitations on Transfer.  Except as set forth in Section 15.1(b) hereof, no Member shall sell, exchange, transfer, give, encumber, assign, pledge, mortgage, hypothecate or otherwise dispose of, voluntarily or involuntarily, directly or indirectly (each, a "Transfer"), all or any part of his Interest to any Person, without the approval of all of the Managers.  Any Transfer shall be evidenced by a Transfer and Assignment of Membership substantially in the form of Exhibit B attached hereto.

      (b)    Permitted Transfers.  Notwithstanding anything to the contrary set forth in Section 15.1, a Member may, upon notice to but without the prior consent of the other Members, transfer all or part of his Interest to a trust for the benefit of such Member or any member of such Member's family, so long as the original Member is the trustee of such trust with full voting power with respect to all matters relating to the Company.

      (c)    Transfers on Death.  Upon the death of a Member, or a former Member who is a trustee of a trust Member pursuant to Section 15.1(b) hereof, (i) his entire Interest shall thereafter be held, by his estate or otherwise, as an Assignee rather than a Substitute Member (unless the Managers agree otherwise), and (ii) the Company may purchase the Interest of the deceased Member or a portion thereof from the estate of such deceased Member if there is agreement as to the purchase price to be paid for such Interest (or portion thereof) between the estate of the deceased Member and the Company.  The Company may, but shall not be obligated to, carry key man insurance on each of its Members in amounts deemed to be sufficient by the Managers to help fund such purchases.

      (d)    Right of First Offer.  If at any time a Member desires to Transfer its Interest to any Person (other than any party to which a Transfer is permitted pursuant to Section 15.1(b) or (c) above), the transferring Member shall first send to each of the other Members a notice (a "First Offer Notice") of the transferring Member's desire to Transfer, which First Offer Notice shall set forth the terms on which the transferring Member is willing to Transfer its Interest.  The other Members shall then have the right, exercisable by written notice sent to the transferring Member within ten (10) business days after such First Offer Notice, to elect to purchase the Interest to be transferred on the terms and conditions set forth in the First Offer Notice (with closing of such sale to occur thirty days after the purchasing Member's notice of its agreement to purchase, or, if later,

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

on a date specified in the First Offer Notice). If more than one Member timely exercises such right of first offer, the Members that have so exercised such right shall be entitled to purchase the Interest to be transferred in proportion to their respective percentage Interests in the Company as of the date of the proposed Transfer. If no Member timely exercises such right of first offer, then the Member which wishes to Transfer may sell its Interest to any Person for no less than 98% of the purchase price set forth in the First Offer Notice. If (i) the transferring Member proposes to sell its Interest for less than 98% of the proposed price set forth in the First Offer Notice, or (ii) the transferring Member does not execute a binding contract to sell its Interest within 180 days after delivery of the First Offer Notice, then in either such case the transferring Member shall again be obligated to first offer its Interest to the other Members in accordance with the terms of this Section prior to selling or offering to sell its Interest.

(e)     Terms of Transfer. An Assignee admitted in accordance with this Section 15.1 will be a Substitute Member if, but only if, the Managers approve the admission of such Assignee as a Substitute Member, in which case such Substitute Member shall succeed, to the extent attributable to the Interest transferred, to the status as Member, Capital Accounts, Capital Contributions, rights, powers, restrictions, liabilities and obligations of the transferor Member. In all other cases (including a transfer following the death of a Member), the Assignee shall not be a Substitute Member, but shall be entitled only to the allocations of income, gains, losses, deductions and credits and distributions of Company assets attributable to the Interest or portion thereof but shall not have any other rights, including any voting or management rights, hereunder. The effective date of a Transfer shall be the closing date with respect to any Transfer. Notwithstanding the foregoing, neither the Company nor any Member other than the transferor Member shall incur any liability for Company allocations and distributions made in good faith to the transferor Member until the written instrument of Transfer satisfactory to all of the Members has been received by the Company and recorded on its books and the effective date of the Transfer has passed.

(f)     Notwithstanding anything herein to the contrary, a Member shall not sell, assign, exchange or otherwise transfer his or her Interest unless such proposed sale or exchange is, in the opinion of counsel to the Company, an exempt transaction under any applicable federal and state securities laws.

15.2   Withdrawal of Members.   Except as otherwise specifically permitted by this Agreement, no Member shall be entitled to withdraw from the Company.

15.2   Additional Members.   The Company may admit any Person (in addition to the original Members and any Substitute Members) as a Member upon the approval of the Managers. The initial Capital Contribution required of an additional Member shall be in an amount determined by the Managers pursuant to Section 8.1.

16.     NOTICES

All notices to the Members under this Agreement shall be in writing and shall be (i) delivered by personal service, (ii) delivered by courier service, (iii) telecopied or (iv) sent by

Page 14

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

certified or registered mail, postage prepaid, return receipt requested, to the Members at the addresses and fax numbers set forth on Exhibit A (or, with respect to any Member which is not an original Member signing this Agreement, at the address and fax number provided to the Company at the time such Member becomes a Member). Except as otherwise expressly set forth herein, each notice shall be effectively given when delivered at such address or fax number. Any notice given by telecopier, facsimile or similar means shall be confirmed by hard copy delivered as soon as possible. Rejection or other refusal to accept a notice or the inability to deliver a notice because of a changed address or fax number of which no notice was given as provided herein shall be deemed to be receipt of the notice sent. By giving to the other parties notice thereof, the parties hereto and their respective permitted successors and assigns shall have the right from time to time and at any time during the term of this Agreement to change their respective addressee or address for notices, and each shall have the right to specify as its address for notices any other address within the United States of America.

17.    NO PARTITION

No Member shall have the right to partition any property of the Company during the term of this Agreement nor shall any Member make application to any court or authority having jurisdiction in such matter or commence or prosecute any action or proceeding for partition of any property of the Company and the sale thereof. Upon any breach of the provisions of this Section by any Member, the other Member(s), in addition to all rights and remedies at law and in equity the Member(s) may have or claim, shall be entitled to a decree or other restraining order enjoining such application, action or proceeding.

18.    CONFIDENTIALITY

The Members agree that Company's business, operating, marketing, leasing and development plans or projections, trade secrets, books and records are confidential and shall not be disclosed to any third party without the Managers' prior written consent; provided, however, that any Member may disclose any such materials if so required by law or to such party's attorneys, accountants and other professionals subject to such professionals' duties not to further disclose such materials.

19.    REPRESENTATIONS AND WARRANTIES REGARDING INVESTMENT

19.1    Investment Intention; No Resales. Each Member hereby represents and warrants that such Member is acquiring his Interest pursuant to this Agreement for investment solely for such Member's own account and not with a view to, or for resale in connection with, the distribution or other disposition thereof in violation of the Securities Act of 1933, as amended (the "Securities Act"). Each Member agrees and acknowledges that such Member will not, directly or indirectly, offer, transfer, sell, assign, pledge, hypothecate or otherwise dispose of his Interest, or solicit any offers to purchase or otherwise acquire or take a pledge of his Interest, unless (a) such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to an effective registration statement under the Securities Act and has been registered under all applicable state securities or "blue sky" laws, or (b) such Member shall have furnished the Company and the Managers with an opinion of counsel, which opinion of counsel shall be reasonably satisfactory to the Managers, to the effect that no such registration is required because

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

of the availability of an exemption from registration under the Securities Act and all applicable state securities or "blue sky" laws.

19.2    Accredited Investor.    Each Member hereby represents and warrants to the Company and the other Members that such Member is an "accredited investor" as that term is defined in Rule 501 of Regulation D under the Securities Act.

19.3    Legend.    It is not contemplated that the Interests will be separately certificated. However, if separate certificates are issued, each certificate shall bear substantially the following legend:

> "THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE TRANSFERRED OR SOLD UNLESS (i) A REGISTRATION STATEMENT UNDER SUCH ACT IS THEN IN EFFECT WITH RESPECT THERETO, (ii) A WRITTEN OPINION FROM COUNSEL FOR THE ISSUER OR COUNSEL FOR THE HOLDER REASONABLY ACCEPTABLE TO THE ISSUER HAS BEEN OBTAINED TO THE EFFECT THAT NO SUCH REGISTRATION IS REQUIRED, OR (iii) A 'NO ACTION' LETTER OR ITS THEN EQUIVALENT WITH RESPECT TO SUCH TRANSFER OR SALE HAS BEEN ISSUED BY THE STAFF OF THE SECURITIES AND EXCHANGE COMMISSION."

19.4    Units Unregistered.    Each Member acknowledges and represents that such Member has been advised that (a) the offer and sale of the Interests have not been registered under the Securities Act in reliance upon the exemption from registration afforded by Sections 3(b) and/or 4(2) thereof and Regulation D thereunder; (b) the Interests must be held indefinitely and such Member must continue to bear the economic risk of the investment in the Interests unless the offer and sale of such Interests is subsequently registered under the Securities Act and all applicable state securities laws or an exemption from such registration is available; (c) there is no established market for the Interests and it is not anticipated that there will be any public market for the Interests in the foreseeable future; (d) Rule 144 promulgated under the Securities Act is not presently available, nor expected to become available, with respect to the sale of any securities of the Company, and the Company has made no covenant to make such Rule available; (e) when and if Interests may be disposed of without registration under the Securities Act in reliance on Rule 144, such disposition can be made only in limited amounts in accordance with the terms and conditions of such Rule; (f) if the Rule 144 exemption is not available, public offer or sale without registration will require the availability of an exemption under the Securities Act; (g) a restrictive legend in the form heretofore set forth shall be placed on the certificates, if any, representing the Interests; and (h) a notation shall be made in the appropriate records of the Company indicating that the Interests are subject to restrictions on transfer.

19.5    Additional Investment Representations.    Each Member further represents and warrants that (a) in making such Member's decision to purchase the Interests hereby subscribed

Page 16

for, such Member has relied upon independent investigations made by such Member and, to the extent believed by such Member to be appropriate, such Member's own financial, tax and other advisors; (b) such Member has been given the opportunity to examine all documents and to ask questions of, and to receive answers from, the Managers concerning the terms and conditions of the purchase of the Interests and to obtain any additional information which such Member has provided to the Company and the Managers concerning such Member and such Member's financial position is true, complete and correct as of the date of this Agreement.

19.6   No Broker or Finder.  Each Member represents and warrants that such Member has not engaged any broker or finder in connection with this Agreement or the transactions contemplated hereby.

## 20.   MISCELLANEOUS

20.1   Governing Law.   This Agreement shall be construed and interpreted in accordance with the laws of the State of Illinois.

20.2   Section 754 Election.  The Managers shall have the power, but not the obligation, to cause the Company to make such income tax elections, including elections pursuant to Section 754 of the Code, in order to adjust the basis of Company property as described in Sections 734 and 743 of the Code, as the Managers may deem appropriate.

20.3   Headings.  Section headings and subheadings thereunder are for convenience of reference only and shall be given no legal effect in the interpretation of this Agreement.

20.4   Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

20.5   Severability.  In the event any part or provision of this Agreement is invalid for any reason, the remainder of this Agreement shall continue and be deemed to be in full force and effect.

20.6   Number and Gender.  Whenever required by the context, the singular number shall include the plural, and any gender shall include all genders.

20.7   Transactions with Affiliates.  Each Member acknowledges that the Members and their Affiliates have interests in various entities which may from time to time provide goods or services to the Company.  Accordingly no transaction between the Company and an entity in which one or more of the Members has an interest shall be void or voidable as a result of such interest of the Members and no Member shall incur liability to the Company or other Members for failing to disclose any such interest to the Company or other Members.

20.8   Power of Attorney.  Each Member hereby makes, constitutes and appoints the Managers with full power of substitution and resubstitution, its true and lawful attorney for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, file and record all instruments amending or cancelling the Articles, as and to the extent required under the Act and applicable law, and to sign, execute, certify, acknowledge, file and record such other agreements, instruments or documents as may be necessary or advisable (a) to reflect the

Page 17

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

exercise by the Managers of any of the powers granted to it under this Agreement, or (b) which may be required of the Company or of the Members by the laws of the State of Illinois or any other jurisdiction, to the extent consistent with the Agreement. Each Member authorizes such attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in and about the foregoing as fully as such Member might or could do if personally present, and hereby ratifying and confirming all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. The power of attorney granted pursuant to this Section: (a) is a special power of attorney coupled with an interest, is irrevocable, and shall survive the bankruptcy, death, adjudication of incompetency or insanity, or dissolution of any Person granting such power; (b) may be executed by such attorney-in-fact by listing all of the Members executing any agreement, certificate, instrument or document with the single signature of any such attorney-in-fact acting as attorney-in-fact for all of them; and (c) shall survive the delivery of an assignment by a Member of its Interest in the Company (except that where the purchaser, transferee or assignee thereof has the right to be, or is admitted as, a Substitute Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling such attorney-in-fact to execute, acknowledge and file any such agreement, certificate, instrument or document necessary to effect such substitution).

20.9   _Amendments._   Except as otherwise required by law, this Agreement may be amended only by the unanimous vote of the Members.

20.10   _Binding Effect._   Except as otherwise expressly provided herein, each and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

[signature page to follow]

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.


_____

SCOTT J. KRONE


SBS PRIVATE EQUITY FUND, LP

By: _____

       STEVE SIEGEL, Partner


_____

NOEL CAIN


_____

ANDREW S. RUBIN

**EXHIBIT A**

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

| Members | Address | Capital Membership Contribution | Interest |
|---|---|---|---|
| **GP/Managers** | | $650,000.00 | |
| Scott Krone | 600 N. Waukegan, #129 Northbrook, IL 60062 | | |
| SBS PRIVATE EQUITY FUND, LP | 620 W Old Elm Lake Forest, IL 60045 | | |
| Noel Cain | 6310 N Santa Monica Blvd Whitefish Bay, WI | | |
| Andrew Rubin | 4808 Preserve Parkway Long Grove, IL 60047 | | |
| **Members** | | | |
| Chesapeake Partners | 4501 Chesapeake Place Amarillo, TX 79119 | $293,493.99 | |
| Poongodi Venkatachalapathi | 2887 W. South Bend Coffeyville, KS 67337 | $ 50,000.00 | |
| Equity Trust Company Custodian Fbo Netta Shelton, IRA | 705 E Grinnell Dr Burbank, CA 91501 | $100,000.00 | |
| Rani Kesavulu | | $100,000.00 | |
| Sarva, LLC (Reddy) | 9451 E. Cross Creek Ct Wichita, KS 67206 | $100,000.00 | |
| Brian Bishop | | $100,000.00 | |
| Oliver Yu | 10616 Dale View Drive | $71,746.99 | |
| Tri-State Real Estate Solutions | 62 Pamela Rd Cortlandt Manor, NY 10567 | $71,746.99 | |
| TRES, LLC | 62 Pamela Rd Cortlandt Manor, NY 10567 | $71,746.99 | |
| R2V2 Investments | 41 Collins Mill Road Chester Springs, PA 19425 | $35,873.50 | |
| Nehasri, Ltd | 4008 Nicols Avenue Richardson, TX 75082 | $35,873.50 | |
| Shan Subhash Family, LP | 2803 N. Penstemon St Wichita, KS 67226 | $293,493.99 | |

Page 20

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

| | | |
|---|---|---|
| Prahabar Kuppuswamy | 2540 N. 10th St<br>Independence, KS  67301 | $35,873.50 |
| Freedom Buildings | 6505 E Central Ave Ste 183<br>Wichita, KS  67206 | $100,000.00 |
| Scott Krone | 600 Waukegan Rd  Ste 129<br>Northbrook, IL  60062 | $100,000.00 |
| SBS Private Equity Fund | 600 Waukegan Rd  Ste 129<br>Northbrook, IL  60062 | $100,000.00 |
| To be Finalized | | $46,656.57 |

C:\Users\lwhite\AppData\Local\Microsoft\Windows\INetCache\Content.Outlook\QFN39HYO\Platform Bradley Operating Agreement Investors 11-1-14.doc

FILED DATE: 4/5/2019 10:04 AM  2018CH06885

## EXHIBIT B

### TRANSFER AND ASSIGNMENT
### OF MEMBERSHIP INTEREST

### PLATFORM BRADLEY LLC

_____ transfers and assigns to _____ all of _____ right, title and interest in and to a ___% Interest in the _____, an Illinois limited liability company.

Dated _____, _____

_____

### ACCEPTANCE

The undersigned accepts the foregoing assignment and agrees to become a substituted Member with respect to such Interest and accepts, adopts and approves all of the terms and provisions of the Operating Agreement of the Platform Bradley LLC, and agrees to execute such documents and take such action as the Members deem necessary or appropriate to comply with the Illinois Limited Liability Company Act.

Dated_____, _____

_____

### RECEIPT

The undersigned, as Members of the Platform Bradley LLC acknowledge receipt of an executed counterpart of the foregoing assignment of Membership Interest, and consent to and recognize ownership of a _____% Interest by _____.

Dated _____, _____

_____          _____

_____          _____

Page 22

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

# EXHIBIT C

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

## PROMISSORY NOTE

**Principal Amount: $2,373,000.00**                     **Date of Note: June 26, 2014**

**PROMISE TO PAY. PLATFORM 600 WAUKEGAN LLC, an Illinois limited liability company ("Borrower"), promises to pay to ALLIANT CREDIT UNION, an Illinois state chartered credit union ("Lender"), whose address is 11545 West Touhy Avenue, Chicago, Illinois 60666, or order, in lawful money of the United States of America, the principal amount of TWO MILLION THREE HUNDRED SEVENTY-THREE THOUSAND AND NO/100 DOLLARS ($2,373,000.00), together with interest on the unpaid principal balance from the date hereof, until paid in full.**

**LOAN.** This Note evidences Borrower's Loan under that Business Loan Agreement dated as of June 26, 2014, between Borrower and Lender (as it may be amended from time to time, the "Loan Agreement"). Capitalized terms used herein, but not otherwise defined herein, shall have the meaning given them in the Loan Agreement.

**PAYMENT.** Borrower will repay the Loan evidenced hereby in accordance with the terms of the Loan Agreement.

**INTEREST.**

> **(a)** **Interest on the Loan.** Borrower shall pay interest on the Loan in accordance with the terms of the Loan Agreement.

> **(b)** **Default Interest.** Notwithstanding the above provisions, if an Event of Default is in existence, all outstanding amounts of principal and, to the extent permitted by law, all overdue interest, in respect of each and every Loan shall bear interest, payable on demand, at the Default Rate under the Loan Agreement.

**EVENTS OF DEFAULT.** A default in the performance of any obligation hereunder or any Event of Default under the Loan Agreement shall constitute an Event of Default hereunder.

**LENDER'S RIGHTS.** Upon the occurrence of an Event of Default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, without notice, and then Borrower will pay that amount, together with any Prepayment Fee which Borrower would be required to pay. Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower also will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also will pay any court costs, in addition to all other sums provided by law. **This Note has been delivered to Lender and accepted by Lender in the State of Illinois. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction and venue of the courts having situs in either Cook County, Illinois, or Shiawassee County, Michigan. LENDER AND BORROWER HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY**

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

**EITHER LENDER OR BORROWER AGAINST THE OTHER. This Note shall be governed by and construed in accordance with the laws of the State of Illinois.**

**COLLATERAL; LOAN AGREEMENT.** This Note is secured by the Collateral (as defined in the Loan Agreement). This Note is the Note referred to in the Loan Agreement.

**SAVINGS CLAUSE.** In no event shall the amount of interest or charges paid hereunder, together will all amounts reserved, charged, or taken by Lender as compensation for fees, services, or expenses incidental to making, negotiation, or collection of the loan evidenced hereby exceed the maximum rate of interest on the unpaid principal balance hereof, charges or compensation for fees, services, or expenses allowable by applicable law. If any sum is collected in excess of the applicable maximum rate or amount, the excess collected shall be applied to reduce the principal debt.

**INDEMNITY.** If the introduction of, or any change in, or in the interpretation of, or any change in its application to the Borrower of, any law or regulation, or compliance with any guideline from any governmental authority (whether or not having the force of law) has the effect of increasing the cost to the Lender of performing its obligations hereunder or otherwise reducing its effective return hereunder, then upon demand from time to time the Borrower shall compensate the Lender for such cost or reduction pursuant to a certificate reasonably prepared by the Lender.

**GENERAL PROVISIONS.** Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other Person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, protest and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew, extend (repeatedly and for any length of time) or modify this Loan, or release any party or guarantor or Collateral; or impair, fail to realize upon or perfect Lender's security interest in the Collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.

**LENDER'S DISCRETION.** Whenever this Note requires either Lender's consent, election, approval or similar action or otherwise vests in Lender the authority to make decisions and/or determinations, such actions shall be made or withheld in Lender's sole and absolute discretion, unless specifically provided otherwise and the granting of any consent, election, approval or similar action by Lender in any instance shall not constitute continuing consent, election, approval or similar action in subsequent instances where such is required.

**CONFESSION OF JUDGMENT.** Borrower hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record and to confess judgment against Borrower for the unpaid amount of this Note as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. If a copy of this Note, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Borrower waives the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Note have been paid in full. Borrower hereby waives and releases any and all claims or causes of action which Borrower might have against any attorney acting under the terms of authority which Borrower has granted herein arising out of or connected with the confession of judgment hereunder.

**ILLINOIS INSURANCE NOTICE.** Unless Borrower provides Lender with evidence of the insurance coverage required by the Security Agreements, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the Collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the Collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by their agreement. If Lender purchases insurance for the Collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on Borrower's own.

<div align="center">

**[SIGNATURE PAGE FOLLOWS]**

</div>

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

[SIGNATURE PAGE TO PROMISSORY NOTE]

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE PROMISSORY NOTE AND ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THE PROMISSORY NOTE.**

**BORROWER:**

**PLATFORM I 600 WAUKEGAN LLC**, an Illinois limited liability company

By: _____
       Scott J. Krone
       Manager

4

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

## ACKNOWLEDGEMENT

STATE OF _I\_____ )
                              ) SS.
COUNTY OF _Cook_____ )

    I, _STEVE SIEGEL_____, a Notary Public in and for the County of _Cook____, in the State of _____I\_____, DO HEREBY CERTIFY that Scott J. Krone, personally known to me to be the same person whose name subscribed to the foregoing instrument as Manager of **PLATFORM I 600 WAUKEGAN LLC**, an Illinois limited liability company, appeared before me this day in person, and acknowledged that he signed, sealed and delivered the said instrument as his free and voluntary act and as the free and voluntary act of said company, for the uses and purposes therein set forth.

    GIVEN under my hand and Notarial Seal this _25_ day of _June___, 20_14_.

_____
NOTARY PUBLIC

My Commission Expires:

_____

OFFICIAL SEAL
STEVE SIEGEL
Notary Public - State of Illinois
My Commission Expires Sep 17, 2016

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

# EXHIBIT D

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

EXECUTION COPY

## PROMISSORY NOTE

$100,000.00                                            January 25, 2013
Maturity Date:  January 25, 2018                   Northbrook , Illinois

1.      <u>Agreement to Pay</u>.  FOR VALUE RECEIVED, PLATFORM I – 600 WAUKEGAN, LLC, an Illinois limited liability company ("Maker"), hereby promises to pay to the order of **TRESI, LIMITED LIABILITY COMPANY**, a New York limited liability company, with its principal place of business at 62 Pamela Road, Cortlandt Manor, NY  10567, its successors and assigns ("<u>Lender</u>"), the principal sum of One Hundred Thousand and No/100 Dollars ($100,000.00) ("<u>Loan</u>"), or so much of the Loan as may be advanced under and pursuant to the terms of the Mortgage (as hereinafter defined), together with the applicable fees and interest thereon in the amounts and at the rates described below, and any and all other amounts which may be due and payable hereunder from time to time, at the place and in the manner hereinafter provided.  Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Mortgage.

2.      <u>Principal, Fees and Interest</u>.

     2.1      <u>Maturity Date</u>.  The outstanding principal balance of the Loan and all interest accrued and unpaid thereon shall be due and payable on or before January 25, 2018 (the "<u>Maturity Date</u>").

     2.2      <u>Interest Rate</u>.  At all times prior to the Maturity Date and prior to the occurrence of an uncured Event of Default, interest shall be paid as follows: a) On all proceeds of the Loan as advanced from time to time a minimum yearly guaranteed rate of three percent (3%) from  the date of disbursement until repaid; and b) On all proceeds of the Loan as advanced from time to time "bonus interest" equal to the amount of all investment returns (including both ordinary income and capital gains no matter how characterized or structured) that are paid or would be payable to an equity investor in PLATFORM I – 600 WAUKEGAN, LLC making an equity investment equal to the amount of the Loan less the amount previously paid under  a) herein but not in excess of the limits of section 6.7 herein.  Said bonus interest is payable to Lender at the same time the equity investors receive any said of their respective investment returns.  In any Event of Default, interest shall accrue on the balance of (a) principal remaining unpaid during any such period.

3.      <u>Payment Terms</u>.

     3.1      <u>Application of Payments and Prepayments</u>.  All payments and prepayments on account of the indebtedness evidenced by this Note may be applied by Lender to amounts owed hereunder and under the Mortgage in such order as Lender shall determine, in its sole discretion.

     3.2      <u>Method of Payments</u>.  All payments of principal and interest hereunder shall be paid by, check or in coin or currency which, at the time or times of payment, is the legal tender for public and private debts in the United States of America and shall be made at such place as Lender or the legal holder or holders of this Note may from time to time appoint in the payment invoice or otherwise in writing, and in the absence of such appointment, then at the address of Lender set forth above.  Payment made by check shall be deemed paid on the date Lender

FILED DATE: 4/5/2019 10:04 AM    2018CH06885

receives such check; provided, however, that if such check is subsequently returned to Lender unpaid due to insufficient funds or otherwise, the payment shall not be deemed to have been made and shall continue to bear interest until collected. Notwithstanding the foregoing, the final payment due under this Note must be made by wire transfer or other final funds. Payments under 2.2 a) shall be made on a quarterly basis and payments under 2.2 b) shall be payable when equity investors are paid the investment returns that are used to calculate said bonus interest.

3.3    Prepayments. Maker may voluntarily prepay the principal balance of this Note, in whole or in part without the express written consent of the Lender.

4.    Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Note:

4.1    the failure by Maker to pay the principal or any fees or interest payable under section 2.2 a) pursuant to this Note on the date when due, or (b) any other amount payable to Lender under section 2.2 b of this Note, no later than sixty (60) days after the date when any such payment is due in accordance with the terms hereof or thereof; or

4.2    the failure by Maker to perform or observe any of the other covenants, agreements or conditions of this Note or of the Mortgage; or

4.3    the occurrence of the dissolution, insolvency, winding-up, death or legal incompetency of Maker; or

4.4    The failure of Maker to cooperate on the execution of the  Mortgage no later than thirty (30) days from any request to cooperate regarding same; or

4.5    An Event of Default under the Mortgage.

5.    Remedies. At the election of the holder hereof, and without notice, the principal balance remaining unpaid under this Note, and all unpaid interest accrued thereon and any other amounts due hereunder, shall be and become immediately due and payable in full upon the occurrence of any Event of Default, the principal balance remaining unpaid under this Note, and all unpaid interest accrued thereon and any other amounts due hereunder, shall automatically, without notice, be and become immediately due and payable in full. Failure to exercise this option shall not constitute a waiver of the right to exercise same in the event of any subsequent Event of Default. No holder hereof shall, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by the holder hereof, and then only to the extent specifically set forth therein. The rights, remedies and powers of the holder hereof, as provided in this Note are cumulative and concurrent, and may be pursued singly, successively or together against Maker and any other security given at any time to secure the repayment hereof, all at the sole discretion of the holder hereof.

6.    Other General Agreements.

EXECUTION COPY

6.1     The Loan is a business loan which comes within the purview of Section 205/4, paragraph (1)(c) of Chapter 815 of the Illinois Compiled Statutes, as amended.  Maker agrees that the Loan evidenced by this Note is an exempted transaction under the Truth In Lending Act, 15 U.S.C., §1601, et seq. and is properly classified as benefitting from the liberal permissible interest rates under said section 205/4, paragraph (1)(c) of Chapter 815 of the Illinois Compiled Statutes, as amended.

6.2     Time is of the essence hereof.

6.3     This Note is governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the statutes, laws and decisions of the state of Illinois.  This Note may not be changed or amended orally but only by an instrument in writing signed by the party against whom enforcement of the change or amendment is sought.

6.4     This Note has been made and delivered at Northbrook, Illinois and all funds disbursed to or for the benefit of Maker will be disbursed in Northbrook, Illinois.

6.5     The obligations and liabilities of Maker under this Note shall be binding upon and enforceable against Maker and its and their successors and /or assigns.  This Note shall inure to the benefit of and may be enforced by Lender and its successors and /or assigns.

6.6     If any provision of this Note is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, Maker and Lender shall negotiate an equitable adjustment or the court having jurisdiction may effect and equitable adjustment in its discretion, in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this and the validity and enforceability of the remaining provisions or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

6.7     If the interest provisions herein shall be or shall result, at any time during the Loan, in an effective rate of interest which, for any month, exceeds the limit of usury or other laws applicable to the Loan, all sums in excess of those lawfully collectible as interest of the period in question shall, without further agreement or notice between or by any party hereto, be applied upon principal immediately upon receipt of such monies by Lender, with the same force and effect as though the payer has specifically designated such extra sums to be so applied to principal and Lender had agreed to accept such extra payment(s) as a premium-free prepayment.

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

FILED DATE: 4/5/2019 10:04 AM   2018CH06885

Notwithstanding the foregoing, however, Lender may at any time and from time to time elect by notice in writing to Maker to reduce or limit the collection to such sums which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirements of the preceding sentence. In no event shall any agreed to or actual exaction as consideration for this Loan transcend the limits imposed or provided by the law applicable to this transaction or the makers hereof for the use or detention of money or for forbearance in seeking its collection.

      6.8    Lender may at any time assign its rights in this Note, or any part thereof and transfer its rights in any or all of the collateral, and Lender thereafter shall be relieved from all liability with respect to such collateral. In addition, Lender may at any time sell one or more participations in the Note. Maker may not assign its interest in this Note, or any other agreement with Lender or any portion thereof, either voluntarily or by operation of law, without the prior written consent of Lender.

7.    <u>Notices</u>. All notices required under this Note will be in writing and will be transmitted in the manner and to the addresses or facsimile numbers required by the Mortgage, or to such other addresses or facsimile numbers as Lender and Maker may specify from time to time in writing.

8.    <u>Consent to Jurisdiction</u>. TO INDUCE LENDER TO ACCEPT THIS NOTE, MAKER IRREVOCABLY AGREES THAT, SUBJECT TO LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS NOTE WILL BE LITIGATED IN COURTS HAVING SITUS IN COOK COUNTY, ILLINOIS. MAKER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN COOK COUNTY, ILLINOIS, WAIVES PERSONAL SERVICE OF PROCESS UPON MAKER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO MAKER AT THE ADDRESS STATED IN THE MORTGAGE AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

9.    <u>Waiver of Jury Trial</u>. MAKER AND LENDER (BY ACCEPTANCE OF THIS NOTE), HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS NOTE OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS NOTE OR (B) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. MAKER AGREES THAT IT WILL NOT ASSERT

ANY CLAIM AGAINST LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

10. <u>Customer Identification - USA Patriot Act Notice; OFAC and Bank Secrecy Act</u>. Reference is made to the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "<u>Act</u>"). Maker shall (a) ensure that Maker and/or no person who owns a controlling interest in or otherwise controls Maker or any subsidiary or affiliate of Maker is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (b) not use or permit the use of the proceeds of the Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (c) comply, and cause any of its subsidiaries to comply, with all applicable Bank Secrecy Act ("<u>BSA</u>") laws and regulations, as amended.

IN WITNESS WHEREOF, Maker has executed and delivered this Promissory Note as of the day and year first written above.

<div style="margin-left:40%">

PLATFORM I – 600 WAUKEGAN, LLC, a Illinois limited liability company

By: _____

    Its: _____

</div>

**State of Illinois**
**County of** L A V E _____

**This instrument was acknowledged before me on** 2 2 ᴱᴼ _____
_____ **(date) by** STEVE SIEGEL _____
**(name of person) as** _____ **(type of authority,**
**e.g., officer, trustee, etc.) of** _____
**(name of party on behalf of whom instrument was executed).**
**(seal)**

_____
**signature of notary public**

**Notary seal:**

OFFICIAL SEAL
STEVE SIEGEL
Notary Public - State of Illinois
My Commission Expires Sep 17, 2016

FILED DATE: 4/5/2019 10:04 AM   2018CH06885