# EXHIBIT B
# (Case No. 1:19-cv-1912)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ILLINOIS ASSET MANAGEMENT, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 19-cv-01912 |
| v. ) | |
| ) | Judge John Z. Lee |
| SCOTT J. KRONE, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S VERIFIED ANSWER AND AFFIRMATIVE DEFENSES**
**TO PLAINTIFF'S COMPLAINT FOR CONFESSION OF JUDGMENT**

Defendant, SCOTT J. KRONE ("Krone"), through his undersigned attorneys and for his

Verified Answer and Affirmative Defenses to Plaintiff's Complaint for Confession of Judgment,

states the following:

**INTRODUCTION**

1) Plaintiff, IAM, brings this action against Defendant, Krone, for confession of judgment arising from a Krone's execution of a Commercial Guaranty, a copy of which is attached hereto as Exhibit A, in which Krone unconditionally guaranteed the payment of a Promissory Note, a copy of which is attached as Exhibit B.

**ANSWER:**     Krone admits that Plaintiff brings this action for judgment relating to a Commercial

Guaranty and admits that a redacted copy of the Commercial Guaranty is attached as Exhibit A

and a redacted copy of the Promissory Note is attached as Exhibit B.  Krone denies that Plaintiff

is entitled to any relief whatsoever.

**PARTIES**

2) Plaintiff, IAM, is a Limited Liability Company with only one member, Abdul Arif ("Arif"), who is President and sole Officer of IAM.  Because Arif, the sole member of IAM, is a citizen of the State of Kansas, IAM is also a citizen of Kansas for diversity of citizenship purposes.

1

**ANSWER:** Krone denies that IAM is a resident of Kansas. Krone admits that Arif purports to

be a resident of Kansas. Krone lacks information sufficient to form a belief as to whether Arif is

the sole officer, President and owner of IAM.

3) Defendant, Krone, is an individual, who is a citizen of the State of Illinois for diversity of citizenship purposes.

**ANSWER:** Krone admits that he is a citizen of the State of Illinois.

## JURISDICTION AND VENUE

4) This Court has subject matter jurisdiction over this case in accordance with 28 U.S.C. §1332, as the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and because the parties are citizens of different states.

**ANSWER:** Krone admits that this Court has subject matter jurisdiction over this matter.

5) Venue is appropriate in this District in accordance with 28 U.S.C. § 1391(b)(1) and (2) respectively because the Defendant, Krone resides in the Northern District of Illinois, Eastern Division and because a substantial part of the events giving rise to Plaintiff's claims occurred within this District.

**ANSWER:** Krone denies that venue is appropriate in this Court, because there are other

proceedings already underway in the Circuit Court of Cook County in which Krone seeks, in part,

declaratory judgment that the Commercial Guarantee is unenforceable and in which Plaintiff and

Arif are named defendants involving claims of breach of fiduciary duty, conspiracy and aiding and

abetting the breach of fiduciary duties. *See Krone v. Freedom Buildings, LLC, et al*., Circuit Court

of Cook County, Illinois, Chancer Division, No. 18 CH 6885.

## STATEMENT OF FACTS

6) On or about June 22, 2016, International Bank of Chicago ("IBC"), IAM's predecessor in interest, made a Commercial loan to an entity known as Platform Bradley, LLC in the original principal amount of $5,600,000.00 ("Bradley Loan").

**ANSWER:** Krone admits the allegations contained in Paragraph 6.

7) The Bradley Loan is evidenced by the Promissory Note in the original principal amount of $5,600,000.00, executed by Scott J Krone and Noel P Cain on June 22,

2

2016 (the "Promissory Note"), a copy of which is attached and made a part of this Complaint as Exhibit B.

**ANSWER:**    Krone admits the allegations in Paragraph 7.

8)    On or about June 22, 2016, in conjunction with the execution of the Promissory Note, and as security for repayment thereof, Krone executed a Commercial Guaranty (the "Krone Guaranty") whereby he personally guaranteed full payment of the Bradley Loan to IBC or to order. A copy of the Commercial Guaranty is attached and made part of this Complaint as Exhibit A. The Krone Guaranty was absolute, unconditional, and continuing, including all costs and expenses incurred in connection with enforcing the Guaranty.

**ANSWER:**    Krone admits that he and Muthukumar Vellachaimy ("Kumar") and Subhash H.

Shah ("Subhash"), each executed a Commercial Guaranty. Krone admits that his Commercial

Guarantee is attached to the Complaint as Exhibit A. Krone denies that his Commercial Guarantee

is absolute, unconditional, and continuing in the context and manner in which Plaintiff acquired it

and is attempting to use it.

9)    The Promissory Note for the Bradley Loan provides for the payment of default interest at the rate of fifteen percent (15%) after default.

**ANSWER:**    Krone admits the allegations in Paragraph 9.

10)    On or about January 24, 2019, IBC, IAM's predecessor in interest, declared the Promissory Note in default pursuant to a Default Letter sent to Krone and others. A correct copy of the Default Letter is attached and made part of this Complaint Exhibit C.

**ANSWER:**    Krone denies the letter attached as Exhibit C to the Complaint was sent January

19, 2010. Krone admits the remaining allegations in Paragraph 10.

11)    On or about February 28, 2019, Plaintiff, IAM, purchased from IBC the $5,600,000.00 Bradley Loan/the Promissory Note and all related Collateral, including, but not limited to, Krone's Commercial Guaranty. A copy of the Non-Recourse Loan Sale Agreement reflecting IAM's purchase of the Bradley Loan/the Promissory Note and all related Collateral is attached and made part of this Complaint as Exhibit D.

3

**ANSWER:** Krone admits that a redacted copy of the Non-Recourse Loan Sale Agreement is attached to the Complaint as Exhibit D, which identifies IAM as the purchaser. Krone denies that IAM alone purchased the Bradley Loan/Promissory Note. Krone admits the remaining allegations in Paragraph 13.

12) As a consequence of its purchase of the Promissory Note, for all collection purposes, IAM is deemed the Lender under the Promissory Note.

**ANSWER:** Krone denies that IAM is deemed as a lender or can enforce the rights of the lender in the context and manner in which it acquired the Promissory Note and (a) is attempting to selectively enforce as to Krone only and not the other guarantors; (b) the other guarantors are represented by Arif, who holds himself out as the attorney and/or "proxy" for Krone's co-managers (c) IAM has not made a demand of the other guarantors of the Promissory Note and (d), as set forth more fully in his affirmative defenses and Krone's Third Party Complaint in the State Court Lawsuit, where this entire process is a scheme set in motion by Arif and the co-guarantors to defraud Krone, remove him as a manager and disenfranchise him of his property rights.

13) The Bradley Loan has been continuously over thirty (30) days past due since July 22, 2018.

**ANSWER:** Krone denies the allegations contained in Paragraph 13.

14) Demand has been made on Krone to pay: (a) the 15% default interest (less the 4.5% interest payments made by others) due on the Promissory Note from July 22, 2018 to February 28, 2019, the date on which IAM purchased the Bradley Loan/the Promissory Note and all related Collateral; (b) the per diem default interest due on the Promissory Note from March 1, 2019 to the date Krone makes payment of the interest amount due; (c) IAM's attorneys' fees incurred in connection with collection efforts on the Promissory Note as provided for by Krone's Guaranty; and (d) Krone has been requested to provide certain financial documents as provided for in his Guaranty.

**ANSWER:** Krone denies that a good faith demand was made upon him on the grounds that (a) is attempting to selectively enforce as to Krone only and not the other guarantors; (b) the other

4

guarantors are represented by Arif, who holds himself out as the attorney and/or "proxy" for Krone's co-managers (c) IAM has not made a demand of the other guarantors of the Promissory Note and (d), as set forth more fully in his affirmative defenses and Krone's Third Party Complaint in the State Court Lawsuit, where this entire process is a scheme set in motion by Arif and the co-guarantors to defraud Krone, remove him as a manager and disenfranchise him of his property rights.

15) Krone has both failed to make the requested payments required to be made pursuant to his Commercial Guaranty and failed to provide the requested financial documents, and is in breach of his Commercial Guaranty.

**ANSWER:** Krone admits he has not made payments or provided said documents on the grounds that the demand was not made in good faith and he is currently seeking a declaration from the Circuit Court of Cook County that the Commercial Guarantee is unenforceable.

16) Krone's Guaranty contains the following provision in the Confession of Judgment clause, in part:

Guarantor hereby irrevocably authorizes and empowers any attorney-at-law to appear in any court of record to confess judgment against Guarantor for the unpaid amount of this Guaranty as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorney's fees plus costs or suit, and to release all errors, and waive all rights of appeal. (Exhibit A, p. 2)

**ANSWER:** Krone admits that the terms of the Commercial Guaranty are set forth in the document that is attached to the Complaint as Exhibit A. Krone denies the guarantee is enforceable and is currently seeking a declaration from the Circuit Court of Cook County that the Commercial Guarantee is unenforceable

17) Attached hereto as Exhibit E is the Affidavit of Abdul Arif, the President of the "Lender," IAM, setting forth the amount then due and attorneys' fees and costs.

**ANSWER:** Krone admits that Exhibit E to the Complaint purports to be Arif's affidavit, but denies that IAM is entitled to any relief whatsoever.

18) Attached hereto as Exhibit F, is the Cognovit of Defendant, Scott J. Krone executed by attorney at law, Timothy J. Somen of the Somen Law Firm, LLC for the unpaid amount of this Guaranty as evidenced by the Affidavit of Abdul Arif, IAM's President.

**ANSWER:**     Krone admits that Exhibit F to the Complaint purports to be a Cognovit signed by an attorney, but denies that he authorized Mr. Somen to execute the document on his behalf and denies that IAM is entitled to any relief whatsoever.

19) Pursuant to the terms of the Promissory Note and the Krone Guaranty, Scott J. Krone has agreed that he is liable for any expenses, including attorneys' fees and costs, incurred by IAM in enforcing its rights. As a result of Krone's default and breach of his Guaranty, IAM has been required to retain counsel to enforce its rights, which amounts should be added to the amounts due and owing under Krone's Guaranty

**ANSWER:**     Krone denies the allegations in Paragraph 19.

20) As of March 20, 2019, the total amount due from Krone under his Guaranty is:

| | | |
|---|---|---|
| a) | Principal Due | $5,600,000.00 |
| b) | Default Interest Due from 7/22/18 to 2/28/19 (221 days x 1,633.33 which is the per diem Default bump of 10.5%) | $ 360,965.93 |
| c) | Default Interest Due from 3/1/19 to 3/20/19= 20 days x $2,333.33 = | $ 46,666.66 |
| d) | Attorneys' Fees | $ 20,614.00 |
| **e)** | **Balance Due:** | **$6,028,246.59** |

**ANSWER:**     Krone denies the allegations contained in Paragraph 20.

21) IAM has performed each of the obligations required of it pursuant to the terms of the Promissory Note and Krone's Guaranty, Krone is in default on the Promissory Note and in breach of Krone's Guaranty to the detriment of IAM.

**ANSWER:**     Krone denies the allegations contained in Paragraph 21.

22) Attached as Exhibit G is the Judgment Order that Plaintiff is proposing for this case.

**ANSWER:**     Krone admits that a proposed Judgment Order is attached as Exhibit G, but denies that Plaintiff is entitled to judgment or any relief whatsoever.

WHEREFORE Defendant SCOTT J. KRONE respectfully requests that the Court enter judgment in his favor and against Plaintiff ILLINOIS ASSET MANAGEMENT, LLC, and grant any further and additional relief the Court deems just and appropriate

## AFFIRMATIVE DEFENSES

### General Allegations Relevant to all Affirmative Defenses

1.      Krone is an individual who resides within the Northern District of Illinois. He is a manager-member of Platform Bradley, LLC ("BRADLEY"), an Illinois limited liability company.

2.      Plaintiff/Counter-Defendant ILLINOIS ASSET MANAGEMENT, LLC ("IAM") is a Wyoming limited liability company.

3.      Jurisdiction in this District is proper because the IAM possesses a mortgage on BRADLEY's property, such Property in this District.

4.      IAM has submitted to personal jurisdiction for this matter by filing Case No. 1:19-cv-1912 and asserting claims against KRONE. This Court further has personal jurisdiction over IAM as that company conducts business in the State which is continuous or systematic.

5.      FREEDOM BUILDINGS, LLC ("FREEDOM") is a Nevada limited liability company with a principal place of business at 6505 E. Central Avenue, Suite #183, Wichita, Kansas, 67206. FREEDOM is also a Member and Manager of BRADLEY.

6.      MUTHUKUMAR VELLAICHAMY ("KUMAR") is the controlling member of FREEDOM.

7.      SHAH SUBHASH FAMILY, L.P. ("SHAH"), is an Alaskan limited partnership, with a principal place of business at 2803 N. Penstemon Street, Wichita, Kansas 67226. SHAH is a Member and Manager of BRADLEY.

8.      SUBHASH H. SHAH, M.D. ("SUBHASH") is an individual and a limited partner of SHAH.

9.      ABDUL ARIF ("ARIF") is an individual residing in Kansas. Upon information and belief, FREEDOM and SHAH have appointed him their proxy for all matters related to BRADLEY. ARIF has physically and personally appeared in Illinois, on numerous occasions in the last three years, for the purpose of acting on FREEDOM and SHAH's behalf in matters related to BRADLEY.

10.     On June 29, 2015, FREEDOM and SHAH executed an agreement with KRONE wherein FREEDOM and SHAH increased their interest in BRADLEY, and SHAH became a manager in BRADLEY.  FREEDOM was a Manager for BRADLEY.

11.     On or about June 22, 2016, International Bank of Chicago ("IBC"), IAM's predecessor in interest, made a Commercial loan to BRADLEY the original principal amount of $5,600,000.00 ("Bradley Loan").

12.     Concurrent with the Bradley Loan, KRONE, KUMAR, and SUBHASH executed personal guaranties of the Bradley Loan.

13.     In or around July 2016, Defendants FREEDOM and SHAH named ARIF as their proxy to discuss business matters related to BRADLEY. FREEDOM did not execute its proxy form until January 23, 2017, and SHAH did not execute its proxy form until September 2017.

14.     From the moment ARIF became involved in BRADLEY, he inserted himself as a barrier between KUMAR and SHAH on the one hand and KRONE on the other, made unreasonable demands that the companies follow his direction and interfered with the management of the companies.

15.     Arif went beyond the scope of "proxy" and began dictating terms, making demands of Krone and in effect trying to bully Krone.  For example:

  a.  On January 8, 2017, Arif wrote to Krone, "As much as you hate to hear from me, you will need to get used to it. Bottom line is I speak for Drs Kumar and Shah. Galkin speaks for the LLC and none else; you speak for yourself… I would suggest you read the operating agreement as to rights and priviliges [sic] of members and managers in these matters… I really dont [sic] give a damn about what you do or dont [sic] understand about the levels of understanding of how I say it."

  b.  On October 3, 2017, Arif wrote in an email to Krone, "Please DO NOT communicate with Drs Kumar or Shah. Period."

  c.  In a second email on October 3, 2017, Arif wrote to Krone and others, "I have [Kumar and Subhash's] authority and trust in my judgment to act on their behalf, to do whatever is necessary to enhance their investment. That authority is broad and limited only by them. And them alone."

  d.  And in a third email to Krone on October 3, 2017, Arif told Krone that Arif's only purpose is to make money for Kumar and Shah and that Krone should "[f]igure out a way to help me or ***get out of the way***." (emphasis added).

  e.  Later in October 2017, Arif attended a Board meeting and threatened Krone, exclaiming that if Krone did not give Freedom and Shah complete control of Waukegan and Bradley, he would cause problems. Noel Cain, another Manager of Bradley, said to Arif that Arif's demands seemed like blackmail.  Arif replied "Damn straight!"

  f.  On November 7, 2017, Arif wrote in an email to Kumar and Krone, and others, "Dont [sic] waste time on Scott. He is useless and more important, worse in being complicit in concealment and enabler of Noel in diverting funds directly from source to Noel… Its like a thief or thieves, that steal and put back the money before anyone notices. And not all of it, mind you!!, I am sure there is more thievery to be discovered. Soon.

16.     Consistent with Arif's demand for Krone to "get out of the way," Kumar and Subhash had already been taking steps to defame Krone and freeze him out.  For example, on September 23, 2017, Kumar hosted an investor call, without advising or including Krone, in which he falsely told investors in both companies that Krone had been wasting corporate assets and opportunities, and that he was preventing the return of equity to members.

17.     In addition, Arif, Kumar and Subhash were undermining Krone's attempts to manage Waukegan and Bradley.  For example, in October 2017, Krone notified them of on opportunity to sell a condo unit owned by Waukegan for $200,000.  Kumar and Subhash refused to respond or approve of the sale, and the opportunity was lost.[1]  In November 2017, no one from Freedom or Shah attended Bradley's annual board meeting, voted on the annual budget or even acknowledged the budget.

18.     On December 2017, Freedom and Shah (through Kumar, Subhash and Arif) refused to consider, respond to, or approve of an extremely beneficial refinancing package Krone had secured for Waukegan, without personal guarantees.  As a result, that opportunity was lost too.

19.     The refinancing would have immediately returned equity to the other members and saved Waukegan over $8,000 per year.  It also would have prevented Waukegan's lender at the time, Alliant Bank, from pursuing a foreclosure action instigated by one of Waukegan's minority members (and one of Kumar, Subhash, Arif and IAM's co-conspirators) Tresi, LLC.  Tresi is a minority's member of Waukegan and Bradley, and is owned by James Licata.

20.     In 2013, Tresi obtained a $100,000 mortgage in its favor from Waukegan; Licata had requested that half of Tresi's $200,000 investment in Waukegan be in the form of a mortgage. In 2017, Tresi's owner recorded the mortgage, triggering a default under Waukegan's mortgage with Alliant Bank.  Throughout December 2017, Freedom and Shah (through Kumar, Subhash and Arif) refused to communicate with Krone about Tresi's recording of the mortgage.

21.     Instead, it appears Kumar and/or Subhash forwarded to Licata confidential emails they and Krone had received from Waukegan's attorney.  These emails discussed legal strategy related to the Tresi's note.  For example, on December 21, 2017, Tresi's owner, James Licata,

---

[1] The operating agreement requires the unanimous consent of all managers for this type of decision.

10

wrote Krone an email with exact passages quoted from a confidential email Krone and his co-managers had received from Waukegan's corporate attorney. Licata could only have gotten this information from Freedom/Kumar, Shah/Subhash or Krone, and it was not Krone.

22.     Armed with information regarding Waukegan's legal strategy, Licata refused to remove Tresi's mortgage from the Waukegan property, causing Alliant to file a foreclosure action in February 2018. Within months, Licata, along with a former manager in Waukegan, Steven Siegel, formed Joint Equity Partners, LLC ("JEP") and bought the mortgage and note from Alliant Bank and are now attempting to obtain the property from Waukegan through foreclosure.

23.     Since that time, Freedom/Kumar and Shah/Subhash have thwarted Krone's attempts to refinance the property, which would extinguish the debt held by JEP and take the property out of foreclosure. That foreclosure action is still pending and has been consolidated with Krone's lawsuit in the State Court Lawsuit.

24.     Meanwhile, since 2017, Bradley, which owns a retail storage facility, has been operating at a deficit. Despite the need for some form of restructuring, Freedom/Kumar, Shah/Subhash and Arif have refused to discuss or approve of any refinance resolution that would bring relief to Bradley's condition so it could operate with a positive cash flow.

25.     On May 15, 2018 (around the same time JEP purchased the Waukegan mortgage from Alliant), Kumar advised Noel Cain he was engaged in discussions with an "outside investor" who wanted to know more about the financial liabilities of Bradley. Cain, sensing the obvious, responded: "is this at all related to the note purchase that [Licata] just completed on the 600 Waukegan property? If the strategy is to purchase the note from our lender I can't assist you with this in any fashion." Kumar never responded and has since refused to confirm or deny whether Licata was the outside investor.

11

26.     In January 2019, Krone announced he had found a bank interested in refinancing the Alliant/JEP loan for Waukegan and sought to obtain a term sheet. He also sought to have Freedom and Shah sign a resolution approving of the loan. Freedom and Shah have never responded to the resolution or indicated whether they will consent, holding up the possibility of refinancing.

27.     On or about February 28, 2019, Plaintiff/Counter-Defendant, IAM, with the backing of KUMAR, SUBHASH, FREEDOM, and SHAH, purchased from IBC the $5,600,000.00 Bradley Loan, the Promissory Note securing that Loan, and all related Collateral, including, but not limited to, the Commercial Guaranties of KRONE, KUMAR, and SUBHASH.

28.     On March 7, 2019, IAM sent a demand letter to KRONE. In that letter, IAM threatened to file a lawsuit to enforce KRONE's personal guaranty on BRADLEY's defaulted Note and obtain a confession of judgment against KRONE if KRONE did not, in just five days' time, pay IAM more than $360,000.00, plus attorneys' fees and turn over KRONE's past five years of tax returns and other financial documents.

29.     IAM made no demand on KUMAR and SUBHASH for any amount, let alone the more $360,000.00, plus attorneys' fees, it demanded from Krone. IAM also did not demand that KUMAR and SHAH turn over their respective past five years of tax returns and other financial documents.

30.     FREEDOM and SHAH's funding of a shell corporation, IAM, to purchase the debt of BRADLEY, and their use ARIF as the purported "sole owner" of IAM to selectively enforce only KRONE's personal guaranty, was done for the purpose for weaponizing KRONE's personal guarantee of the BRADLEY Note against him, forcing him out as manager of both BRADLEY and WAUKEGAN and disassociating his membership interests in both companies under the threat

12

of financial ruin. Such actions are breaches of the fiduciary duties FREEDOM and SUBHASH owe to KRONE as co-Managers of BRADLEY.

31.     There currently is pending, in the Circuit Court of Cook County, Illinois, Case No. 18 CH 6885 (the "State Lawsuit"). KRONE in the Plaintiff in the State Lawsuit.

32.     On March 18, 2019, KRONE filed a Motion for Leave to Amend his operative complaint, to add IAM as a party to the State Lawsuit, and to assert the forgoing allegations against IAM, ARIF, KUMAR, SUBHASH, FREEDOM, and SHAH (amongst other allegations).

33.     On March 20, 2019, IAM, with full knowledge of the State Lawsuit and KRONE's proposed Third Amended Complaint, filed this action in this Court to obtain a confession of judgment.

34.     On March 21, 2019, KUMAR sent an email to all members and managers of BRADLEY, except for KRONE (the "March 2019 Email").

35.     In the March 2019 Email, KUMAR made additional false and defamatory statements about KRONE, and confirmed the roles he, SUBHASH, and ARIF undertook in the BRADLEY scheme, including the formation of IAM and IAM's purchase of the BRADLEY Note from International Bank.

36.     KUMAR's false and defamatory statements about KRONE in the March 2019 Email included:

   a. "Despite numerous inquiries, Krone as the tax matters partner has refused to send any K1 or give property report for 2018";
   b. "Krone changed the bank accounts sometime last year 2018 and effectively stopped paying excess revenues from Cubesmart to pay the bank note."
   c. We have broken pipes, no heat and assorted issues there, despite that, our rent roll is steady at $44k a month, unfortunately, only until now, all of the excess revenue was like being siphoned off by Krone. (I dont have proof, but he never gave any accounting)"; and
   d. "I and Dr Shah have borne the brunt of Krone's misdeeds all by ourselves."

37.     KUMAR knew the foregoing statements were false. As another manager immediately notified KUMAR after KUMAR sent the March 2019 Email, KRONE did not refuse to send K1 statements, change bank accounts, or stop paying revenues. Nor did KRONE siphon off revenue.

38.     With regard to IAM and its purchase of the Bradley Note held by International Bank, KUMAR wrote in the March 2019 Email:

  a.  "In February, Mr Arif's company Illinois Asset Management LLC bought out the bank note for 5.6M and now is our banker. He is pursuing personal guarantees against Mr Krone and the company at the defaulted rate of 15% on the 5.6M note";
  b.  "[ARIF] is patiently waiting till we come to terms about repairing the property and selling it to pay off everyone and their investment. Obviously, his patience is not finite and will run out eventually and he will foreclose and force sell the property at some point";
  c.  "We need about 150K in less than 30 days or so and another 60K in 60 days or so";
  d.  "Please understand, your contribution will be treated as a loan to the company. we (*sic*) will pay the vendor directly and avoid touching any company bank account controlled by Krone:" and
  e.  "Conversely, if you dont want to contribute any money or cannot, this will effectively work to shrink your investment and in the end, (within a next 12-24 months) result in substantial reduction of your investment."

39.     By the text of the March 2019 Email, not only did KUMAR confirm that he and SUBHASH worked with their attorney and/or "proxy" ARIF to acquire the BRADLEY Note, but KUMAR also attempted to extort the other BRADLEY members into giving BRADLEY a "loan" or risk losing all of their respective investments.

40.     At all times relevant hereto, ARIF and IAM either acted at the direction of FREEDOM and SHAH, and their human alter egos KUMAR and SUBHASH, or conspired with them in order for unlawfully injure KRONE. ARIF and IAM were aware of their role in FREEDOM and SHAH's breaches of their fiduciary duties owed to KRONE. In fact, ARIF and IAM embraced their role.

14

41.     Following through on his threats to KRONE, first made in October 2017, ARIF, at the instruction and/or with the backing of KUMAR and SUBHASH, formed IAM, purchased the BRADLEY Note held by IBC, and then send a letter to KRONE, via counsel, threatening legal action to enforce KRONE's personal guarantee of the Bradley Note.

42.     As the "proxy" and attorney appointed by FREEDOM and SHAH to conduct their business related to WAUKEGAN and BRADLEY, ARIF's conduct was required to conform to the same fiduciary duties owed to KRONE by FREEDOM and SHAH.

43.     The Illinois Limited Liability Company Act establishes the general duties of a manager in a manager-managed LLC as substantively identical to that of the members in a member-managed LLC.  Thus, a manager of a limited liability company owes fiduciary duties of loyalty and care both to the limited liability company and to its other managers, including an obligation to discharge these duties to the other managers "consistent with the obligation of good faith and fair dealing.

44.     Similarly, a manager owes a manager-managed company and its other managers fiduciary duties of loyalty and care.  A fiduciary has the duty to "act with the utmost good faith and loyalty in managing the corporation and is prohibited from enhancing his or her own personal interests at the expense of corporate interests.

45.     As an attorney, ARIF purports to be knowledgeable as the operations of a limited liability company, including the fiduciary obligations of a company's managers.  Moreover, as the sole owner and President of IAM, ARIF is likewise aware of these fiduciary obligations.

46.     KUMAR and SUBHASH are likewise aware of the fiduciary obligations a manager owes to a limited liability company. Each manages his own entity. KUMAR managers FREEDOM and SUBHASH manages SHAH.

15

47.     Although ARIF has held himself out as the "proxy" and/or attorney for KUMAR and SHAH, and purports to take actions in their shoes as managers of BRADLEY, he has already indicated his only purpose is to benefit his "clients," not to help the company, regardless of who gets in the way. Indeed, ARIF made this point clear, having once told KRONE that his only purpose is to make as much money as possible for his clients.  ARIF also told KRONE, "Figure out a way to help me or get out of the way."

48.     Consistent with ARIF's own words, ARIF, IAM, KUMAR and SUBESH knowingly and substantially assisted FREEDOM and SHAH in breaching their fiduciary duties, in an effort to force KRONE out and take over the company.  They did so in the following ways:

    a.  They used IAM, a company purportedly owned solely by ARIF, for the purpose of purchasing the BRADLEY mortgage and promissory notes from IBC, in order to use only KRONE's personal guarantee as weapon against KRONE, and they did so without disclosing these actions to BRADLEY or KRONE;

    b.  KUMAR, SUBHASH, FREEDOM and/or SHAH, directly or indirectly provided the funds, or facilitated the financing for funds, which IAM used to purchase BRADLEY's mortgage from IBC, and they did so without disclosing these actions to BRADLEY or KRONE;

    c.  IAM, purportedly controlled by ARIF, used these funds to purchase BRADLEY's mortgage from IBC and is now using KRONE's personal guarantee as weapon against KRONE to force him out of the company;

    d.  IAM, purportedly controlled by ARIF, demanded that KRONE alone pay more than $360,000 to cover purported deficiencies in the IBC mortgage, plus attorneys' fees and interest, within a five-day deadline or risk having the personal guarantee enforced through a confession of judgment;

    e.  IAM, as an alter ego for ARIF, whose only goal is to make money for KUMAR, SUBHASH, FREEDOM and SHAH, are attempting to force KRONE out so they can take over the property through foreclosure, without any significant opposition, to the detriment of KRONE and the other members of BRADLEY.

49. In addition, FREEDOM, acting through KUMAR, using IAM's and ARIF's new status as the so-called "bank," attempted to extort the other members of BRADLEY into making "loans" to BRADLEY or risk losing their respective investments.

50. Part of FREEDOM, SHAH, KUMAR, SUBHASH, ARIF, and IAM's motivation for attempting to force KRONE out and case a default is greed. By triggering defaults on the mortgages, purchasing the companies' respective mortgages and notes and then foreclosing on the properties, they are able to obtain the properties at a much lower cost basis in order to enrich themselves at the expense of KRONE and BRADLEY's other members.

51. IAM and its co-conspirators stand to enrich themselves on the BRADLEY Property at the expense of KRONE, the company and its members. That note had an original principal amount of $5,600,000. Members of BRADLEY made initial equity contributions of $1,753,343, for a total cost to BRADLEY of $7,353,343.

52. IAM paid the full, original principal value of the Note to obtain it, and FREEDOM and SHAH's share of equity investors' equity contribution for the BRADLEY Property was only $365,240. That means the cost to IAM, FREEDOM and SHAH is $5,965,240.

53. Additionally, in the time since BRADLEY originally purchased the Property, the company has made improvements to the property and its value has otherwise increased, estimated at $7,650,000.

54. If IAM, FREEDOM, SHAH, KUMAR, ARIF and SUBHASH are successfully able to force KRONE out as a manger of BRADLEY, which they have repeatedly tried to do and are still trying to do, there would be no management voice resisting efforts to foreclose on the properties.

17

55.     By taking the properties into foreclosure, which IAM is now poised to do with BRADLEY, IAM, FREEDOM, SHAH, KUMAR, ARIF and SUBHASH stand ready to take ownership of the properties away from BRADLEY, depriving BRADLEY (and its several other members) of its most significant asset.  In other words, the scheme is a way to obtain the BRADLEY property at a discount.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
### The Commercial Guarantee Is Unenforceable Because
### It Is Being Unlawfully Used To Aid And Abet The Breach Of Fiduciary Duties

56.     For Paragraph 56 of its Affirmative Defenses, Krone adopts and restates Paragraphs 1 through 55 as though fully set forth herein.

57.     As Managers of BRADLEY, FREEDOM and SHAH owe fiduciary duties of care, loyalty and good faith to BRADLEY's Members and Managers, including KRONE.

58.     In addition to the duties established by common law, the Illinois Limited Liability Company Act sets forth specific duties owed by managers in manager-managed LLCs. *See* 805 ILCS 180/15-3(g).

59.     FREEDOM and SHAH have breached their common law fiduciary duties of care, loyalty, and good faith, as well as the statutory duties imposed on them by 805 ILCS 180/15-3(b) and (c).

60.     FREEDOM and SHAH breached the duties they owed as Managers by refusing to consider, or even acknowledge, refinancing offers for BRADLEY's Mortgage that would

eliminate BRADLEY's financial deficiencies, reduce BRADLEY's overall debt, and would result in returns of equity for BRADLEY's members, including KRONE.

61.     The defamatory statements about KRONE in the March 2019 Email, by FREEDOM through KUMAR, as detailed above, also were a breach of fiduciary duty owed from one manager to another.

62.     FREEDOM and SHAH's involvement in the funding, creation, and activities of IAM, including the purchase of BRADLEY's Note held by IBC, and their subsequent demand for additional capital from members without unanimous consent of all BRADLEY's managers, were additional breaches of fiduciary duties FREEDOM and SHAH owed to BRADLEY and KRONE.

63.     As FREEDOM and SHAH are corporate entities, all actions they took, each of their breaches of fiduciary duties, can be ascribed to their human alter egos, KUMAR and SHAH.

64.     Accordingly, KUMAR and SHAH knowingly and substantially participated in FREEDOM and SHAH's breach of fiduciary duties.

65.     At all times relevant hereto, ARIF and IAM either acted at the direction of FREEDOM and SHAH, and their human alter egos KUMAR and SUBHASH, or conspired with them in order for unlawfully injure KRONE. ARIF and IAM were aware of their role in FREEDOM and SHAH's breaches of their fiduciary duties owed to KRONE. In fact, ARIF and IAM embraced their role.

66.     ARIF told KRONE in an April 2017 email, "I am directed by Dr. KUMAR to pursue any avenue" to circumvent KRONE's managerial rights regarding a potential sale of the BRADLEY property.

67.     As ARIF wrote to KRONE on October 3, 2017, he was "authorized" by them "to do whatever is necessary to enhance their investment."

68.     As direct and proximate result of KUMAR, SUBHASH, ARIF and IAM's misconduct, KRONE has been injured and continues to be injured through their attempts to enforce KRONE's personal guarantee and force him out as a manager of both WAUKEGAN and BRADLEY.

**<u>Second Affirmative Defense</u>**
**The Commercial Guarantee Is Unenforceable Because It Is Being**
**Unlawfully Used To As Part Of A Conspiracy To Breach Of Fiduciary Duties**

69.     For Paragraph 69 of its Affirmative Defenses, Krone adopts and restates Paragraphs 1 through 68 as though fully set forth herein.

70.     FREEDOM and SHAH's various breaches of their fiduciary duties, described in detail above, were unlawful acts conducted in furtherance of a civil conspiracy for force KRONE out as a manager of BRADLEY and to force KRONE to give up his membership interest to FREEDOM and SHAH without compensation.

71.     FREEDOM and KUMAR's defamation of KRONE, was an overt, tortious acts in furtherance of the civil conspiracy.

72.     SHAH, SUBHASH, FREEDOM, KUMAR and IAM assisted each other in the unlawful acts and lawful acts done for unlawful purposes in furtherance of the conspiracy, including, but not limited to: ARIF's attempt to blackmail KRONE into resigning as manager at the October 2017 meeting; IAM's surreptitious plan to allow FREEDOM and SHAH to gain control of BRADLEY while enforcing KRONE's personal guaranty but not KUMAR's or SUBHASH's personal guaranty on the IBC Note.

73.     SHAH, SUBHASH, FREEDOM, KUMAR, ARIF, and IAM did the things herein alleged maliciously and to oppress KRONE and BRADLEY, causing each of them irreparable damage and damages.

74.     IAM's scheme, with SHAH, SUBHASH, FREEDOM, KUMAR and ARIF, is to obtain the properties at a reduced cost and enrich themselves.

75.     KRONE and BRADLEY were damaged as a direct and proximate cause of Defendants' civil conspiracy.

**Third Affirmative Defense**
**Declaratory and Injunctive Relief**

76.     For Paragraph 76 of its Affirmative Defenses, Krone adopts and restates Paragraphs 1 through 75 as though fully set forth herein.

77.     As the sometimes-proxy, sometimes-attorney for FREEDOM, SHAH, KUMAR, and SUBHASH, ARIF has tried for several years to force KRONE out as a manger from BRADLEY, interfered with the business of each company, falsely accused KRONE of mismanagement and theft and threatened to financially ruin KRONE, as detailed in the incorporated Paragraphs.

78.     FREEDOM, KUMAR, SHAH, SUBHASH, and ARIF are using IAM for the purpose of forcing KRONE out of BRADLEY through the purchase of BRADLEY's debt from IBC.

79.     IAM purchased BRADLEY's debt for the full price of the loan, $5.6 million, with full knowledge of any alleged existing defaults.

80.     FREEDOM, KUMAR, SHAH, SUBHASH, ARIF, and IAM are trying to use KRONE's personal guaranty as a weapon against him, as part of the civil conspiracy alleged in above.

81.     By weaponizing the personal guarantee against KRONE and only KRONE, to the exclusion of the other personal guarantors, KUMAR and SUBHASH, FREEDOM and SHAH, ARIF and IAM are attempting to inflict as much harm as possible against KRONE in order to force him out of the companies.

82.     The selective enforcement of the personal guarantors by ARIF and IAM further demonstrates this malicious motive.  ARIF, as the sole owner of IAM and as the current or former "proxy" and attorney for KUMAR, SHAH, FREEDOM and SUBHASH, purchased the IBC note and now seeks only to enforce the note as to KRONE.

83.     ARIF's contentious communications with KRONE between 2016 and 2018, in which he repeatedly accused KRONE of mismanagement and misappropriation, tried to generate support among investors for KRONE's removal and openly advocated for KRONE's removal, only serve to confirm that ARIF, through IAM, purchased the IBC loan in order to threaten KRONE with the prospect of a judgment so significant KRONE would have no choice but to withdraw from each company.

84.     ARIF did all this as a conspirator with FREEDOM and SHAH or as their "proxy" or attorney. In other words, ARIF, through IAM, either conspired with FREEDOM and SHAH or aided and abetted FREEDOM and SHAH in a committing a massive breach of their fiduciary duties to KRONE as a co-manager and the members of each company.

85.     Consistent with the attempt to unlawfully force KRONE through the selective enforcement of KRONE's personal guarantee of the IBC note, KUMAR then sent an email to the members of BRADLEY, without including KRONE as a recipient, purporting to update the members as to the status of the business.  In the email, KUMAR tried to mislead the members and

generate support for his position by defaming KRONE and accusing him of criminal misconduct and mismanagement, while admitting that he was working closely with ARIF.

86.     KUMAR also made it clear to the other members that if they did not "loan" the business money within 60 days, they would lose their investments, without advising the other members that he had in fact either provided the funds for IAM to purchase the debt or provided the financing for the purchase.  In other words, KUMAR fraudulently concealed this material fact – his involvement in the purchase - in an attempt to force the members into making a "loan" or risk losing their investments.

87.     Because AIRF and IAM are using KRONE's personal guarantee of the IBC loan unlawfully to facilitate the breach of FREEDOM and SHAH's fiduciary duties, the personal guarantee should be declared unenforceable.

88.     Pursuant to 735 ILCS 5/2-701, this Court has jurisdiction in cases of actual controversy to make binding declarations of rights.

89.     An actual controversy exists between KRONE and IAM, as KRONE has alleged IAM is involved in a civil conspiracy to force KRONE's resignation as a Manager of BRADLEY and to relinquish his membership interest in BRADLEY, under the threat of IAM enforcing KRONE's personal guaranty, while IAM refuses to enforce the guaranties of KUMAR and SHAH to cover the same alleged deficiency on the Note held by IAM, and seek to confess judgment against KRONE.

90.     A declaration of KRONE's right to not be coerced and that IAM has no right to use the personal guaranty in furtherance of the alleged civil conspiracy will terminate a portion of the controversy between the parties to this litigation.

91.     KRONE has protectable rights as a manager and investor in BRADLEY that are at serious risk if IAM is allowed to selectively and arbitrarily enforce KRONE's personal guarantee of the BRADLEY debt.

92.     Aside from that ascertainable monetary injury, KRONE will suffer irreparable injuries, for which there are no adequate remedies at law, including property rights as a manager and member of BRADLEY, damage to his credit rating, and inability to personally guaranty refinance loans for BRADLEY (a requirement from all lender given this on-going litigation and the financial histories of the companies).

93.     Krone also has established a likelihood of success on the merits of his claims, because the record thus far clearly raises a "fair question" that (1) FREEDOM and SHAH have breached their fiduciary duties as co-managers of BRADLEY and WAUKEGAN by using ARIF and IAM as the straw man to purchase the BRADLEY mortgage and arbitrarily enforce Krone's personal guarantee and (2) ARIF, and IAM through ARIF, has conspired with KUMAR and SUBHASH to do the same.

### Fourth Affirmative Defense
### Contribution as to Kumar and Subhash

94.     For Paragraph 94 of its Affirmative Defenses, Krone adopts and restates Paragraphs 1 through 93 as though fully set forth herein.

95.     Kumar and Subhash each signed a commercial guarantee identical to Krone's for the same debt.

96.     Because IAM and Arif have either conspired with Kumar and Subhash, aided and abetted them or acted at their direction, any release of the commercial guarantees granted by IAM and Arif are the functional equivalent of Kumar and Subhash releasing themselves.

97.     In Illinois, the general rule is that the "release of a co-guarantor releases the remaining guarantors of liability on the guaranty to the extent of the proportionate value of their respective lost rights of contribution against the released guarantor, absent a contrary agreement between the guarantor and the guarantee." *F.D.I.C. v. O'Malley*, 249 Ill. App. 3d 340, 358 (1st Dist. 1994).

98.     Accordingly, IAM can only enforce the guarantee as to Krone in an amount proportional his lost rights lost rights of contribution against the released guarantors.

**Fifth Affirmative Defense**
**The Confession Of Judgment Is Unenforceable As A Matter Of Law**
**Because The Judgment Amount Is Not Readily Ascertainable From The**
**Face Of The Note Or Commercial Guarantee**

99.     For Paragraph 99 of its Affirmative Defenses, Krone adopts and restates Paragraphs 1 through 98 as though fully set forth herein.

100.    The judgment cannot be confessed because the judgment amount is not readily ascertainable from the Promissory Note or Commercial Guarantee.

101.    The Guarantee contains no amount whatsoever.

102.    The promissory note only reflects the original loan amount without reference to any setoffs for amounts paid to date

103.    Plaintiff's Complaint in fact goes outside the note and guarantee to establish its alleged damages by reference to the Non-Recourse Loan Sale and attorneys' fees.

104.    Accordingly, Plaintiff cannot confess judgment for Krone.

WHEREFORE Defendant SCOTT J. KRONE respectfully requests that the Court enter judgment in his favor and against Plaintiff ILLINOIS ASSET MANAGEMENT, LLC, and grant any further and additional relief the Court deems just and appropriate.

DATED: April 12, 2019

Respectfully submitted,

SCOTT J. KRONE

*/s/ Patrick R. Moran*
One of His Attorneys

John J. Rock, ARDC #6237980
Patrick R. Moran, ARDC #6272747
Rock Fusco & Connelly, LLC
321 N. Clark Street, Suite 2200
Chicago, IL 60654
(312) 494-1000 (p)
(312) 494-1001 (f)
jrock@rfclaw.com
pmoran@rfclaw.com
*Attorneys for Defendant*

## Verification

Under penalties of perjury as set forth in 28 U.S.C.1746, I depose and state under oath that I have read the foregoing Verified Answer and Affirmative Defense to Plaintiff's Complaint for Confession of Judgment, and declare that the matters made therein are true and correct to the best of my personal knowledge.

_____    4/12/19
Scott J. Krone                              Date

28